# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        v.<br><br>ANTHEM, INC.,<br><br>                    Defendant. | Case No.  1:20-cv-02593-ALC<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ANTHEM, INC.'S (1) MOTION TO TRANSFER VENUE, (2) MOTION TO DISMISS, AND (3) MOTION TO STRIKE**<br><br>**Oral Argument Requested** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 9

I. The Medicare Advantage Program's Risk-Adjusted Payments............................ 9

II. CMS Calculates Payments to MAOs Based in Part on Diagnosis Code Data from Traditional Medicare That CMS Knows Is Not Supported by the Medical Records ...... 12

III. CMS Requires MAOs to Take Reasonable Steps to Ensure the Accuracy of Risk Adjustment Data But Has Never Required MAOs to Audit or Guarantee the Accuracy of Every Diagnosis Code Submitted to CMS .................................................... 16

IV. Anthem Designed Its Retrospective Chart Review Program to Supplement the Diagnosis Code Data Reported to Anthem by Healthcare Providers ............................ 18

V. Plaintiff's Amended Complaint ...................................................................... 21

MOTION TO TRANSFER ................................................................................................. 23

I. This Case Is About Business Processes and Conduct that Predominantly Occurred in the Southern District of Ohio, and Most Material Witnesses Live in that District...... 23

    A. The Chart Review Program and Risk Adjustment Compliance Processes at Issue in this Case Were Conducted from Anthem's Columbus, Ohio Office ................................................................................................................. 23

    B. Current and Former CMS Officials Who Are Material Witnesses in this Case Do Not Live or Work in the Southern District of New York..................... 26

    C. The Amended Complaint Does Not Identify Any Material Witnesses Who Live in this District or Significant Business Processes That Occurred Here....... 26

II. This Case Should Be Transferred To the Southern District of Ohio, Which Would Be a More Convenient Venue and Serve the Interests of Justice .................................. 27

    A. Convenience of the Witnesses .............................................................. 29

    B. The Location of Relevant Documents and Access to Sources of Proof .............. 31

    C. The Locus of Operative Facts ............................................................... 31

    D. The Fifth, Sixth, and Seventh Factors Are Neutral............................... 32

    E. Plaintiff's Choice of Forum .................................................................. 33

    F. The Interest of Justice Based on the Totality of the Circumstances ................. 34

MOTION TO DISMISS ...................................................................................................... 36

I. Plaintiff Must Plead Materiality To Establish That Anthem Violated the FCA.............. 36

-i-

# TABLE OF CONTENTS
(continued)

Page

II.   Plaintiff's Attestation-Based Claims Must Be Dismissed Because Plaintiff Fails to Allege That CMS Would Have Denied Payment to Anthem if the Agency Had Known of Anthem's Chart Review Practices ................................................................. 40

    A.   The Amended Complaint Does Not Allege That CMS Would Have Refused to Make Risk Adjustment Payments to Anthem Had It Known How Anthem Was Conducting Its Chart Review Program ................................. 41

    B.   The Amended Complaint Alleges Only That CMS Had the Right to Deny Payment to Anthem and Might Have Done So, Which Is Legally Insufficient Under *Escobar* ................................................................................. 44

    C.   Plaintiff Does Not Allege Facts Plausibly Demonstrating that CMS Would Have Refused to Pay Anthem Had It Known How Anthem Was Conducting Its Chart Review Program ................................................................ 46

MOTION TO STRIKE ............................................................................................................. 49

I.   The Amended Complaint's Allegations Relating to Settlements by Non-Defendants Should Be Stricken Because Such Allegations Are Inadmissible and Immaterial for any Proper Purpose ...................................................................... 50

II.   The Settlement Allegations Should Also Be Stricken Because They Are Not Relevant and Are Highly Prejudicial ............................................................................ 52

    A.   The Amended Complaint's Allegations Regarding Settlements Are Not Relevant ....................................................................................................... 52

    B.   The Settlement Allegations Are Unfairly Prejudicial to Anthem and Will Waste the Resources of the Parties and the Court ............................................. 54

CONCLUSION ......................................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*800-Flowers, Inc. v. Intercontinental Florist, Inc.*,
  860 F. Supp. 128 (S.D.N.Y. 1994) ......................................................... 33

*Anderson v. Davis Polk & Wardwell LLP*,
  850 F. Supp. 2d 392 (S.D.N.Y. 2012) ..................................................... 49

*Bristol-Myers Squibb Co. v. Andrx Pharm. LLC*,
  2003 WL 22888804 (S.D.N.Y. Dec. 5, 2003) .......................................... 33

*Cirrex Sys. LLC v. InfraReDx, Inc.*,
  2010 WL 3431165 (S.D.N.Y. Aug. 31, 2010) ..................................... 30, 31

*Citigroup Inc. v. City Holding Co.*,
  97 F. Supp. 2d 549 (S.D.N.Y. 2000) ....................................................... 28

*Command Arms Accessories, LLC v. ME Tech. Inc.*,
  2019 WL 5682670 (S.D.N.Y. Oct. 31, 2019) ........................................... 29

*Correction Officers Benevolent Ass'n v. Kralik*,
  226 F.R.D. 175 (S.D.N.Y. 2005) ......................................... 49, 50, 51, 53

*Coyne v. Amgen, Inc.*,
  717 F. App'x 26 (2d Cir. 2017) ......................................................... 37, 44

*Dickerson v. Novartis Corp.*,
  315 F.R.D. 18 (S.D.N.Y. 2016) ............................................................... 31

*Eres N.V. v. Citgo Asphalt Refining Co.*,
  605 F. Supp. 2d 473 (S.D.N.Y. 2009) ..................................................... 28

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .......................................... 51

*Fuji Photo Film Co. v. Lexar Media, Inc.*,
  415 F. Supp. 2d 370 (S.D.N.Y. 2006) ..................................................... 31

*Garity v. Tetraphase Pharm. Inc.*,
  2019 WL 2314691 (S.D.N.Y. May 30, 2019) ...................................... 33, 34

*Gotlin v. Lederman*,
  367 F. Supp. 2d 349 (E.D.N.Y. 2005) ............................................... 51, 54

*Herbert Ltd. P'ship v. Elec. Arts Inc.*,
  325 F. Supp. 2d 282 (S.D.N.Y. 2004) ............................................... 29, 31

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*In re Glob. Cash Access Holdings, Inc. Sec. Litig.*,
2008 WL 4344531 (S.D.N.Y. Sept. 18, 2008) ........................................................ 30

*In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*,
218 F.R.D. 76 (S.D.N.Y.2003) ............................................................................... 51

*In re Trilegiant Corp., Inc.*,
11 F. Supp. 3d 82 (D. Conn. 2014) .................................................................. 50, 51

*InVivo Research, Inc. v. Magnetic Resonance Equip. Corp.*,
119 F. Supp. 2d 433 (S.D.N.Y. 2000) .................................................................... 33

*Izkhakov v. Educ. Comm'n for Foreign Med. Graduates*,
2012 WL 2861338 (S.D.N.Y. July 10, 2012) ....................................... 27, 28, 29, 33

*Kent v. AVCO Corp.*,
815 F. Supp. 67 (D. Conn. 1992) ........................................................................... 52

*Ledford v. Rapid-Am. Corp.*,
1988 WL 3428 (S.D.N.Y. Jan. 8, 1988) .......................................................... 52, 54

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ........................................................................... passim

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
306 F. Supp. 3d 629 (S.D.N.Y. 2018) .................................................................... 55

*Low v. Robb*,
2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) .................................................... 50, 51

*MC1 Healthcare, Inc. v. United Health Grp., Inc.*,
2019 WL 2015949 (D. Conn. May 7, 2019) ........................................................... 55

*OTG Brands, LLC v. Walgreen Co.*,
2015 WL 1499559 (S.D.N.Y. Mar. 31, 2015) ................................................. 50, 52

*Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*,
657 F. Supp. 136 (E.D.N.Y. 1987) ......................................................................... 55

*Rindfleisch v. Gentiva Health Sys., Inc.*,
752 F. Supp. 2d 246 (E.D.N.Y. 2010) .................................................................... 30

*Royal & Sunalliance v. Biritish Airways*,
167 F. Supp. 2d 573 (S.D.N.Y. 2001) .................................................................... 29

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*RSM Production Corp. v. Fridman,*
    643 F.Supp.2d 382 (S.D.N.Y. 2009) ...................................................... 51

*Shahzad v. Meyers,*
    1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) ........................................... 50, 51

*Silverman v. Wachovia Bank, N.A.,*
    2011 WL 13305358 (E.D.N.Y. May 4, 2011) ......................................... 51

*U.S. ex rel. McBride v. Halliburton Co.,*
    848 F.3d 1027 (D.C. Cir. 2017) ............................................................ 46

*United Healthcare Ins. Co. v. Azar II,*
    330 F. Supp. 3d 173 (D.D.C. 2018) ........................................... 12, 14, 16

*United States ex rel. Dresser v. Qualium Corp.,*
    2016 WL 3880763 (N.D. Cal. July 18, 2016) ........................................ 47

*United States ex rel. Gohil v. Sanofi U.S. Servs., Inc.,*
    2020 WL 1888966 (E.D. Pa. April 16, 2020) ........................................ 41

*United States ex rel. Jersey Strong Pediatrics, LLC v. Wanaque Convalescent Ctr.,*
    2017 WL 4122598 (D.N.J. Sept. 18, 2017) ........................................... 38

*United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc.,*
    305 F. Supp. 3d 964 (S.D. Ind. 2018) ................................................... 47

*United States ex rel. Maetski v. Raytheon Co.,*
    2017 WL 3326452 (C.D. Cal. Aug. 3, 2017) ......................................... 47

*United States ex rel. Mei Ling v. City of Los Angeles,*
    2018 WL 3814498 (C.D. Cal. July 25, 2018) ........................................ 45

*United States ex rel. Patel v. Catholic Health Initiatives,*
    792 F. App'x 296 (5th Cir. 2019) ......................................................... 38

*United States ex rel. Poehling v. United Health Care,*
    2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) .................................. passim

*United States ex rel. Potter v. CASA de Maryland,*
    2018 WL 1183659 (D. Md. Mar. 6, 2018) ............................................. 48

*United States ex rel. Scharff v. Camelot Counseling,*
    2016 WL 5416494 (S.D.N.Y. Sept. 28, 2016) ....................................... 37

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*United States ex. rel. Swoben v. Scan Health Plan*,
    2017 WL 4564722 (C.D. Cal. Oct. 5, 2017) .................................................................. passim

*United States v. CalPortland Construction*,
    2018 WL 6262877 (C.D. Cal. Mar. 9, 2018) ......................................................................... 47

*United States v. N. Adult Daily Health Care Ctr.*,
    205 F. Supp. 3d 276 (E.D.N.Y. 2016) .................................................................................. 38

*United States v. Nature's Farm Prods., Inc.*,
    2004 WL 1077968 (S.D.N.Y. May 13, 2004) ................................................................ passim

*United States v. Pfizer Inc.*,
    2019 WL 1200753 (N.D. Ill. Mar. 14, 2019) ....................................................................... 38

*Universal Health Services v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ............................................................................................... passim

*Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.*,
    774 F. Supp. 858 (S.D.N.Y. 1991) ...................................................................................... 28

*Warrick v. General Elec. Co.*,
    70 F.3d 736 (2d Cir. 1995) .................................................................................................. 29

**Statutes**

28 U.S.C. § 1331 ........................................................................................................................ 28

28 U.S.C. § 1391(b)(2) ............................................................................................................. 28

28 U.S.C. § 1404(a) ............................................................................................................ passim

31 U.S.C. § 3729 ......................................................................................................................... 1

31 U.S.C. § 3729(a)(1)(B) ......................................................................................................... 36

31 U.S.C. § 3729(a)(1)(G) .................................................................................................... 22, 40

31 U.S.C. § 3731 ........................................................................................................................ 28

31 U.S.C. § 3732(a) ................................................................................................................... 28

42 C.F.R. § 422.503(b)(4)(vi) ................................................................................................... 18

42 C.F.R. § 422.504(l) .......................................................................................................... 17, 19

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

42 U.S.C. § 1395w-23 ................................................................................................ 10

42 U.S.C. § 1395w-23(a)(1)(C)(i) ............................................................................ 12

**Other Authorities**

2 James Wm. Moore et al., Moore's Federal Practice (3d ed. 2010) ............................................ 49

2 James Wm. Moore et al., Moore's Federal Practice (2020) ...................................................... 55

26 R. Lord, Williston on Contracts (4th ed. 2003) ...................................................................... 37

CMS, Medicare Managed Care Manual (2014) ................................................................... 10, 19

CMS, Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations 2008
    Participant Guide .................................................................................................... 19

CMS, Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and
    Medicare Advantage and Part D Payment Policies and Final Call Letter (Apr. 4, 2016) ........ 11

CMS, Final Encounter Data Diagnosis Filtering Logic (Dec. 22, 2015) ..................................... 19

CMS, Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage
    Risk Adjustment Data Validation for Contract-Level Audits (Feb. 24, 2012) ........................ 15

Humana, Comment Letter on RADV Sampling and Error Calculation Methodology (Jan. 21,
    2011) ...................................................................................................................... 15

Humana, Inc., Comment Letter on Proposed Chart Review Rule (March 7, 2014) ..................... 21

United Healthcare, Comment Letter on Proposed Chart Review Rule (Mar. 7, 2014) ............... 21

**Rules**

Fed. R. Civ. P. 11 ........................................................................................................ 7

Fed. R. Civ. P. 12(f) .............................................................................................. 49, 52

Fed. R. Evid. 402 ....................................................................................................... 52

Fed. R. Evid. 403 ................................................................................................. 52, 55

**TABLE OF AUTHORITIES**

*(continued)*

Page(s)

**Regulations**

Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and The Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918 (Jan. 10, 2014) ..................................................................................................................... 20

Medicare Program; Medicare+Choice Program, 65 Fed. Reg. 40,170, 40,268 (June 29, 2000).. 17

Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844 (May 23, 2014) ................................................................................................................... 16, 21

Publication of the OIG's Compliance Program Guidance for Medicare+Choice Organizations Offering Coordinated Care Plans, 64 Fed. Reg. 61,893 (Nov. 15, 1999)................................. 18

## INTRODUCTION

Pursuant to the Court's August 8, 2020 order, Defendant Anthem, Inc. ("Anthem" or "the Company") submits this memorandum of law in support of three concurrently-filed motions: (1) a motion to transfer this action to the Southern District of Ohio, where the most relevant Anthem business operations were based, and where the witnesses who will be most material to this litigation are located; (2) a motion to dismiss Plaintiff's First and Second Claims for Relief (referred to herein as "Claims") in the Amended Complaint, and part of the Third Claim, for failure to allege materiality under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*; and (3) a motion to strike from the Amended Complaint irrelevant and prejudicial allegations regarding Plaintiff's prior settlements with non-parties.

This lawsuit relates to the Medicare Advantage ("MA") program, in which Medicare beneficiaries receive their health benefits through private insurance companies like Anthem—commonly referred to as Medicare Advantage Organizations ("MAOs")—rather than through traditional Medicare. Unlike traditional Medicare, where the Centers for Medicare and Medicaid Services ("CMS") reimburses healthcare providers based on the services they render to beneficiaries, CMS compensates MAOs prospectively based on the financial risk that the MAOs assume to provide Medicare benefits to their members. This risk is determined, in part, based on diagnosis codes that healthcare providers report from their encounters with the MAOs' members.

Plaintiff's Claims fundamentally concern a specific business process, Anthem's retrospective chart review program. As part of this program, Anthem (1) reviewed medical records from healthcare providers who rendered medical care to its MA members, (2) identified diagnosis codes for medical conditions that were documented in the medical records for those members, and then (3) submitted those diagnosis codes to CMS if the codes had not previously

been provided to the agency.  Chart review programs like the one at issue in this case are common in the MA industry.  CMS not only knows that Anthem and other MAOs submit additional diagnosis codes identified from these medical record reviews, but CMS program guidance explicitly authorizes the submission of diagnosis codes identified from chart reviews.

Plaintiff contends that when Anthem reviewed medical records to determine if any diagnosis codes that should be on file with CMS had not been previously submitted, Anthem was *also* required to review those medical records to verify the accuracy of diagnosis codes that healthcare providers had previously reported to Anthem—and by extension CMS—for those same member visits.  But no regulation has ever required Anthem to use its retrospective chart reviews to confirm that previously-submitted diagnosis codes were supported in the members' medical records.  In fact, CMS proposed a regulation to impose such a requirement in 2014 but withdrew it after receiving industry comments objecting to the proposal.  Plaintiff has thus sued Anthem here for not implementing a business practice that CMS itself expressly declined to require.

In the Amended Complaint, Plaintiff alleges that when Anthem submitted annual attestations to CMS that its risk adjustment data was "accurate, truthful and complete," those attestations were knowingly false claims for payment under the FCA because Anthem did not use its chart review program to identify potentially unsupported diagnosis codes.  The Amended Complaint relies on two separate theories of FCA liability—one based on allegedly false attestations and another based on individual diagnosis codes that were allegedly false.  Plaintiff's attestation-based FCA theory, appearing in Claims One and Two of the Amended Complaint, and part of Claim Three, is that Anthem's chart review program rendered its attestations false because the program did not include a review of medical records to identify unsupported

diagnosis codes that healthcare providers had previously submitted to Anthem and that the Company in turn submitted to CMS.  Amended Complaint ("AC") ¶¶5-7, 156.  Plaintiff's diagnosis code-based theory, which is stated in Claim Three, is that Anthem submitted specific diagnosis codes to CMS that the Company later learned (or should have learned) were unsupported by medical records, that Anthem did not correct those unsupported codes, and that each of those unsupported diagnosis codes resulted in the Company retaining an overpayment from CMS.  *Id.* ¶171; *see also id.* ¶¶42-43.

This memorandum of law is filed in support of three motions, one that addresses where this suit should be litigated and two addressing flaws in Plaintiff's pleading.  The allegations in Plaintiff's Amended Complaint are virtually identical to its allegations against a separate MAO for its chart review operations in *United States ex rel. Poehling v. United Health Care*, 16-cv-08697-FMO (C.D. Cal.), where the court held that the appropriate venue for FCA claims related to the MAO's chart review program was the district where that program was located.  Additionally, in *Poehling* and another case like it, the district courts concluded that Plaintiff's allegations regarding the MAO's attestations—virtually identical to those at issue here—failed to adequately allege materiality under the FCA, and dismissed Plaintiff's attestation-based claims.  *See United States ex rel. Swoben v. Scan Health Plan*, 2017 WL 4564722 (C.D. Cal. Oct. 5, 2017); *Poehling*, 2018 WL 1363487 (C.D. Cal. Feb. 12, 2018).  Anthem similarly moves to transfer this case to the judicial district where its chart review operations were located, and to dismiss the attestation-based Claims asserted in the Amended Complaint for the reasons stated in *Poehling* and *Swoben*.

**I.  Motion To Transfer:**  The Southern District of New York is not the appropriate forum for this case.  ***No*** material witnesses live in this judicial district and ***no*** business operations

relevant to this litigation have ever been based here.  Indeed, during its three-year investigation, Plaintiff did not depose a single witness who lives here.  New York is referenced in only four of the Amended Complaint's 178 paragraphs, and then only to allege that Anthem serves MA beneficiaries, maintains an office, and collects medical records from healthcare providers in this district; facts that make this judicial district indistinguishable from other districts across the country.  Those facts may establish the bare jurisdictional connection to this district, but fall far short of establishing that it is the most appropriate and convenient forum under 28 U.S.C. § 1404(a).

The most appropriate forum for this case is the Southern District of Ohio.  To resolve Plaintiff's Claims, the Court will need to understand Anthem's retrospective chart review program and related business processes.  This program originated out of Anthem's office in Columbus, Ohio, was designed by Anthem personnel in that office, and has continuously been operated out of that location for essentially the entire time period at issue.  The other business processes that Anthem designed to satisfy the regulatory obligations cited throughout the Amended Complaint—such as provider education, guidance on diagnosis coding standards, and audits of provider-submitted data—were likewise designed and directed predominantly by Anthem personnel in Columbus.  The centrality of the business processes based in Ohio is evident from the Amended Complaint; approximately 40 paragraphs in the Amended Complaint describe these and other business processes that were primarily directed by Anthem personnel based in Columbus, and the Amended Complaint repeatedly quotes documents written by Anthem employees who live and work there.

Under § 1404(a), those facts far outweigh the irrelevant connections the Amended Complaint draws to this district, which do not distinguish this judicial district from others across

the country.  Indeed, in *Poehling*, on nearly identical facts, ***Plaintiff*** convinced the court to transfer the action from New York to the venue where the defendant MAO's chart review program had been operated.  The same logic compels that this case be transferred to the Southern District of Ohio under 28 U.S.C. § 1404(a).

If the Court transfers this action to the Southern District of Ohio, it need not address Anthem's remaining motions.  At the same time, because Anthem moves to dismiss only some of Plaintiff's Claims, Anthem's motion to transfer will not be rendered moot if the Court grants Anthem's other motions.

**II.  Motion To Dismiss**:  Plaintiff has failed to allege that its FCA Claims based on Anthem's attestations were material, as required by the FCA.  Accordingly, the Court should—consistent with the only two courts to have addressed this exact issue—dismiss Claim One, Claim Two, and a portion of Claim Three.  Anthem does not move to dismiss the portion of Claim Three that alleges violations of the FCA based on the Company knowingly retaining overpayments tied to certain individual diagnosis codes submitted to CMS that Anthem allegedly learned were not supported by the members' medical records.

Under *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), Plaintiff must allege facts demonstrating that the manner in which Anthem operated its chart review program was "material to the Government's payment decision," *id.* at 1996, meaning that CMS "would not have paid [the] claim[] had it known of [the] violation[]," *id.* at 2004.  Thus, Plaintiff must allege facts showing that CMS would have refused to make risk adjustment payments to Anthem had it known that Anthem was not using its chart review program to identify potentially unsupported diagnosis codes that were previously submitted to the agency.

But Plaintiff fails to make the basic and necessary allegation that CMS would have refused to make payment, much less allege facts plausibly supporting that contention. That failure is particularly telling given that Plaintiff has twice brought nearly identical claims based on the retrospective chart review practices of another MAO, and in both cases, the courts dismissed Plaintiff's attestation-based claims for failing to adequately plead materiality under the FCA. *Swoben*, 2017 WL 4564722, at *6; *Poehling*, 2018 WL 1363487, at *10. As here, *Swoben* and *Poehling* involved FCA claims by the United States alleging that the MAO's annual attestations were false because it did not use its chart review program to identify potentially unsupported diagnosis codes. And as here, Plaintiff failed to allege that CMS would have refused to pay the MAO if it had known how the MAO was conducting its chart reviews. In both cases, the district courts held that this failure was fatal to Plaintiff's claims and dismissed those claims for failure to meet the FCA's "rigorous" and "demanding" materiality standard described in *Escobar*. As the *Swoben* court put it, under *Escobar* "the complaint must allege that the violations at issue 'are so central that the Government would not have paid these claims had it known of these violations.'" 2017 WL 4564722, at *6 (quoting *Escobar*, 136 S. Ct. at 2004 (alterations omitted)). The *Poehling* court reached the same conclusion, holding that "as in *Swoben*, the Government . . . failed to allege that CMS would have refused to make risk adjustment payments if it had known the Attestations were false." 2018 WL 1363487, at *10.

Knowing full well that it would need to address the pleading failures that doomed its attestation-based claims in *Swoben* and *Poehling*, Plaintiff nevertheless failed to allege that it "would have refused to make risk adjustment payments" to Anthem if it had known how the Company's chart review program operated. As in *Poehling* and *Swoben*, the only explanation

for Plaintiff's failure to assert this basic allegation is that it cannot do so in good faith under Rule 11.

Instead, Plaintiff alleges that CMS might have taken certain actions had it known that Anthem had specific knowledge of particular unsupported diagnosis codes that were submitted to CMS but never deleted. AC ¶¶162, 167. This materiality allegation fails to meet *Escobar*'s standard in three crucial ways, each of which independently requires dismissal of Plaintiff's attestation-based Claims.

**First**, the Amended Complaint does not plead that the alleged falsity of the attestations was material to CMS's decision to pay Anthem. Plaintiff never contends that if the agency had known how the Company operated its chart review program, it would have denied payment to Anthem because of the supposedly false attestations. Instead, Plaintiff alleges that something **entirely different** would have been material to CMS, namely that it would have been material to CMS if Anthem had actual knowledge of specific unsupported diagnosis codes. Thus, the alleged falsity of the attestations is not what Plaintiff alleges would have been material to CMS. The fact that is allegedly material to CMS in the Amended Complaint is not the manner in which Anthem conducts its retrospective chart reviews but instead the Company's supposed knowledge that specific diagnosis codes previously submitted to the agency are unsupported by the medical records. *Escobar* makes clear that, for false certification theories of liability, Plaintiff must plead that the government would have rejected the claim for payment because of the alleged falsity. *Escobar*, 136 S. Ct. at 2004; *see id.* at 2003 n.5. As *Swoben* and *Poehling* held, here that requires an allegation that CMS would have refused to make "risk adjustment payments" if it had known of the chart review practices that allegedly rendered the attestation false. *Poehling*, 2018 WL 1363487, at *10. Because the Amended Complaint does not allege that CMS would have

done *anything* if the agency had learned how Anthem was operating its chart review program (much less that it would have denied payment), the attestation-based FCA Claims must be dismissed.

*Second*, Plaintiff's materiality allegation fails for the independent reason that it provides a non-exhaustive list of actions that CMS *might* have taken, rather than making the clear and definite statement required by *Escobar* that CMS *would* have denied payment.  Specifically, Plaintiff alleges that had CMS known that Anthem's attestations were false, it might have taken certain actions in response, including (but not limited to) recouping payments through administrative processes, adjusting reconciliation payments, or pursuing an enforcement action. AC ¶¶162, 167.  But this allegation merely establishes that CMS would have had the *option* to deny payment, which *Escobar* squarely held is insufficient to plead that an allegedly false certification was material, *Escobar*, 136 S. Ct. at 1995.  This contention falls well short of the concrete allegation required by *Escobar*, *Swoben*, and *Poehling*.

*Finally*, Plaintiff does not allege that CMS has denied payment "in the mine run of cases" based on the kind of conduct alleged here, even though such evidence is central to a showing of materiality under *Escobar*.  *See id.* at 2003.  Plaintiff, in fact, does not allege that CMS has *ever* withheld payment from any MAO upon learning that the MAO did not use its chart reviews to identify unsupported diagnosis codes.  Nor does Plaintiff allege that, at any time after its three-year investigation of these issues, CMS ever denied payment to Anthem on this basis (because it cannot).  The Amended Complaint also does not explain *why* operating a chart review program in this manner would have mattered at all to CMS's payment decision.

Indeed, Plaintiff has failed to allege *any* facts to support its conclusory assertion that the alleged falsities in Anthem's attestations might have impacted CMS's payment decision.  FCA

plaintiffs must not only allege that CMS would have denied payment, but they also must plead specific facts to support the allegation.  Here, Plaintiff has not alleged any facts bearing on materiality beyond the conclusory assertions held to be insufficient in *Poehing* and *Swoben*. These fatal pleading failures are understandable in light of the fact that CMS has never required perfect data accuracy from MAOs and expressly declined in 2014 to impose a regulation requiring that MAOs conduct chart reviews in the precise manner advanced by Plaintiff in this case.

Plaintiff is well aware after *Swoben* and *Poehling* that to adequately plead materiality of its attestation-based FCA Claims, it must allege that CMS would have denied payment to Anthem had it known how the Company operated its chart review program.  The fact that it has not made this simple allegation (much less with the required supporting factual contentions), even after the dismissal of identical claims in *Swoben* and *Poehling*, is clearly because it cannot truthfully do so.  The Court should dismiss Plaintiff's attestation-based Claims for failure to plead sufficient facts to meet the materiality standard required by *Escobar*.

**III.  Motion To Strike**:  The Amended Complaint improperly references Plaintiff's prior settlements—down to the dollar amounts—with other MAOs or healthcare providers in suits challenging conduct that is not at issue here.  Under clear Second Circuit authority, those allegations have no place in a complaint, are unfairly prejudicial, and must be stricken pursuant to Rule 12(f).  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).

For these reasons, the Court should grant Anthem's motions.

# BACKGROUND

## I.    The Medicare Advantage Program's Risk-Adjusted Payments

Medicare is a federal health insurance program administered by CMS.  AC ¶21. Beneficiaries may receive their hospital and medical benefits through either Medicare Parts A

and B, which is known as traditional Medicare, or through Part C, which is called Medicare Advantage. *Id.* ¶¶22-23. In MA, beneficiaries receive their benefits through private MA plans administered by insurance companies that CMS calls MAOs. *Id.* ¶23. CMS contracts with MAOs, such as Anthem, to offer MA plans to Medicare beneficiaries. *Id.* ¶26.

The payment systems for traditional Medicare and MA differ significantly. In traditional Medicare, CMS directly reimburses physicians and other healthcare providers on a fee-for-service basis. *Id.* ¶22. CMS thus compensates healthcare providers ***retrospectively*** for services they have already rendered to beneficiaries. In the MA program, CMS compensates MAOs ***prospectively*** based on the estimated cost of care for the MAO's members during the next year. *Id*. ¶39.

MAOs receive a monthly payment from CMS that takes into account the risk profile of theirs members based, in part, on the likelihood that those members will require increased cost for their care. 42 U.S.C. § 1395w-23. CMS thus pays MAOs more for MA members who are more likely to incur additional healthcare costs based in part on each of the members' prior year health profiles. CMS, Medicare Managed Care Manual, Chapter 7, § 70.1 and 70.5.1 (2014). The process of adjusting payments to MAOs to account for variations in the anticipated cost of insuring members is known as "risk adjustment." *Id.*

The risk adjustment system that CMS employs to determine payments to MAOs relies on "diagnosis codes," which are primarily assigned by healthcare providers during face-to-face encounters with beneficiaries, for two different purposes. First, CMS determines the expected costs of care for various health conditions by calculating "risk coefficients" that are designed to measure the marginal expected costs of providing medical care for beneficiaries diagnosed with certain conditions. For instance, if CMS has determined that having a particular condition—*e.g.*,

diabetes—increases a patient's expected healthcare costs by 20% based on traditional Medicare cost data, then the risk coefficient for that condition in the MA program would be 0.2.  As a general matter, risk coefficients increase based on the relative expense historically associated with treating the various health conditions reported by providers.  For that reason, the risk coefficient for diabetes with acute complications is higher than the coefficient for diabetes without complications, because CMS's analysis of traditional Medicare claims data indicates that CMS has historically incurred higher marginal costs for the treatment of beneficiaries diagnosed with the former condition.  *See* CMS, Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, at 79-82 (Apr. 4, 2016), *available at* https://tinyurl.com/h8ny3x9.  The CMS risk coefficients are derived from diagnosis codes submitted to CMS by healthcare providers who treat traditional Medicare beneficiaries, and the vast majority of that data are not audited by CMS to determine if they are supported by the relevant medical records.

Second, CMS relies on the diagnosis codes that MAOs submit for their members to determine which risk coefficients will be applied to "adjust" an MAO's base payment rate for a particular member.  Like the diagnosis codes that CMS receives for traditional Medicare beneficiaries, the diagnosis codes submitted by MAOs are primarily assigned by healthcare providers who treat the MAOs' members.  Those providers submit diagnosis codes to MAOs that, in turn, submit them to CMS.  CMS then assigns the risk coefficients that correspond to each of the diagnosis codes that the MAOs submitted for their members.  The agency aggregates the various risk coefficients for each MAO member as part of calculating that member's so-called "risk score," which determines the monthly premium payment to the MAO for each member.  The CMS risk adjustment model is premised on the average MA member having a risk

score of 1.0. A simplified illustration shows how the CMS system works. Hypothetically, if an otherwise average member is diagnosed by her physician with both diabetes, with the hypothetical risk coefficient of 0.2, and rheumatoid arthritis, with a hypothetical risk coefficient of 0.4, then that member's risk score would be 1.6. The two coefficients (*i.e.*, 0.2 + 0.4) would be added to the base risk score of 1.0 to produce a total risk score of 1.6. CMS would then pay the MAO 160% of the applicable base rate for that member. So, if the applicable base rate were $1,000 in this hypothetical, CMS would pay a $1,600 monthly premium to the MAO for that member.

By statute, CMS not only must adjust MA premium payments "for such risk factors as . . . health status," but must do so in a manner that "***ensure[s] actuarial equivalence***." 42 U.S.C. § 1395w-23(a)(1)(C)(i) (emphasis added). As Plaintiff has put it, the Social Security Act's ("Act's") "actuarial equivalence" requirement mandates equivalence "between the average payments that CMS would expect to make on behalf of a given beneficiary under traditional . . . Medicare, and the payments made to [MAOs] for covering an individual with those same characteristics." Defs.' Cross-Mot. for Summ. J. 8, *United Healthcare Ins. Co. v. Azar II ("Azar II")*, No. 1:16-cv-00157-RMC (D.D.C. Dec. 4, 2017), ECF No. 57-1 at 16. In other words, the statute requires CMS to compensate MAOs for a given MA member in an amount that equals the costs that CMS would incur in traditional Medicare to provide benefits to that same beneficiary. *Azar II*, 330 F. Supp. 3d 173, 184 (D.D.C. 2018).

## II.    CMS Calculates Payments to MAOs Based in Part on Diagnosis Code Data from Traditional Medicare That CMS Knows Is Not Supported by the Medical Records

As CMS is well aware, a significant percentage of diagnosis codes submitted by healthcare providers in traditional Medicare lack sufficient support in the medical record under established CMS coding and documentation standards. Nevertheless, CMS uses these

unsupported diagnosis codes to calculate the risk coefficients for different medical conditions. *See id.* at 186 (noting that CMS acknowledged in litigation that traditional Medicare diagnosis data contains "known and unknown errors").

Those unsupported diagnosis codes are thus baked into the MA payment model. Specifically, because the vast majority of the traditional Medicare diagnosis data that CMS uses to calculate risk coefficients is ***not audited***, the coefficients calculated from that data understate the actual costs required to treat the medical conditions included in the risk adjustment model. Simplifying somewhat, CMS's risk coefficients reflect the agency's total expenditures on traditional Medicare beneficiaries assigned a particular diagnosis code, divided by the total number of beneficiaries assigned that diagnosis code.  But because some of the beneficiaries in traditional Medicare do not actually have the underlying medical condition associated with the reported diagnosis code—at least as reflected in their medical records—the denominator is artificially high, and so the resulting risk coefficient (and corresponding payment to the MAO) is artificially depressed.

Another simplified example illustrates the point:  If traditional Medicare data showed that the additional cost of providing healthcare to 10 beneficiaries diagnosed with diabetes was a total of $100,000, the expected increase in Medicare's per-capita cost for care related to diabetes would be $10,000 (*i.e.*, $100,000 of marginal costs for treating Medicare beneficiaries diagnosed with diabetes divided by 10 Medicare beneficiaries diagnosed with diabetes = $10,000 per capita marginal cost of care for diabetes).  But if only 8 of the 10 beneficiaries in CMS's sample ***actually*** had diabetes, that $100,000 figure should be divided by 8, not 10, to calculate the true cost of providing care associated with a diabetes diagnosis.  Thus, the per-capita cost estimate should actually be $12,500, rather than $10,000 (*i.e.*, $100,000 of marginal costs for treating

13

Medicare beneficiaries diagnosed with diabetes divided by 8 Medicare beneficiaries who actually have diabetes = $12,500 per capita marginal cost of care for diabetes).  In CMS's own words, "[i]f we include diagnoses for beneficiaries who don't actually have the disease, or for whom the medical record documentation is not clear, this tends to reduce the estimated average cost of various conditions and therefore our risk adjustment factors."  *Azar II*, 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017), ECF 44-4 at 3; *see also Azar II*, 330 F. Supp. 3d at 184 ("[T]he risk adjustment model is built on unaudited data about traditional, fee-for-service Medicare beneficiaries, which must contain errors." (quoting CMS brief)).  CMS thus ***knows*** that some of the unaudited diagnosis codes that it receives for traditional Medicare beneficiaries reflect conditions those beneficiaries do not have, yet those codes are hard-wired into its MA payment system.

CMS's decision to build the risk adjustment payment system on unaudited diagnosis codes submitted for beneficiaries in traditional Medicare is important to this case for two reasons.  First, the Act's requirement of "actuarial equivalence" prohibits the United States from using a different documentation standard to determine payment to MAOs than the documentation standard that it used to create the risk coefficients.  Second, when CMS requires more stringent documentation for the MAO data than it does for the data in traditional Medicare that is used to calculate the risk coefficients, CMS systematically undercompensates MAOs for the likely costs of providing Medicare benefits to MA members.

CMS has recognized as much.  In CMS's Risk Adjustment Data Validation ("RADV") audit program, CMS reviews the medical records for selected MAO members to determine if the conditions on file with CMS for the selected members are supported by the members' medical records.  Declaration of Brian Matthew Cogdill ("Cogdill Decl.") ¶10(vi) n.3.  In 2010, CMS

14

proposed that it would calculate "payment errors" to MAOs through the RADV program by identifying the difference between the amount that the agency paid an MAO for the sampled members and the amount that CMS would have paid the MAO based on just the diagnosis codes for those members that the RADV audit found were supported by the medical records.  It proposed to then extrapolate that "payment error" contract-wide.[1]  Responding to this proposal, MAOs explained that "[i]t is mathematically certain that payments calculated using [CMS's] Proposed Methodology would not accurately reflect the costs of providing benefits to Medicare Advantage members" and would "significantly underpay[] [MAOs] for the risks they assume." Humana, Comment Letter on RADV Sampling and Error Calculation Methodology 1 (Jan. 21, 2011), *Poehling*, 2:16-cv-8697-FMO-SS, ECF No. 182-1 at 42.  In response, CMS acknowledged the MAOs' actuarial concerns and announced that payment recoveries based on RADV audits would be calculated only after applying a fee-for-service adjuster ("FFS Adjuster") to "account[] for the fact that the documentation standard used in RADV audits to determine a contract's payment error (medical records) is different from the documentation standard used to develop the Part C risk-adjustment model ([traditional Medicare] claims)."[2]

---

[1]  CMS, Medicare Advantage Risk Adjustment Data Validation (RADV) Notice of Payment Error Calculation Methodology for Part C Organizations Selected for Contract-Level RADV Audits – Request for Comment (Dec. 20, 2010).  *See Poehling*, 2:16-cv-8697-FMO-SS, ECF No. 182-1 at 8 (filed Dec. 8, 2017).

[2]  CMS, Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation for Contract-Level Audits, at 4-5 (Feb. 24, 2012), available at https://tinyurl.com/ybwc6lwt.  CMS explained that it did so to "take[] into account how CMS payments would change" if the same documentation standard that is applied to MAO diagnosis code submissions during the RADV audits "was also used when calculating [the] risk [coefficients]."  *Azar II*, 1:16-cv-00157-RMC (D.D.C. Oct. 2, 2017), ECF No. 44-3 at 11 (Document authored by CMS staff titled "Model Calibration Factor"); *id.* at 8 ("Why does FFS Diagnosis Error Matter? . . . Inclusion of undocumented diagnoses tends to reduce risk adjustment values.").

In 2014, however, CMS unexpectedly changed course. It finalized a regulation that equated each and every diagnosis code that lacked sufficient support in an underlying medical record to an "overpayment."[3] In 2018, a federal district court vacated that rule on the ground that it "inevitabl[y]" violates the Act's actuarial equivalence requirement to calculate MA payments using largely unaudited traditional Medicare data but then treat each inadequately supported MA diagnosis code as an overpayment. *Azar II*, 330 F. Supp. at 187. The court explained that "the rates at which CMS pays Medicare Advantage insurers are based on flawed data . . . [y]et the 2014 Overpayment Rule ignores those flaws when defining an 'overpayment.'" *Id.* at 184.[4]

### III.  CMS Requires MAOs to Take Reasonable Steps to Ensure the Accuracy of Risk Adjustment Data But Has Never Required MAOs to Audit or Guarantee the Accuracy of Every Diagnosis Code Submitted to CMS

CMS understands that payments to MAOs are based on diagnosis data from traditional Medicare, which contains significant errors and is not comprehensively audited, and that MAOs cannot possibly audit all of the millions of diagnosis codes that they receive from healthcare providers and then submit to CMS. As a result, CMS has not required that MAOs affirmatively audit the diagnosis codes that they submitted to the agency. Indeed, during the period at issue in this case, CMS did not require MAOs to undertake any specific compliance measures to verify the accuracy of their diagnosis code data.

---

[3] *See* Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844, 29,847 (May 23, 2014) ("2014 Overpayment Rule").

[4] The United States has appealed the *Azar II* decision to the D.C. Circuit. *See UnitedHealthcare Insurance Co., et al. v. Azar, et al.*, No. 18-5326 (D.C. Cir.).

During the time period relevant to Plaintiff's Claims—the 2013 through 2016 payment years, *see* AC ¶155—CMS regulations required MAOs to attest that the risk adjustment data they submitted, including diagnosis codes from healthcare providers who treated the MAOs' members, were accurate, truthful, and complete based on their "best knowledge, information, and belief." 42 C.F.R. § 422.504(l). But CMS deliberately implemented a ***qualified*** attestation standard that did not require MAOs to review all risk adjustment data submitted to CMS. Medicare Program; Medicare+Choice Program, 65 Fed. Reg. 40,170, 40,268 (June 29, 2000). CMS has made unmistakably clear that Anthem and other MAOs are not required to ensure that their diagnosis code data is entirely complete or accurate; instead, MAOs are only "held responsible for making ***good faith efforts*** to certify the accuracy, completeness, and truthfulness of encounter data submitted." *Id.* (emphasis added).

CMS did not specify the data accuracy or compliance processes that MAOs must implement to satisfy this "good faith" standard. The agency instead granted discretion to MAOs to determine what constituted a "good faith effort" and acknowledged, for example, that MAOs "cannot reasonably be expected to know that every piece of data is correct, nor is that the standard that [CMS], the [Office of Inspector General for the U.S. Department of Health and Human Services], and [Department of Justice] believe is reasonable to enforce." *Id.* In fact, CMS's "good faith" standard recognized "that encounter data [can] come into [MAOs] in great volume from a number of sources, presenting significant verification challenges for the organizations." *Id.* Anthem, for its part, received tens of millions of diagnosis codes ***each year*** from healthcare providers during the period at issue in the Amended Complaint. Cogdill Decl. ¶5. For these reasons, the Office of Inspector General for the U.S. Department of Health and Human Services has explicitly noted that the annual risk adjustment data attestation from MAOs

"does not constitute an absolute guarantee of accuracy."  Publication of the OIG's Compliance Program Guidance for Medicare+Choice Organizations Offering Coordinated Care Plans, 64 Fed. Reg. 61,893, 61,900 (Nov. 15, 1999).

CMS regulations also required MAOs to implement a general compliance program that included "measures that prevent, detect, and correct fraud, waste, and abuse."  42 C.F.R. § 422.503(b)(4)(vi).  This requirement was general, however, and not specific to risk adjustment data.  And similar to the attestation requirement, CMS conferred on MAOs broad discretion to determine the precise methods that they would use to comply with these general requirements. *See* 65 Fed. Reg. at 40,265.[5]

CMS, in sum, recognizes that many of the diagnosis codes that MAOs receive from healthcare providers and submit to CMS will be unsupported in the medical records, but understandably has never required or expected MAOs to review and verify every diagnosis code they submitted to the agency.  Thus, contrary to Plaintiff's suggestions in the Amended Complaint, CMS has ***never*** required MAOs to conduct any particular type of audit of the diagnosis code data that they submit to CMS.

**IV.    Anthem Designed Its Retrospective Chart Review Program to Supplement the Diagnosis Code Data Reported to Anthem by Healthcare Providers**

CMS regulations require that MAOs make good faith efforts to report to the agency all of the medical conditions for each member and certify that the data they submit to CMS is

------

[5] Anthem and other MAOs engage in a variety of good faith efforts beyond their chart review programs to improve the quality of the diagnosis code data that healthcare providers submit, including provider education and diagnosis coding guidance as well as audits of samples of provider-submitted diagnosis codes.  Discovery will show the full extent of those efforts, but the Amended Complaint describes some of them.  AC ¶66; *see* Cogdill Decl. ¶¶9-10.

complete. *See, e.g.*, 42 C.F.R. § 422.504(l).[6]  To satisfy this requirement, it is common in the industry for MAOs to review their members' medical records to determine if they support additional diagnosis codes that healthcare providers neglected to report.  CMS has not only sanctioned this practice, but has expressly authorized MAOs to submit additional diagnosis codes that they identify through these chart reviews.[7]

The Amended Complaint contends that, during the period at issue in this case, Anthem contracted with a vendor, MediConnect, to collect medical records from healthcare providers who rendered medical care to Anthem's members and to assign teams of certified MediConnect coders to review those records and identify properly-documented diagnosis codes for potential submission to CMS.  AC ¶111.  Anthem then allegedly directed certified coders from its own quality assurance team to conduct a rigorous quality assurance review of the diagnosis codes identified by the MediConnect coders.  *Id.* ¶129.  Plaintiff contends that, once Anthem's quality assurance team had completed its review, the Company submitted to CMS the diagnosis codes identified in these reviews that it had not previously reported to the agency.  *Id*.

The Amended Complaint contends, however, that Anthem was also required to use its retrospective chart reviews to separately identify ***unsupported*** diagnosis codes from provider-submitted claims.  *E.g.*, *id.* ¶¶8, 154.  But no CMS regulation or guidance has ever required

---

[6] *See also* CMS, Medicare Managed Care Manual, Chapter 7, § 40 (2014) (requiring MAOs to "[s]ubmit all required diagnosis codes for each [member]"), *available at* https://tinyurl.com/yc9b3hwc; CMS, Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations 2008 Participant Guide 6.1, *available at* https://tinyurl.com/y33s2sx8.

[7] *See* CMS, Final Encounter Data Diagnosis Filtering Logic at 5 (Dec. 22, 2015) ("In addition to submitting records for encounters, plan sponsors are also allowed to submit encounter data records that reflect their reviews of medical records (called 'chart review' records)."), *available at* https://tinyurl.com/ybppxz5c.

Anthem or other MAOs to do so.[8]  And this makes sense because, as explained *supra* at 12-14,

CMS does not itself comprehensively audit the vast majority of the provider-submitted diagnosis

codes from traditional Medicare on which the MA risk adjustment system is based.  *See* Brief of

Appellants Alex Michael Azar, II et al., at 15, *UnitedHealthcare Insurance Co., et al. v. Azar, et

al.*, D.C. Cir. No. 18-5326 (Apr. 23, 2020) (noting that CMS conducts only "limited error

correction of traditional Medicare diagnosis data").

  In fact, CMS has affirmatively declined to adopt ***exactly the requirement*** that Plaintiff

seeks to impose through this FCA action.  In January 2014, CMS proposed a rule that would

have prohibited an MAO from conducting medical record reviews to identify previously

unreported diagnosis codes unless those medical record reviews were also designed to confirm

that all codes that the MAO had previously submitted to CMS had adequate support in the

underlying medical records.  *See* Medicare Program; Contract Year 2015 Policy and Technical

Changes to the Medicare Advantage and The Medicare Prescription Drug Benefit Programs, 79

Fed. Reg. 1918, 2053 (Jan. 10, 2014) ("Proposed Chart Review Rule").  CMS candidly

acknowledged that this rule was designed to substantively change the relevant regulatory

landscape by "strengthen[ing] existing regulations" concerning MAOs' obligations with respect

to diagnosis code data.  *Id.* at 1922.

  But CMS later ***withdrew that rule*** after receiving comments from MAOs that explained

that the rule was unnecessarily burdensome, and that it contravened the statutory requirement

---

[8] By their plain text, the annual Part C contracts between MAOs and CMS that Plaintiff cites in the Amended Complaint, AC ¶63, do not obligate MAOs to conduct chart reviews in any particular manner.  In fact, they say nothing about chart reviews at all, and also do not reference any obligation to correct unsupported diagnosis code data that MAOs previously submitted to CMS.

that payment to MAOs ensure actuarial equivalence between the MA program and traditional Medicare.[9]  In short, CMS squarely considered and abandoned the very requirement that Plaintiff seeks to impose here through FCA litigation.

## V.     Plaintiff's Amended Complaint

Plaintiff alleges that Anthem submitted two types of false claims to CMS.

First, the Amended Complaint contends that Anthem's annual risk adjustment data attestations were false claims under the FCA because Anthem operated a chart review program that could have been, but was not, designed to identify and withdraw unsupported diagnosis codes that the Company received from healthcare providers and previously submitted to CMS. AC ¶¶160, 165.  The Amended Complaint focuses on this point from the outset, alleging in paragraph 5 that Anthem's retrospective chart review program was a practice operated "in direct contravention of its promises and attestations to CMS."  *Id.* ¶5.

Plaintiff's attestation-based FCA theory is that Anthem's chart review program rendered its attestations false because, even though the Company represented that its risk adjustment data were "accurate, complete, and truthful" based on the Company's "best knowledge, information, and belief," the program did not review the medical records for the same member visits to identify diagnosis codes that healthcare providers previously submitted to Anthem in error and

---

[9] 2014 Overpayment Rule, 79 Fed. Reg. at 29,925-26; *see* United Healthcare, Comment Letter on Proposed Chart Review Rule at 33-36 (Mar. 7, 2014), *available at* https://beta.regulations.gov/comment/CMS-2014-0007-1689 (explaining that proposed rule would violate actuarial equivalence and "make MAO members appear artificially healthier than otherwise identical FFS beneficiaries"); Humana Inc., Comment Letter on Proposed Chart Review Rule at 44 (March 7, 2014), *available at* https://beta.regulations.gov/comment/CMS-2014-0007-1652 (arguing that rule "would be fundamentally at odds with the MA payment model, which is based on diagnoses in Medicare FFS **claims** rather than **medical records**" (emphasis added)).

that Anthem in turn submitted to CMS.  *Id.* ¶¶5, 156; *see id.* ¶7 (alleging that Anthem could have

used its chart review program to find and delete unsupported diagnosis codes, but did not do so);

*id.* ¶8 (alleging that Anthem's chart review program failed to "identify[] and delet[e] inaccurate

codes").  Plaintiff also describes the purpose of the attestations as confirming that Anthem made

"good faith efforts" to ensure the accuracy, completeness, and truthfulness of its data, including

by having adequate "systems" and "activities" in place.  *Id.* ¶¶89, 90.  The "system" that Plaintiff

challenges in the remainder of the Amended Complaint is Anthem's chart review program, and

Plaintiff spills much ink describing that program, its purposes, and how it failed to search for,

identify, or correct unsupported diagnosis codes.  *See, e.g., id.* ¶¶106-33.  The Amended

Complaint does not allege, however, that Anthem's attestations were false because Anthem

actually knew of specific unsupported diagnosis codes that it previously submitted to CMS but

failed to correct.  *See id.* ¶¶5, 160, 165, 170.

These attestation-based theories of FCA liability are stated in Claim One, Claim Two,

and part of Claim Three in the Amended Complaint.  Anthem moves to dismiss only these

attestation-based FCA Claims.

Plaintiff's second theory of FCA liability is stated in the other part of Claim Three in the

Amended Complaint, which alleges that Anthem submitted specific unsupported diagnosis codes

to CMS, and that each of these allegedly false diagnosis codes constitutes a false claim for

payment under the FCA that Anthem had a duty to correct when it learned that the codes were

false.  *Id.* ¶171; *see also id.* ¶¶42-43 (alleging that Risk Adjustment Processing System data

submissions and "each diagnostic cluster" is a separate "claim for payment").  This diagnosis

code-based theory is premised on the so-called reverse false claims provision of the FCA.  *See*

31 U.S.C. § 3729(a)(1)(G); *Poehling*, 2018 WL 1363487, at *6 (noting Plaintiff's claim based on

a "[v]iolation of the second part of 31 U.S.C. § 3729(a)(1)(G), . . . known as the 'reverse false claims' provision, by knowingly concealing or knowingly and improperly avoiding an obligation to pay or transmit money to the Government").  Plaintiff does not allege that Anthem knew the diagnosis codes were unsupported at the time the Company submitted the codes to CMS; instead, it asserts that Anthem had an obligation to correct the codes when Anthem allegedly learned sometime thereafter that they were not supported in the relevant medical records.  AC ¶171. Anthem is not moving to dismiss the portion of Claim Three that relies on this diagnosis code-based theory of FCA liability.

## MOTION TO TRANSFER

Pursuant to 28 U.S.C. § 1404(a), the Court should transfer this FCA action to the Southern District of Ohio.

**I.     This Case Is About Business Processes and Conduct that Predominantly Occurred in the Southern District of Ohio, and Most Material Witnesses Live in that District**

### A.     The Chart Review Program and Risk Adjustment Compliance Processes at Issue in this Case Were Conducted from Anthem's Columbus, Ohio Office

Anthem's retrospective chart review program was developed and managed primarily by personnel in the Southern District of Ohio, and virtually every aspect of that program operated out of that district.  Cogdill Decl. ¶¶7, 10.  This includes the selection of medical records to collect from healthcare providers in Anthem's network, *id*. ¶10(iv); the configuration of the diagnosis coding process, AC ¶¶121-27; Cogdill Decl. ¶10(i); and the quality control measures that Anthem implemented to confirm medical record support for the diagnosis codes identified from reviewing medical records, AC ¶¶113-15, 128-29; Cogdill Decl. ¶10(ii)-(iv).

The risk adjustment compliance functions related to Plaintiff's allegations were similarly managed from that district.  Those compliance activities include Anthem's implementation of CMS and industry diagnosis coding guidelines, AC ¶¶45-50; the development of Anthem's

23

diagnosis coding manual, *id.* ¶¶67-69, 132, 136; Medicare risk adjustment compliance education

and training for healthcare providers and Anthem employees, *id.* ¶¶66, 90, 116; Anthem's

sample audits of diagnosis codes submitted to the Company by healthcare providers, *id.* ¶¶110,

128-29; Anthem's development of risk adjustment policies and procedures, *id.* ¶¶76, 86; and

Anthem's responses to CMS's RADV audits, *id.* ¶¶91-97, 138, 140.  *See* Cogdill Decl. ¶10.

Likewise, the Anthem personnel with the most material involvement in directing the

chart review and risk adjustment compliance processes at issue in the Amended Complaint live

in the Southern District of Ohio.  These personnel include the following:

- **Brian M. Cogdill** is the Manager of Risk Adjustment Quality Control and former
  Manager of Retrospective Risk Programs.  He lives in the Columbus, Ohio area and works
  in the Columbus office.  Cogdill participated in developing key Medicare risk adjustment
  programs at Anthem, including the chart review program.  Cogdill was involved in the
  selection of Anthem's chart review vendor and creating its current chart review program.
  From 2010 through approximately 2016, Cogdill directed the operations of the chart
  review program and was the primary point of contact with that vendor.  Since 2010,
  Cogdill has also been responsible for Anthem's quality assurance processes relating to the
  chart review program, and supervised Anthem's quality assurance review of the chart
  review results conducted by Anthem's chart review vendor.  He developed and
  implemented the quality assurance audits that Anthem conducted of the vendor's chart
  review results.  Additionally, he implemented a separate audit of a sample of diagnosis
  codes from the chart review results reported by the vendor.  Finally, Cogdill developed a
  corporate manual regarding diagnosis coding standards for Anthem's vendors and
  employees, has managed Anthem's response to CMS's RADV audits since 2007, and is
  responsible for maintaining hard copy documents in Columbus relating to RADV audits.
  Cogdill Decl. ¶12(i)-(vii).

- **Patricia Cabrera** is Anthem's Director of Policy and Strategic Initiatives and was
  formerly the Medicare Risk Adjustment Regulatory Compliance Manager and Manager
  of Performance & Quality Audit.  She lives and works in the Columbus, Ohio area.  From
  2010 to 2018, she was responsible for analyzing CMS guidance and regulations in
  connection with Anthem's Medicare risk adjustment programs and developing Anthem's
  Medicare risk adjustment policies and procedures.  From 2010 through 2015, she also
  supervised Anthem's quality assurance audits of the chart review results reported to
  Anthem by its vendor in connection with the Anthem chart review program, and was
  responsible for conducting other audits of Anthem's Medicare risk adjustment programs
  and vendors.  Also between 2010 and 2015, she supervised Anthem's education and
  training for healthcare providers regarding Medicare risk adjustment compliance.  From
  2010 through 2018, Cabrera was responsible for developing and supervising Anthem's

24

education and training for associates regarding Medicare risk adjustment compliance  *Id.* ¶12(viii)-(xii).

- **Tonya Ries** is Manager Compliance (Medicare Risk Adjustment and Coding) and formerly a Medical Records Auditor and Training Consultant.  She lives in the Columbus, Ohio area and works in Anthem's Columbus office.  Ries was Team Lead, as a Medical Records Auditor and Training Consultant, from 2015 through 2017.  Ries has also been responsible, along with Cogdill, for developing Anthem's diagnosis coding manual and implementing CMS and industry diagnosis coding guidelines.  Ries supervises the Anthem team that conducts various coding audits that Anthem has performed since 2016.  Ries also revised Anthem's diagnosis coding manual, and separately has supervised the training for healthcare providers, Anthem employees, and vendors on diagnosis coding and proper medical record documentation.  Starting in 2012, Ries also performed audits of a sample of the diagnosis codes generated by the Anthem chart review program until the Quality Audit team's chart review audit process was consolidated with Cogdill's quality assurance audit team in 2015.  *Id*. ¶12(xiii)-(xvii).

The conduct of these Anthem employees is referenced throughout the Amended Complaint.  For example, paragraphs 112 through 116 describe a set of Frequently Asked Questions regarding Anthem's chart review program and the document with these questions is attached as an exhibit to the Amended Complaint.  AC Ex. 10.  This document directs individuals to contact Cogdill for questions concerning the program.  *Id.* at 3.  The Amended Complaint also refers extensively to Anthem's 2015 Coding Manual, and attaches that document as an exhibit.  AC ¶¶67-69, 132, 136, Ex. 5.  Cogdill and Ries created this document and regularly updated it each year.  Cogdill Decl. ¶12(iv), (xv).  And Cabrera authored an email that Plaintiff quotes in paragraph 75.  *See* Declaration of James A. Bowman ("Bowman Decl.") ¶6.

Several other employees from Anthem's Columbus office were involved in developing and implementing the business and compliance operations that are central to the allegations in the Amended Complaint.  Those employees include Lori Bishop (currently Program Manager, Sales Performance & Programs, and formerly a Medicare Risk and Recovery Compliance Training and Policy consultant), Chanda Caffey (currently Director of Performance Audit, Medicaid Risk Revenue, and formerly a Medical Record Audit and Training consultant), and

Paul Etterling (Medicare Risk and Recovery Specialist, who drafted and maintained MA policies and procedures).  Cogdill Decl. ¶13.  They all live in the Columbus area as well.  *Id.*

### B.    Current and Former CMS Officials Who Are Material Witnesses in this Case Do Not Live or Work in the Southern District of New York

In addition to the Anthem witnesses located in the Columbus area, the most important witnesses in this case will be current and former CMS employees who promulgated the MA regulations and program guidance that Plaintiff now seeks to enforce through FCA litigation. Based on publicly available information, most of those current and former CMS officials live and work in the Baltimore and Washington D.C. area and, to Anthem's knowledge, none of those witnesses live in the Southern District of New York.  Bowman Decl. ¶7.

Anthem expects to assert defenses in this case that are based, in part, on the conduct and communications of CMS and its representatives.  Anthem intends to seek testimony and documents from current and former administrators of the MA program regarding their understanding of program requirements.  Anthem expects that these witnesses will confirm that there was no requirement to perform chart reviews to audit the accuracy of previously-submitted diagnosis codes.  For example, in *Poehling,* a CMS official who supervised the creation of the MA risk adjustment system testified in his deposition that he did not believe it was "improper" or "fraud" for an MAO to perform chart reviews that did not seek to validate prior diagnosis codes submitted by healthcare providers to MAOs that were then passed along to CMS.  *Id.* ¶8, Ex. 1 at 309-10.

### C.    The Amended Complaint Does Not Identify Any Material Witnesses Who Live in this District or Significant Business Processes That Occurred Here

The Amended Complaint does not identify any key Anthem personnel who live in the Southern District of New York.  To Anthem's knowledge, although there were a number of Anthem employees involved in these business processes around the country, ***none*** of the

26

employees who were involved in the design and operation of the chart review program, or who were involved in related quality assurance processes, live in the Southern District of New York. *Id.* ¶¶8, 11.

The Amended Complaint contains only minimal allegations relating to New York. Plaintiff notes that Anthem operated an MA plan in New York, maintains an office in New York, and communicated with New York providers regarding medical record collection in New York. AC ¶¶11, 13, 118-19.  These facts have no meaningful connection to Plaintiff's FCA theories. And they hardly distinguish New York from any other judicial district in the country.  Anthem has offices and enrolls MA members across the country and communicates with healthcare providers in two dozen states in connection with its MA plans.  Cogdill Decl. ¶3.  Plaintiff's allegations thus do not distinguish New York from the other jurisdictions—such as Ohio, which is a larger MA market for Anthem than New York—where Anthem offers MA plans or collects medical records for chart reviews.  *Id.* ¶4.

## II.    This Case Should Be Transferred To the Southern District of Ohio, Which Would Be a More Convenient Venue and Serve the Interests of Justice

The Court should grant Anthem's motion to transfer because the relevant factors under 28 U.S.C. § 1404(a) weigh decisively in favor of transfer to the Southern District of Ohio.

The Court has discretion to transfer a civil action "[f]or the convenience of parties and witnesses, in the interest of justice" to "any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  The § 1404(a) analysis proceeds in two steps.  First, the Court asks "whether the case could have been brought in the transferee district."  *Izkhakov v. Educ. Comm'n for Foreign Med. Graduates*, 2012 WL 2861338, at *2 (S.D.N.Y. July 10, 2012) (Carter, J.).  Plaintiff cannot dispute that the Southern District of Ohio is a proper venue for this suit.  That court has personal jurisdiction over Anthem due to the Company's operations in

Columbus, *see* Cogdill Decl. ¶¶4, 7, 10, and subject matter jurisdiction based on 28 U.S.C. § 1331 and 31 U.S.C. § 3731.  Venue is proper in the Southern District of Ohio because "a substantial part of the events or omissions" giving rise to Plaintiff's Claims occurred there, and because Anthem "transacts business" there.  *See* 28 U.S.C. § 1391(b)(2); 31 U.S.C. § 3732(a).

Second, the Court considers a number of factors to decide whether a transfer is warranted.  *Izkhakov*, 2012 WL 2861338, at *2.  Those factors include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of the circumstances.

*Id.* at *3; *see United States v. Nature's Farm Prods., Inc.*, 2004 WL 1077968, at *3 (S.D.N.Y. May 13, 2004) (same).  Anthem must make a "clear and convincing showing that the balance of convenience favors [its] choice" of forum.  *Izkhakov*, 2012 WL 2861338, at *3.  "There is no rigid formula for balancing these factors and no single one of them is determinative."  *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000).  "[W]eighing the balance is essentially an equitable task left to the Court's discretion."  *Id.* (quotation marks omitted).

"The core determination under § 1404(a) is the center of gravity of the litigation." *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.*, 774 F. Supp. 858, 868 (S.D.N.Y. 1991). Convenience of witnesses is "typically the most important factor," and the "location of operative events" is another "primary factor."  *Izkhakov*, 2012 WL 2861338, at *3-*4 (citing *Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 480-81 (S.D.N.Y. 2009)).  "Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district."  *Viacom*, 774 F. Supp. 3d at 868.

Although the plaintiff's choice of forum is ordinarily "entitled to substantial consideration," *Warrick v. General Elec. Co.*, 70 F.3d 736, 741 (2d Cir. 1995) (citation omitted), "[t]he emphasis that a court places on plaintiff's choice of forum diminishes where the facts giving rise to the litigation bear little material connection to the chosen forum," *Nature's Farm*, 2004 WL 1077968, at *3. This is such a case. As detailed *infra* at 29-36, the most important § 1404(a) factors weigh—clearly and convincingly—in favor of transfer, and the remaining factors are neutral. ***None*** of the factors favor this district as the venue for this litigation.

### A.   Convenience of the Witnesses

The convenience of witnesses "is typically the most important factor." *Izkhakov*, 2012 WL 2861338 at *3. "When weighing the convenience of the witnesses, courts must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Royal & Sunalliance v. Biritish Airways*, 167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001) (movant "demonstrated that the witnesses needed in [the proposed forum] are more material to this case"). "The convenience of witnesses who reside in neither the current nor the transferee forum ***is irrelevant*** when considering a motion to transfer." *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F. Supp. 2d 282, 288 (S.D.N.Y. 2004) (emphasis added); *see Command Arms Accessories, LLC v. ME Tech. Inc.*, 2019 WL 5682670, at *6 (S.D.N.Y. Oct. 31, 2019) (similar).

None of the current or former Anthem employees who designed and operated the Anthem chart review program, or who designed and managed Anthem's risk adjustment compliance processes, live in New York. Cogdill Decl. ¶¶8, 11. In fact, to Anthem's knowledge, there is not a single material witness who resides in the Southern District of New York. If the case proceeds in this judicial district, ***every single witness***, for ***both*** parties, will need to travel from some other location.

Plaintiff knows this fact—during its three-year investigation, Plaintiff did not depose a single Anthem employee or former employee who lives in the Southern District of New York. Bowman Decl. ¶4.  Similarly, of the more than two dozen email custodians identified by Plaintiff for its document requests, none of those Anthem custodians live or work in this district.  *Id*. ¶5.

The Anthem chart review program collected medical records from healthcare providers across the country, and followed the same process regardless of the state where the member or healthcare provider lived.  Cogdill Decl. ¶6.  In fact, Anthem's MA market in Ohio is larger than its MA market in New York.  *Id.* ¶4.  *See Rindfleisch v. Gentiva Health Sys., Inc.*, 752 F. Supp. 2d 246, 255 (E.D.N.Y. 2010) (transferring case from New York to district where corporate policy at issue in case was developed because "Plaintiffs' case . . . is based upon the allegation that defendant . . . has a 'corporate policy'" that applied to its operations broadly).

In contrast, as detailed *supra* at 24-26, the Anthem personnel who designed, operated, and supervised the Anthem chart review program and relevant compliance processes live in the Southern District of Ohio.  Plaintiff cannot dispute the materiality of these witnesses—the Amended Complaint devotes countless allegations to describing statements made by these personnel or documents authored by them.

Courts in this district have repeatedly granted motions to transfer to the district where a defendant's employees with knowledge of the operative facts live, even in cases where the plaintiff was able to identify material witnesses in this district.  *See, e.g.*, *Cirrex Sys. LLC v. InfraReDx, Inc.*, 2010 WL 3431165, at *3 (S.D.N.Y. Aug. 31, 2010) (transferring case to district where the defendant's employees knowledgeable about facts at issue resided, even though the plaintiff identified four potential witnesses in this district); *In re Glob. Cash Access Holdings,*

*Inc. Sec. Litig.*, 2008 WL 4344531, at *4 (S.D.N.Y. Sept. 18, 2008) (similar).  The convenience of witnesses factor therefore weighs heavily in favor of transfer to the Southern District of Ohio.

### B.    The Location of Relevant Documents and Access to Sources of Proof

The location of documents and sources of proof factor also weighs in favor of transfer. Because Columbus is the center of gravity for Anthem's risk adjustment coding operations, that location is where Anthem maintains all hard copy RADV audit files and similar documents—materials that will be relevant to Plaintiff's allegations.  Cogdill Decl. ¶12(vii).  In contrast, no Anthem hard copy documents relevant to this case are maintained in this district.  *Id*.  "While technology has made shipping documents easier and less expensive, retaining this action in New York would still impose additional costs on [Anthem] that [it] would not incur if the case were transferred to" Ohio.  *Cirrex*, 2010 WL 3431165, at *3.  Where, as here, transfer would reduce the burden of producing documents, even if the resulting benefit is "incremental," this factor weighs in favor of transfer.  *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 374-75 (S.D.N.Y. 2006); *see also Herbert Ltd. P'ship*, 325 F. Supp. at 289.

### C.    The Locus of Operative Facts

For similar reasons, the locus of operative facts also strongly favors transfer.  "To determine the locus of operative facts, a court must look to the site of the events from which the claim arises."  *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 30 (S.D.N.Y. 2016) (internal quotations and citation omitted).  The Amended Complaint focuses on Anthem's chart review program.  AC ¶¶3-5, 160, 165.  It devotes approximately 40 paragraphs to describing that program and related business operations and corporate actions that occurred primarily in Columbus.  *Supra* at 23-24.  To prove its Claims, Plaintiff thus must present evidence about Anthem's chart review program, how it operates, and how it interacts with Anthem's other efforts to submit accurate and complete diagnosis code data to CMS.  *See, e.g.*, AC ¶¶3-5.  The

Southern District of Ohio is the historical "hub" of Anthem's chart review program, and Columbus is where most of the team leaders for Anthem's chart review operations, diagnosis coding audits, and key risk adjustment compliance activities were located during the relevant time period. *Supra* at 23-26; Cogdill Decl. ¶¶4, 7, 10, 12. The Anthem business units that directed the quality assurance operations of the chart review program and Anthem's Medicare risk adjustment compliance operations likewise centered their activities in Columbus. Cogdill Decl. ¶10. The core facts of this case relate to the business processes that were developed, implemented and conducted from Columbus.

In contrast, as explained *supra* at 26-27, the Amended Complaint's only factual allegations relating to this judicial district are that Anthem operates an MA plan, maintains an office, and has communicated with healthcare providers in New York regarding the collection of medical records. Those allegations have little weight in the § 1404(a) analysis because they are not material to Plaintiff's Claims and do not distinguish New York from many other states where Anthem does business. And again, Ohio is a larger MA market for Anthem than New York is, so even if the existence of MA members or healthcare providers in a particular location were relevant to venue, those facts would still favor transfer. Cogdill Decl. ¶4.

While there are other Anthem employees across the country who have also been involved in these business processes, ***none*** of the Anthem chart review processes at issue in the Amended Complaint have ever been operated from the Southern District of New York. *Id*. ¶8, 11.

### D.   The Fifth, Sixth, and Seventh Factors Are Neutral

Anthem is not aware of any "unwilling witnesses" who would require compulsion to appear in either judicial district. *Nature's Farm*, 2004 WL 1077968, at *3. Nor do the "relative means of the parties" independently weigh for or against a transfer. *Id.* Both Anthem, a public corporation, and the United States have the capability to litigate in either Ohio or New York.

And the "forum's familiarity with the governing law factor" is also "neutral" because "the False Claims Act is a federal statute and 'any district court may handle [a federal case] with equal skill.'" *Id.* at *6 (quoting *Bristol-Myers Squibb Co. v. Andrx Pharm. LLC*, 2003 WL 22888804 at *4 (S.D.N.Y. Dec. 5, 2003)).

E.     **Plaintiff's Choice of Forum**

A plaintiff is typically entitled to a presumption in favor of its choice of forum but that choice "is given less weight where the case's operative facts have little connection with the chosen forum," *800-Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F. Supp. 128, 134 (S.D.N.Y. 1994), or where the "plaintiff chooses a forum other than [its] place of residence," *Izkhakov*, 2012 WL 2861338, at *4 (internal quotations and citation omitted).  Here, Plaintiff has alleged no facts at all meaningfully connecting this case to the Southern District of New York and the Amended Complaint cites no material witnesses who live in this district.

This matter was not initiated by a relator, much less one living or working in this district. The only fact that distinguishes this district from numerous others, including the Southern District of Ohio, is the location of Plaintiff's lawyers.  But courts—including this Court—have repeatedly held that "[t]he convenience of counsel is not an appropriate factor to consider on a motion to transfer." *Garity v. Tetraphase Pharm. Inc.*, 2019 WL 2314691, at *5 (S.D.N.Y. May 30, 2019) (Carter, J.) (quoting *InVivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F. Supp. 2d 433, 438 (S.D.N.Y. 2000)).  That is especially true where the plaintiff is the United States:  "[T]he United States government clearly also has attorneys resident in the [transferee district]." *Nature's Farm*, 2004 WL 1077968, at *4.

Even Plaintiff's choice of attorneys in this case has an attenuated connection to the Southern District of New York.  Here, the pre-filing investigation did not originate in New York. Instead, for over a year the investigation was directed by the Civil Fraud Section of the

33

Department of Justice located in Washington, D.C.  Bowman Decl. ¶2.  In early 2018, the

Department of Justice transferred the investigation to the U.S. Attorney's Office for the Southern

District of New York.  *Id.* ¶3.  Plaintiff's recent preference for this district is entitled to no

weight in the transfer analysis.  *Garity*, 2019 WL 2314691, at *5.

### F.   The Interest of Justice Based on the Totality of the Circumstances

Finally, the interests of justice and the totality of the circumstances weigh heavily in

favor of transfer to the Southern District of Ohio.  This factor considers the overall impact of

transfer, and the Court's interest in the efficient adjudication of the case.  *See Nature's Farm*,

2004 WL 1077968, at *7.  Anthem filed this motion to transfer promptly, before the parties or

the Court invested considerable resources litigating this action.  And this case has no material tie

to this district except that Plaintiff's attorneys happen to work here.  As the *Nature's Farm* court

put it, "the 'interests of justice' are not served by imposing travel inconvenience and significant

expense on individual litigants for the convenience of the United States government."  *Id.*

(citation omitted).

Courts have repeatedly transferred cases filed by the United States where the operative

facts occurred and material witnesses live in the transferee district, and where there was little

connection to the judicial district where the complaint was filed.  *Nature's Farm* is a prime

example.  There, a court in this district transferred a government FCA action from this district to

the Northern District of California.  Though some operative facts in *Nature's Farm* occurred in

this district—as well as in Buffalo, Detroit, and Canada—the "bulk of the operative facts

occurred" in California, and the United States failed to identify material witnesses living in the

Southern District of New York.  *Id.* at *5.  The court afforded especially little weight to the

Plaintiff's choice of forum "[b]ecause the United States government can adequately litigate in

multiple fora."  *Id.* at *6.  The court also emphasized that the litigation was "in the early stages,

34

which weighs in favor of a transfer." *Id.* at *7.  Indeed, although the defendant filed the motion to transfer within months of the Justice Department's intervention, the *Nature's Farm* litigation was initiated by a relator and had been pending for ***three years***, allowing the court to develop familiarity with the case and even rule on some motions.  *Id.*  Here, ***no*** material facts or witnesses connect the case to this district, and this case has been pending for far less time.  A transfer is even more warranted here than it was in *Nature's Farm*.

In fact, Plaintiff itself previously convinced a New York district court judge to transfer a similar FCA case to the judicial district where the defendant MAO's chart review operations were conducted.  *Poehling* similarly concerned allegations by Plaintiff that the defendant MAO should have used its chart reviews to identify potentially unsupported diagnosis codes that had previously been submitted to CMS.  A relator originally filed the *qui tam* complaint in the Western District of New York.  Plaintiff intervened and moved to transfer the case to the Central District of California, in part because the MAO's chart review operations were based in Los Angeles.  *See* Mem. of L. in Support of Unopposed Motion of the United States to Transfer Venue, *Poehling*, 16-cv-08697, Dkt. 49 (C.D. Cal. Nov. 8, 2016).  Plaintiff emphasized, among other things, that the defendant MAO had "a large office . . . in the Central District of California that performed a substantial portion of the work related to [its] submission of risk adjustment claims and its medical record review programs" and that "there are numerous witnesses who work or worked at that office with relevant knowledge, and many of the relevant documents are located there."  *Id.* at 6.  Plaintiff asserted that "in contrast . . . the Government did not take testimony from any witnesses located in [the Western District of New York], or obtain documents from any person or entity located in [that] district."  *Id.* at 7.

Plaintiff's arguments there strongly support transfer here.  Just as in *Poehling*, a "substantial portion of the work related to [Anthem's] submission of risk adjustment claims" occurred in Columbus, and "there are numerous witnesses who work or worked at that [Columbus] office with relevant knowledge, and many of the relevant documents are located there."  *Id.* at 6.  Further, during its pre-filing investigation, the Department of Justice deposed no witnesses, and collected no documents from any Anthem custodians, who live in this district.  Bowman Decl. ¶¶4-5.

*        *        *

This case should not be litigated in the Southern District of New York.  It belongs in the Southern District of Ohio—the venue that is convenient for the most material witnesses in the case, was the locus of the operative facts at issue, and is where the documents that relate to those facts are stored.  No material witnesses reside or work in New York and no material events occurred here.  Because the most important factors all weigh in favor of transfer, and because the remaining factors are neutral, Anthem respectfully requests that the Court transfer this action to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a).

## MOTION TO DISMISS

If the Court decides to consider Anthem's motion to dismiss, it should dismiss Plaintiff's attestation-based FCA Claims with prejudice.  This motion is directed at Claims One and Two of the Amended Complaint, as well as the portion of Claim Three that alleges Anthem submitted knowingly false risk adjustment data attestations to CMS.

## I.  Plaintiff Must Plead Materiality To Establish That Anthem Violated the FCA

For an allegedly false claim or statement to be actionable under the FCA, it must be "material."  31 U.S.C. § 3729(a)(1)(B).  After the Supreme Court's seminal decision in *Escobar*,

whether an FCA complaint adequately pleads materiality must be analyzed "rigorous[ly]" and is appropriate for resolution on a motion to dismiss.  *Escobar*, 136 S. Ct. at 2004 n.6.

In cases alleging a false certification as the basis for FCA liability, the supposed falsity of the certification "must be material to the Government's payment decision."  *Id.* at 1996.  It is insufficient for a plaintiff merely to allege that the certification or attestation is a condition of payment or that the government "would have the option to decline to pay" if the defendant failed to comply with the certification requirement.  *Id*. at 2003.  Instead, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation"—*i.e.,* the impact on the government's payment decision of the practice that supposedly rendered the attestation false.  *Id.* at 2002 (quotation marks omitted); *see also id.* at 2003 n.5 (an allegedly false attestation is material only if the government "would not have taken the action alleged to have been induced by the misrepresentation") (quoting 26 R. Lord, Williston on Contracts § 69:212, 549-50 (4th ed. 2003)).

Following *Escobar*, courts have dismissed FCA claims where the plaintiff failed to plausibly allege that the government would have refused payment of a claim if it had known the true facts regarding an alleged misrepresentation.  In *Coyne v. Amgen, Inc.*, 717 F. App'x 26 (2d Cir. 2017), for example, the Second Circuit affirmed dismissal of an FCA complaint under *Escobar* because the plaintiff failed to include "concrete allegations" that the alleged misrepresentations "caused the Government to make the reimbursement decision" at issue.  *Id.* at 29.[10]

-------------------

[10] *See also United States ex rel. Scharff v. Camelot Counseling*, 2016 WL 5416494, at *8 (S.D.N.Y. Sept. 28, 2016) (dismissing FCA claims and explaining that "[*Escobar*] stated that the relators must sufficiently allege that the defendant 'misrepresented its compliance with . . . requirements that are so central . . .  that the Medicaid program would not have paid these claims

Specifically in the context of FCA claims against an MAO based on its alleged failure to use its chart review process to identify unsupported diagnosis codes, the courts in *Swoben* and *Poehling* applied *Escobar* to dismiss Plaintiff's attestation-based claims against another MAO. *Swoben*, 2017 WL 4564722, at *6; *Poehling*, 2018 WL 163487, at *3. Just as here, Plaintiff alleged in both cases that another MAO's annual attestations regarding the accuracy of its risk adjustment data were false because the MAO conducted chart reviews that were designed only to identify new diagnosis codes but not to audit or validate the accuracy of previously submitted codes. *See Swoben*, 2017 WL 4564722, at *6 ("[The complaint] asserts that the [defendant MAOs] were involved in and aware of the . . . chart review activities and, thus, the [defendant MAOs] were obligated to undertake additional validation efforts to confirm that the . . . diagnosis codes were supported by the underlying medical charts."); *Poehling*, 2018 WL 1363487, at *6 ("The Government alleges that in 2009 through 2016, Attestations were submitted to the Medicare Program on behalf of [defendant MAOs] by [defendant MAO] officers who ignored or

---

had it known of these violations'" (quoting *Escobar*, 136 S. Ct. at 2004)); *United States v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 296 (E.D.N.Y. 2016) (dismissing complaint where relators "do not allege, as they are now required to do under [*Escobar*], . . . that the government would have refused reimbursement had it known of [defendant's] noncompliance with" the regulations at issue); *United States ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019) (affirming dismissal of relators' complaint because "the Supreme Court understands materiality to turn on whether the government would pay the claim or not if it knew of the claimant's violation"); *United States v. Pfizer Inc.*, 2019 WL 1200753, at *8 (N.D. Ill. Mar. 14, 2019) (dismissing complaint because it did not "allege that the Government's decision to pay would have been different had it known of the alleged regulatory violations"); *United States ex rel. Jersey Strong Pediatrics, LLC v. Wanaque Convalescent Ctr.*, 2017 WL 4122598, at *3 (D.N.J. Sept. 18, 2017) (materiality cannot be established unless "the government would 'not have paid the[] claims had it known of the[] violations" (quoting *Escobar*, 136 S. Ct. at 2004)).

disregarded that Defendants had failed to comply with requirements regarding submission of diagnoses.").

In *Swoben*, the district court held that Plaintiff was required to plead "that [CMS] would not have paid these claims had it known of these violations."  2017 WL 4564722, at *6 (reasoning that Plaintiff's complaint "fail[ed] to allege that CMS would have refused to make risk adjustment payments to the [defendants] if it had known about [their] alleged involvement with the . . . chart review process").  The court granted Plaintiff leave to amend its complaint to make the necessary allegation that CMS would not have paid based on the alleged false attestations, *id.* at *10, but Plaintiff instead voluntarily dismissed all of its claims against the MAO, *see* Notice of Dismissal Without Prejudice Pursuant to Fed. R. Civ. Proc. 41(a) or (c), *Swoben*, 2:09-cv-5013-JFW-JEM, Dkt. 341 (C.D. Cal. Oct. 12, 2017).

 Following the dismissal in *Swoben*, Plaintiff knew in *Poehling* that it again faced dismissal of its attestation-based claims unless it alleged that CMS would not have paid the defendant MAO had it known that its attestations were false because of the manner in which the defendant MAO conducted chart reviews.  But Plaintiff again did not make this basic allegation.  The result was the same:  the *Poehling* court held that Plaintiff must plead that "CMS would have refused to make risk adjustment payments if it had known the Attestations were false." 2018 WL 1363487, at *10.  Because Plaintiff had not made this allegation, the court dismissed Plaintiff's claims based on the defendant MAO's attestations for failing to allege materiality under *Escobar*.  *Id*.  As in *Swoben*, the court gave Plaintiff leave to amend to make the necessary allegation, and again Plaintiff declined, electing instead to prosecute its other claims against the defendant MAO.  In dismissing these attestation-based claims, the *Poehling* court remarked that the only explanation for Plaintiff's failure to make this allegation was that Plaintiff likely ***cannot***

assert it in good faith.  *Id.* (Plaintiff's refusal to make that allegation suggests *Escobar*'s

requirement is "more than just 'magic words'").

## II. Plaintiff's Attestation-Based Claims Must Be Dismissed Because Plaintiff Fails to Allege That CMS Would Have Denied Payment to Anthem if the Agency Had Known of Anthem's Chart Review Practices

Plaintiff devotes dozens of pages in the Amended Complaint to describing Anthem's

chart review program and how it allegedly rendered the Company's risk adjustment attestations

false.  Plaintiff fails entirely, however, to make the straightforward allegation required under

*Escobar* that CMS would have refused to pay Anthem had it known how the program operated.

As in *Swoben* and *Poehling*, this pleading failure is fatal to Plaintiff's attestation-based Claims.

After reviewing Plaintiff's original Complaint, Anthem submitted a letter to the Court

seeking a pre-motion conference that highlighted Plaintiff's failure to plead materiality and

sought permission to file this motion to dismiss based on the reasoning of *Swoben* and *Poehling*.

Dkt. 20.  Plaintiff then notified the Court that it would be amending its Complaint.  Dkt. 23.  In a

vain attempt to avoid the same result in *Swoben* and *Poehling*, the Amended Complaint added a

single conclusory allegation to its First and Second Claims for Relief:

> If CMS had known that Anthem's attestation was false because, at the time of the attestation, *Anthem knew that specific diagnosis codes it had submitted for payment and never deleted were inaccurate*, CMS would have taken appropriate actions to ensure that Anthem did not receive or retain risk adjustment payments to which it was not entitled, including by recouping payments through administrative processes, adjusting the reconciliation payments, or obtaining repayments in enforcement actions.

AC ¶¶162, 167 (emphasis added).[11]

_____

[11] Notably, Plaintiff makes no allegation at all regarding the materiality of the portion of its Third Claim that is based on Anthem's risk adjustment data attestations.  The only materiality allegation in that Third Claim is the conclusory assertion that Anthem "knowingly made or used a false record or statement material to an obligation to repay the Government," AC ¶169, which simply paraphrases the relevant statutory language, *see* 31 U.S.C. § 3729(a)(1)(G) (providing for

For at least three independent reasons, this lone allegation, unaccompanied by any additional factual allegations regarding CMS's "likely or actual" behavior, cannot save Plaintiff's attestation-based Claims.

### A.   The Amended Complaint Does Not Allege That CMS Would Have Refused to Make Risk Adjustment Payments to Anthem Had It Known How Anthem Was Conducting Its Chart Review Program

Every plaintiff bringing a false certification claim must show that the alleged facts which render the certification false are the same facts that are material to the government's payment decision.  *See, e.g.*, *United States ex rel. Gohil v. Sanofi U.S. Servs., Inc.*, 2020 WL 1888966, at *2 (E.D. Pa. April 16, 2020) ("The materiality inquiry focuses on whether a false claim's 'falsity' was of the type that could normally influence the government's decision to pay the claim.").  Plaintiff fails that basic requirement.  Specifically, Plaintiff fails to adequately plead materiality for its attestation-based Claims because the fact that was supposedly material to CMS's payment decision (*i.e.*, Anthem's failure to delete specific diagnosis codes that the Company subsequently learned were not supported by medical records) was not the fact that allegedly rendered Anthem's risk adjustment data attestations false (*i.e.*, how Anthem operated its chart review program).

Throughout the Amended Complaint, Plaintiff alleges that Anthem's annual attestations to CMS were false specifically because Anthem ***could have used*** its chart review program to identify potentially unsupported diagnosis codes, but chose not to do so.  *See* AC ¶156 ("As

---

liability for one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government").  Based on this failure alone, the attestation-based portion of Plaintiff's Third Claim must be dismissed.  *See Poehling*, 2018 WL 1363487, at *10 (dismissing Plaintiff's similarly unsupported attestation-based reverse false claim theory, the "Fourth Claim" in that case).

Anthem knew, each of those Part C attestations was false.  Specifically, Anthem had information in its possession—the chart review results it received from Medi-Connect—that Anthem ***could have used*** to uncover numerous inaccuracies like the seven examples enumerated in paragraph 154 above." (emphasis added)); *see also id.* ¶160 ("*[O]n account of its choice to operate its chart review program in deliberate ignorance or reckless disregard of its regulatory and contractual obligation to delete inaccurate diagnosis codes*, Anthem knowingly submitted false Part C annual attestations to CMS" (emphasis added)); *id.* ¶165 (same).  These allegations are expressly premised on Anthem's failure to use its chart review program to identify specific diagnosis codes that were not supported by medical records, not the Company's failure to correct specific diagnosis codes that it had already determined were unsupported.

Nowhere in its Amended Complaint does Plaintiff allege that CMS would not have paid Anthem had the agency known that the Company's attestations were supposedly false because it chose to operate its chart review program in a manner that did not identify potentially unsupported diagnosis codes.  Instead, in an effort to evade *Swoben* and *Poehling*, Plaintiff contends that CMS would have taken certain actions had it known that Anthem's attestations were purportedly false because of ***something entirely different***, namely, that "Anthem knew that specific diagnosis codes it had submitted for payment and never deleted were inaccurate."  *Id.* ¶¶162, 167.  But under *Escobar*, the FCA's materiality requirement "looks to the effect on the likely or actual behavior of the recipient ***of the alleged misrepresentation***," not of some other purported misrepresentation or alleged misconduct.  136 S. Ct. at 2002 (emphasis added).  Because (1) the ***purported misrepresentation*** for Plaintiff's attestation-based Claims (*i.e.*, Anthem's attestations are false because it could have used its chart review program to identify unsupported codes and failed to do so) does not match (2) the ***purported material falsity***

42

affecting CMS's payment decision (*i.e.*, actual knowledge by Anthem that specific diagnosis codes it had submitted for payment and never deleted were unsupported), Plaintiff has failed to plead that the alleged misrepresentations were material.

The court in *Poehling* rejected a similar attempt to conflate the alleged falsity of the attestations with the materiality of specific, known unsupported diagnosis codes.  There, Plaintiff attempted to save its attestation-based claims by asserting that the attestations were somehow "intertwined" with the accuracy of diagnosis codes, that the allegedly false attestations were how the defendant MAO concealed its fraudulent chart review operations from CMS, and that it would be illogical to conclude that diagnosis codes themselves are material but that "lying" in the attestations about diagnosis codes is not.  *Poehling*, 2018 WL 1363487, at *10.  In other words, as here, Plaintiff sought to establish the materiality of the allegedly false attestations by relying on the actions CMS would have supposedly taken had it known about allegedly false diagnosis codes submitted by the defendant MAO.  *Id*.

The *Poehling* court rejected this argument, concluding that "the Government must do more than allege that the Attestations and the diagnosis codes are intertwined."  *Id*.  Instead, "[t]o the extent the FCA claims are based on violations related to the Attestations, the Government must plead that the Attestations are 'material to [the Government's course of action,' specifically, to the 'Government's payment decision.'"  *Id*. (quoting *Escobar*, 136 S. Ct. at 2001).  Thus, the court held, although the "allegations regarding the diagnostic data . . . appear[ed] to be material," the allegations regarding the attestations did not suggest that the

falsities in the attestations themselves "[were] likely to influence the payment of money." *Id*. (internal citations omitted).

Here, as in *Poehling*, the potential falsity of specific diagnosis codes cannot establish the materiality of the risk adjustment attestation in a case where the attestation is allegedly false because of how the MAO conducts its chart review program; therefore, Plaintiff's Claims based on the attestations must be dismissed. *See id*. at *9 ("[T]o be material the government must have made the payment as a result" of the challenged practice) (quoting *Coyne*, 717 F. App'x at 29) (internal quotation marks omitted).

> **B.**     **The Amended Complaint Alleges Only That CMS Had the Right to Deny Payment to Anthem and Might Have Done So, Which Is Legally Insufficient Under *Escobar***

Plaintiff's attestation-based Claims must also be dismissed because the Amended Complaint only lists a series of ***potential*** actions that CMS might have taken had it known that Anthem's attestations were allegedly false, rather than making the concrete assertion—supported by factual allegations—that the agency would have refused payment, as *Escobar* requires.  *See* AC ¶¶162, 167 (alleging that CMS would have taken steps "***including*** . . . recouping payments through administrative processes, adjusting the reconciliation payments, ***or*** obtaining repayments in enforcement actions" (emphasis added)).  *Escobar* held that the fact the government "would have the option to decline to pay" or "would be entitled" to withhold payment "if it knew of the defendant's noncompliance" is not "sufficient for a finding of materiality."  *Escobar*, 136 S. Ct. at 2003-04.  Indeed, *Escobar* specifically rejected the government's argument that the appropriate test is whether "the government ***could*** lawfully withhold payment."  *Id.* at 2004 (internal quotations and citation omitted, emphasis added); *see also Poehling*, 2018 WL 1363487, at *8 ("Nor is it enough that the Government 'would have the option to decline to pay if it knew of the defendant's noncompliance.'" (quoting *Escobar*, 136 S. Ct. at 2003)).

44

Plaintiff's non-exclusive list of possible options is also insufficient because it leaves open the possibility that all CMS "would have done" is authorized an enforcement action like this lawsuit.  It is not sufficient under *Escobar* to allege that CMS would have authorized an FCA lawsuit or that it had brought FCA cases under other similar circumstances—otherwise the materiality standard would be a nullity whenever the government filed FCA claims or intervened in a relator's suit.  Such a standard is contrary to *Swoben*, *Poehling*, and every other case that has assessed materiality in a government-filed FCA suit.  *See Swoben,* 2017 WL 4564722 at *6; *Poehling*, 2018 WL 1363487 at *1 (same); *see also United States ex rel. Mei Ling v. City of Los Angeles*, 2018 WL 3814498, at *20 (C.D. Cal. July 25, 2018) ("[I]f the Government's decision to intervene in an action were given substantial weight, then materiality would be a fait accompli in any case where intervention has occurred, thus working an end-run around *Escobar*.").  As these cases make clear, vague assertions regarding actions the government **might** have taken do not meet the *Escobar* standard; instead, *Escobar* demands that a plaintiff allege facts demonstrating that the government **would not have paid** the defendant had it known of the alleged misrepresentations.  *Escobar*, 136 S. Ct. at 2002, 2004.

Plaintiff has not done that here.  It instead lists an explicitly non-exclusive series of actions that CMS might have taken (or not) had it known of the allegedly false attestations, including a step (pursuing an FCA action) that is plainly insufficient to establish materiality.  AC ¶¶162, 167.  The optional nature of these allegations renders the entire allegation meaningless, as it is possible (consistent with Plaintiff's pleading) that CMS would have taken a step that would be plainly insufficient for materiality, or even that it would have done something else entirely.  This empty allegation falls far short of the concrete statement required by *Escobar* regarding the

impact of the alleged misrepresentation on the government's payment decision and itself requires dismissal of Plaintiff's attestation-based Claims.  *Escobar*, 136 S. Ct. at 2002.

### C.   Plaintiff Does Not Allege Facts Plausibly Demonstrating that CMS Would Have Refused to Pay Anthem Had It Known How Anthem Was Conducting Its Chart Review Program

 Plaintiff has not only failed to make even the basic boilerplate allegation required under *Escobar* to plead materiality, it has also failed to support its allegation of materiality with any factual allegations.  *Escobar* made clear that a primary form of evidence that would support a materiality showing is evidence "that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular" requirement at issue.  *Id.* at 2003. Given that similar chart review practices are common in the MA industry—CMS even considered imposing a regulation addressing those practices in 2014, after all—and that Plaintiff amended its Complaint specifically to address this issue, one would have expected Plaintiff to support the materiality of its claims by alleging that CMS had denied payment to other MAOs "in the mine run of cases" based on their chart review practices.  *Id.*  But the Amended Complaint contains ***no allegation*** that CMS has ***ever*** denied payment to an MAO based on such practices.

Plaintiff also conspicuously fails to allege that CMS has refused, or likely will refuse, payment to Anthem because of how it operated its chart review program, despite the Justice Department's three-year investigation of these claims and the fact that CMS necessarily learned of Anthem's chart review practices long before Plaintiff filed this suit.  *See, e.g.*, *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("[W]e have the benefit of hindsight and should not ignore what actually occurred: the DCAA investigated McBride's allegations and did not disallow any charged costs.").  As the defendant MAO asserted in *Poehling*, the simple fact is that Plaintiff likely ***cannot*** plead that CMS would refuse to pay

claims as a result of an MAO's chart review practices "because it knows full well that CMS *is* paying them." *Poehling*, 16-cv-08697, Dkt. 182 at 14 (C.D. Cal. Dec. 8, 2017).

Plaintiff has also failed to plead any other facts suggesting that the alleged falsity in Anthem's attestations would have actually affected CMS's payment decision. "False Claims Act plaintiffs must . . . plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." 136 S. Ct. at 2004 n.6. Following *Escobar*, courts have consistently dismissed FCA claims where plaintiffs made only conclusory assertions that the government would not have paid the defendant if it had known of the alleged falsity. For example, in *United States v. CalPortland Construction*, 2018 WL 6262877 (C.D. Cal. Mar. 9, 2018), the court held that the relator's "conclusory allegations that . . . the government would not have purchased from Defendants had it been aware of Defendants' knowing violations" was "insufficient to allege materiality" under *Escobar* because "[a]n FCA complaint must allege facts to *'explain why'* the government would not have paid." *Id.* at *5 (emphasis added); *see also, e.g., United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Indiana, Inc.*, 305 F. Supp. 3d 964, 977 (S.D. Ind. 2018) (finding that relator's "bald" allegations that the government "would not have paid" the defendant had it known of defendant's alleged noncompliance were insufficient to satisfy *Escobar*'s "demanding" materiality requirement); *United States ex rel. Dresser v. Qualium Corp.*, 2016 WL 3880763, at *6 (N.D. Cal. July 18, 2016) ("The Amended Complaint alleges in several places that the government would not have paid Defendants' claims had they known of Defendants' fraudulent conduct, but does not explain why. This does not meet [*Escobar*'s] heightened materiality standard."); *United States ex rel. Maetski v. Raytheon Co.*, 2017 WL 3326452, at *7 (C.D. Cal. Aug. 3, 2017) (allegation that United States would not have paid

Raytheon's requests for payment if it knew that Raytheon had not complied with contractual specifications was "insufficient" because "it does not show *how* Raytheon's misrepresentations were material" (emphasis in original)).[12]

Following the dismissals in *Swoben* and *Poehling*, and after amending its Complaint here, Plaintiff had every opportunity and incentive to plead specific facts regarding "the ***likely*** or ***actual behavior***" of CMS based on Anthem's alleged misrepresentation. *Escobar*, 136 S. Ct. at 2002 (emphasis added). But Plaintiff pleads no facts at all regarding CMS's likely or actual behavior in response to Anthem's alleged misrepresentations. Plaintiff's inability to allege such facts is not surprising given the regulatory backdrop to this suit. *See supra*, Background Sections II-IV. After all, in 2014, CMS expressly declined to impose a regulation that would have required MAOs to conduct chart reviews in the precise manner that Plaintiff advocates in this case. Plaintiff's pleading failure is, in short, no technicality. If it were, Plaintiff would have corrected it. The only reasonable inference is that Plaintiff ***cannot*** make the contention that *Escobar*, *Swoben*, and *Poehling* require; the required factual allegation is evidently "more than just 'magic words.'" *Poehling*, 2018 WL 1363487, at *10.

Accordingly, Anthem respectfully requests that the Court dismiss with prejudice the Plaintiff's First and Second Claims, as well as the portion of its Third Claim based on Anthem's allegedly false risk adjustment attestation.[13]

---

[12] *See also United States ex rel. Potter v. CASA de Maryland*, 2018 WL 1183659, at *6 (D. Md. Mar. 6, 2018), *reconsideration denied,* 2018 WL 4733733 (D. Md. Oct. 2, 2018) ("Because the Complaint does not show ***how*** CASA's failure to disclose its I-9 noncompliance would have influenced the government's funding decisions, Potter has not adequately demonstrated materiality." (emphasis in original)).

[13] Plaintiff does not make any allegation regarding materiality in its Third Claim, and the

# MOTION TO STRIKE

Anthem also moves under Rule 12(f) to strike from the Amended Complaint irrelevant and prejudicial allegations regarding prior settlements that Plaintiff entered with healthcare providers or other MAOs that are largely based on unrelated conduct.  Specifically, the Amended Complaint describes the following settlements:

- A $3.82 million August 2012 settlement with a managed care company in a suit challenging the company's chart review program (that was part of a global settlement resolving a host of other unrelated allegations), AC ¶99;

- A $32.5 million May 2017 settlement with an MAO that allegedly submitted diagnosis codes to CMS that it knew were unsupported, *id.* ¶100;

- A $270 million October 2018 settlement with a provider "based in part" on a challenge to the provider's coding guidance and chart review program, *id.* ¶101; and

- An August 2019 settlement against a physician group for allegedly submitting diagnosis codes to CMS that it knew were unsupported, *id.* ¶102.

None of the alleged settlements involved Anthem, much less its chart review program.

A "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "An allegation is 'impertinent' or 'immaterial' when it is neither responsive nor relevant to the issues involved in the action."  *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 416 (S.D.N.Y. 2012) (quoting 2 James Wm. Moore et al., Moore's Federal Practice ¶12.37[3] (3d ed. 2010)).  Although motions to strike are "generally disfavored," they should be granted when "the matter asserted clearly has no bearing on the issue in dispute," particularly where the allegations would prejudice the defendant. *Correction Officers Benevolent Ass'n v. Kralik*, 226 F.R.D. 175, 177 (S.D.N.Y. 2005); *see also*

---

attestation portion of that Claim must therefore be dismissed.  *See supra* note 11.

*OTG Brands, LLC v. Walgreen Co.*, 2015 WL 1499559, at \*10-11 (S.D.N.Y. Mar. 31, 2015).

Here, Plaintiff's allegations regarding these unrelated settlements should be stricken for two reasons. First, courts in the Second Circuit have repeatedly held that allegations regarding prior settlements, including settlements with non-defendants, are inherently improper and should be stricken. *See, e.g.*, *Lipsky*, 551 F.2d at 893; *Low v. Robb*, 2012 WL 173472, at \*9 (S.D.N.Y. Jan. 20, 2012); *Kralik*, 226 F.R.D. at 177; *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 131 (D. Conn. 2014), *aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018); *Shahzad v. Meyers*, 1997 WL 47817, at \*13-14 (S.D.N.Y. Feb. 6, 1997). Second, the allegations regarding these unrelated settlements should be stricken because they are irrelevant, are highly prejudicial to Anthem, and will result in burdensome and unnecessary litigation if not stricken.

## I.    The Amended Complaint's Allegations Relating to Settlements by Non-Defendants Should Be Stricken Because Such Allegations Are Inadmissible and Immaterial for any Proper Purpose

Allegations regarding a prior settlement "between a federal agency and a private corporation" cannot "be used as evidence in subsequent litigation between that corporation and another party" to imply that the defendant is liable, and therefore are not "appropriately within the pleadings." *Lipsky*, 551 F.2d at 893, 894. In *Lipsky*, the Second Circuit affirmed a district court's order striking allegations regarding a prior U.S. Securities & Exchange Commission ("SEC") complaint against the defendant. Because a subsequent consent judgment between the defendant and the SEC was "not the result of an actual adjudication of any of the issues," it could "not be used as evidence in subsequent litigation between that corporation and another party." *Id.* at 893.

Following *Lipsky*, district courts in this circuit have considered it "well settled under Second Circuit law that allegations in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of

law, immaterial within the meaning of Fed. R. Civ. P. 12(f)." *Robb*, 2012 WL 173472, at *9 (striking "references to unrelated disputes and lawsuits").[14]  As these cases have explained, allegations regarding prior settlements, like the allegations here, "could have no possible bearing on the dispute before the court" because they are "the result of a private bargain between the parties and was not a 'hearing or ruling[] or any form of decision on the merits by the . . . court.'" *Fridman*, 643 F. Supp. 2d at 403 (quoting *Lipsky*); *see also Silverman v. Wachovia Bank, N.A.*, 2011 WL 13305358, at *3 (E.D.N.Y. May 4, 2011) (granting motion to strike allegations about prior proceedings "because they are 'not the result of an actual adjudication of any of the issues' and thus are not 'appropriately within the pleadings'") (quoting *Lipsky*).

The logic of those decisions applies with equal (if not greater) force to allegations regarding prior settlements or proceedings involving non-defendants.  As one court put it, such allegations are "clearly irrelevant" because they say nothing about the current "case or the facts giving rise thereto."  *Kralik*, 226 F.R.D. at 177; *see also In re Trilegiant*, 11 F. Supp. 3d at 131 (striking allegations regarding prior settlement to which several defendants were not a party); *Shahzad*, 1997 WL 47817, at *13-14 (striking allegations regarding several consent orders the defendant entered into with regulators, as well as an affidavit written by an SEC investigator in a suit involving different defendants).

Under *Lipsky* and well-established authority in this circuit, Plaintiff's allegations relating to its settlements with nonparties must be stricken from the Amended Complaint.

---

[14] *See also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010); *RSM Production Corp. v. Fridman,* 643 F.Supp.2d 382, 403 (S.D.N.Y. 2009); *Gotlin v. Lederman*, 367 F. Supp. 2d 349 (E.D.N.Y. 2005), *aff'd sub nom. Gotlin ex rel. Cty. of Richmond v. Lederman*, 483 F. App'x 583 (2d Cir. 2012); *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.,* 218 F.R.D. 76, 78 (S.D.N.Y.2003).

II.     **The Settlement Allegations Should Also Be Stricken Because They Are Not Relevant and Are Highly Prejudicial**

The settlements alleged in the Amended Complaint, which do not involve Anthem and relate primarily to practices not at issue in this case, are irrelevant to Plaintiff's assertions that Anthem's retrospective chart review program rendered its risk adjustment data attestations false. Further, any possible relevance of these allegations is plainly outweighed by the unfair prejudice to Anthem and the wasteful expenditure of resources that will necessarily result if they are not removed from the Amended Complaint.[15]  *See, e.g.*, *OTG Brands*, 2015 WL 1499559, at *10-11.

A.     **The Amended Complaint's Allegations Regarding Settlements Are Not Relevant**

None of the allegations involving prior government settlements involve Anthem, and by the Amended Complaint's own description, two of the settlements do not involve chart review practices at all.  *See* AC ¶¶99, 101.  For the two settlements that marginally involved chart review practices, government press releases suggest that those cases predominantly involved other business practices that appear to have driven the settlements in those cases.[16]

One reason why allegations regarding such prior settlements rarely, if ever, have

─────────────────

[15] Courts have recognized that in appropriate cases the Rule 12(f) analysis is very similar to the evidentiary analysis required by Federal Rules of Evidence 402 and 403.  *See Ledford v. Rapid-Am. Corp.*, 1988 WL 3428, at *1-2 (S.D.N.Y. Jan. 8, 1988) (striking allegations per *Lipsky* and noting that Rules 402 and 403 were "the governing evidentiary Rules"); *Kent v. AVCO Corp.*, 815 F. Supp. 67, 71 (D. Conn. 1992) (allegations about separate litigation had "no relevance . . . and their only effect [was] to prejudice the defendant," such that "[t]he value of allowing these references in this case [was] outweighed by the prejudicial effect they would have").

[16] *See* U.S. Dep't of Justice, *DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks* (Oct. 22, 2014), https://www.justice.gov/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks; U.S. Dep't of Justice, *Long Beach-Based Health Plan Pays Nearly $320 Million to Settle Allegations that it Received Overpayments for Medi-Cal Patients* (Aug. 23, 2012), https://www.justice.gov/archive/usao/cac/Pressroom/2012/112.html.

probative value in later cases is that it is impossible to know the basis for the prior settlements without a mini-trial into the circumstances or motivations of the settling parties. Perhaps the United States settled its chart-review allegations in those cases for pennies on the dollar because it doubted the viability of its claims. For instance, Plaintiff's $3.2 million settlement with SCAN Health Plan, alleged in paragraph 99 of the Amended Complaint, was a minuscule portion of a much larger settlement totaling nearly $324 million—*one hundred times* the amount of the chart review-related settlement. *See supra* n.16. Such allegations are not "appropriately within the pleadings" because they are the result of a "private bargain," not a finding by any court. *Lipsky*, 551 F.2d at 893-94. Those concerns are heightened here because Anthem was not even a party to those settlements, and is not able to address the settlements without extensive discovery from Plaintiff and the non-parties that negotiated the settlements. *See, e.g.*, *Kralik*, 226 F.R.D. at 177.

The ostensible basis offered in the Amended Complaint for these irrelevant allegations is that they somehow support the materiality of Plaintiff's FCA Claims. *See* AC ¶98; Dkt. 23. But as detailed above, *supra* at 36-39, 44-45, whether or not a false claim is material is based on the impact of an alleged misrepresentation on "the Government's *payment decision*," *Escobar*, 136 S. Ct. at 2002 (emphasis added), rather than whether the government chose to file a lawsuit against that defendant or, for unknown reasons, it settled prior lawsuits involving similar conduct. In short, prior lawsuits filed by the United States, and then settled, say nothing about CMS's decision to continue payments to MAOs that conduct so-called "one-way" chart reviews, and thus are not relevant to the materiality of Plaintiff's FCA Claims under *Escobar*. *See Poehling*, 2018 WL 1363487, at *10.

The Amended Complaint also alleges that Anthem was aware of "the Government's active efforts to pursue legal remedies in order to enforce Medicare Part C's risk adjustment data

accuracy requirement" and that Anthem executives were aware of one of the alleged settlements. AC ¶¶103-05.  But it is not clear how these allegations are relevant to any element of Plaintiff's Claims, such as knowledge of falsity.  The allegation that Anthem was aware that Plaintiff had filed and settled an FCA suit connected in some unknown way to another MAO's chart review practices does nothing to establish that Anthem (or even the settling MAO) should have concluded that its own practices were unlawful.  Plaintiff acknowledges the limited relevance of this allegation, asserting in the Amended Complaint only that Anthem was aware of the potential for "scrutiny in connection with how retrospective reviews are performed and . . . how risk adjustment payments are calculated." *Id.* ¶104.  But a general awareness of government oversight—in a highly regulated government program—falls far short of specific knowledge by Anthem that its own chart review program violated a particular CMS requirement.

### B. The Settlement Allegations Are Unfairly Prejudicial to Anthem and Will Waste the Resources of the Parties and the Court

The settlement allegations should also be stricken because any potential relevance of those settlements is substantially outweighed by the unfair prejudice and waste of time and resources that would result if they remain.

The effect of these allegations is to "bootstrap" Plaintiff's Claims by suggesting that Anthem is liable because other defendants have settled purportedly similar suits before.  Thus, even if the allegations were somehow relevant to Plaintiff's Claims, they should be stricken under the Rule 403 standard because any potential relevance is substantially outweighed by the obvious prejudice to Anthem and the confusion to the litigation that would result from submitting evidence regarding non-party settlements.  *See Ledford*, 1988 WL 3428, at *2 (striking "bootstrapping" allegations regarding a prior administrative finding against the defendant, because the evidence pertaining to the allegation would violate Rule 403); *Gotlin*, 367

F. Supp. 2d at 364 (striking similar allegation because the "probative value [of the allegation was] likely to be outweighed by prejudice to defendants" were the case to proceed to trial).[17]

The settlement allegations, if not struck, will also waste time and resources because the allegations will necessitate costly litigation of issues entirely unrelated to Plaintiff's Claims against Anthem.  "The function of the motion [to strike] is to avoid the expenditure of time and money that must arise from litigating spurious issues, by dispensing with those issues prior to trial."  2 James Wm. Moore et al., *Moore's Federal Practice* § 12.37(3) (2020); *cf.* Fed. R. Evid. 403; *see also Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 647 (S.D.N.Y. 2018) (Carter, J.).  Unless these allegations are stricken, Anthem will have no choice but to seek discovery regarding the nature of the business practices challenged in the prior actions and the circumstances of the settlements to distinguish their facts, as well as to test Plaintiff's professed reasons for entering into these settlements.  Despite putting the settlements directly at issue, Plaintiff to date has refused to waive any assertion of privilege over documents related to the settlements.  *See* Dkts. 19, 23.  As a consequence, Anthem will be forced to challenge that untenable position if the allegations remain part of the Amended Complaint, ensuring that these irrelevant and prejudicial allegations will result in unnecessary and expensive discovery litigation.

---

[17] *See also Reiter's Beer Distribs., Inc. v. Christian Schmidt Brewing Co.*, 657 F. Supp. 136, 144 (E.D.N.Y. 1987) (allegations in a private antitrust suit that the state Attorney General had pursued actions against beer wholesalers, generally, for antitrust violations, "impl[ied], without so stating directly, that the Attorney General has begun an investigation into [the defendant's] practices in this case," and the "only effect" of those allegations was to prejudice the defendant); *MC1 Healthcare, Inc. v. United Health Grp., Inc.*, 2019 WL 2015949, at *11 (D. Conn. May 7, 2019), *on reconsideration in part*, 2019 WL 3202965 (D. Conn. July 16, 2019) ("The Court agrees with United that the Ingenix litigation is irrelevant to this proceeding.  As such, its only intended effect can be to prejudice United and therefore it is stricken.").

# CONCLUSION

For the foregoing reasons, this Court should transfer this suit to the Southern District of

Ohio.  If the Court addresses Anthem's motion to dismiss and motion to strike, it should dismiss

Plaintiff's First and Second Claims, and the portion of Claim Three based on Anthem's

attestations, and strike paragraphs 99 through 105 from the Amended Complaint.


Dated:  September 17, 2020

By:   /s/ K. Lee Blalack, II _____

K. LEE BLALACK, II, *Admitted Pro Hac Vice*
DAVID J. LEVISS
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C.  20006-4061
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414
lblalack@omm.com
dleviss@omm.com

JAMES A. BOWMAN, *Admitted Pro Hac Vice*
MARGARET L. CARTER, *Admitted Pro Hac Vice*
**O'MELVENY & MYERS LLP**
400 South Hope Street
18th Floor
Los Angeles, California 90071-2899
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407
jbowman@omm.com
mcarter@omm.com

DAVID DEATON, *Admitted Pro Hac Vice*
**O'MELVENY & MYERS LLP**
610 Newport Center Drive
17th Floor
Newport Beach, California 92660
Telephone: +1 949 823 6900
Facsimile: +1 949 823 6994
ddeaton@omm.com

VALERYA ("VALERIE") COHEN
**O'MELVENY & MYERS LLP**
7 Times Square
New York, New York 10036
Telephone: +1 212 326 2000
Facsimile: +1 212 326 2061
vcohen@omm.com

*Attorneys for Defendant*
*Anthem, Inc.*