USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/30/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES,**

                Plaintiff,

        -against-

**ANTHEM INC.,**

                Defendant.

20-cv-2593 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, United States District Judge:**

The Government brings this civil fraud action against Defendant, Anthem Inc. ("Anthem"), alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*. The Government alleges that Defendant has knowingly disregarded its duty to ensure the accuracy of the risk adjustment diagnosis data that it submitted to the Centers for Medicare and Medicaid Services ("CMS") under the Part C plans operated by Anthem. The Government alleges that through failure to delete inaccurate diagnoses, Defendant unlawfully obtained and retained from CMS, payments under the risk adjustment payment system for Medicare Part C. Plaintiff alleges that through Defendant's actions, Anthem has improperly obtained and retained millions of dollars from CMS in violation of three FCA provisions, (1) 31 U.S.C. § 3729(a)(1)(A), (2) 31 U.S.C. § 3729(a)(1)(B), and § (3)3729(a)(1)(G).

## BACKGROUND

The Centers for Medicare and Medicaid Services ("CMS"), an agency within Department of Health and Human Services ("HHS"), administers the Medicare Program's risk adjustment system for Medicare Part C. CMS promulgates regulations and annual agreements to define the obligations of Medicare Advantage Organizations ("MAOs")under Medicare Part C. CMS requires MAOs to implement effective compliance programs under 42 U.S.C. § 422.503(a),

which in turn, ensures that information submitted to CMS is accurate and truthful. (*See* 65 Fed. Reg. 40170-01 at 40263 (June 29,2000). CMS's Part C regulations require MAOs to "[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct fraud, waste and abuse." 42 C.F.R. § 422.503(b)(4)(vi). CMS's Part C regulations specify that MAOs are required to implement certain core requirements.

Defendant, Anthem Inc., formerly known as WellPoint, through its subsidiaries and affiliates, operates dozens of Medicare Part C plans.

Plaintiff alleges that Defendant was obligated to follow CMS regulations required for compliance with the ICD coding guidelines, medical record documentation standard, and the requirement that MAOs must affirmatively assess the accuracy of their diagnosis data submissions against the coding guidelines and medical record documentation standard.

Defendant was aware of its contractual obligations to submit diagnosis data in accordance with CMS's requirements.  For instance, in August 2010, Defendant distributed an "outreach and education" bulletin to physicians and other healthcare providers entitled "Risk Adjustment 101." (Exhibit 4). The bulletin stated that "CMS uses documentation from medical records to validate that the appropriate ICD-9 code has been assigned" and "If the medical record does not support the reported ICD-9 code, CMS may adjust payments" to the Part C plans. (*See* Exhibit 4).

In another instance, Plaintiff asserts that Defendants understood the relevant sections of the Medicare Manage Care ("MMC") Manual and CMS's trainings since in 2015, Defendants issued an internal coding manual. Defendants instructed its staff that "when coding medical records on behalf of Anthem (formerly WellPoint) for Medicare Advantage Risk Adjustment purposes… [individuals should] refer to the Official ICD… Coding Guidelines." *See* Medicare Advantage Risk Adjustment Programs (the "2015 Anthem Coding Manual") (Exhibit 4 and 5).

By executing the Part C annual agreements, Defendants agreed to abide by CMS's requirement for MAOs to delete inaccurate diagnosis codes that they previously submitted. (ECF. No 1. At 24). Although this posed challenges of its own, part of Defendants regulatory obligation is to be "responsible for deleting the submitted ICD codes as soon as possible when it determined that any ICD diagnosis codes that have been submitted do not meet risk adjustment submission requirements." *See* MMC Manual, Chap. 7 § 40 (June 2013).

The Government filed this suit on.  Defendant now moves to transfer this action to the Southern District of Ohio, or in the alternative to dismiss.  Defendant also moves to strike allegations from the Amended Complaint.

## I. Motion to Strike

Anthem seeks to strike portions of the complaint referencing the government's settlements with other MAOs or healthcare providers.  Under Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  The motion must "state with particularity the grounds for seeking the order." Fed. R. Civ. P. 7(b)(1); *see, e.g.*, *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 579 (2d Cir. 1969) ("[T]he motion to strike was much too general in that it did not specify which parts of the ... affidavit should be stricken and why . . . . [T]he motion to strike must be precise."). "To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15 CIV. 7425 (JSR), 2016 WL 3144053, at *1 (S.D.N.Y. Apr. 11, 2016) (collecting cases).  "[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." *See Lipsky v. Commonwealth*

*United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see also Arias-Zeballos v. Tan*, No. 06 CIV. 1268 (GEL), 2006 WL 3075528, at *9 (S.D.N.Y. Oct. 26, 2006) (describing motions to strike as "generally disfavored").

"Matters should be stricken on the basis of impertinence only where the allegation bears no possible relation whatsoever to the subject matter of the litigation." *AdvanceMe, Inc. v. Lenders Int'l*, No. 11 CV 3624 VB, 2011 WL 6425488, at *2 (S.D.N.Y. Dec. 19, 2011) (quoting *Wahlstrom v. Metro–North Commuter R.R. Co.*, No. 96-CV-3589 (PKL), 1996 WL 684211, at *2 (S.D.N.Y. Nov. 25, 1996)). The Court is not inclined to strike any of the disputed paragraphs.

## II.     Motion to Transfer

Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). In deciding a motion to transfer venue, the Court must first consider whether this case could have been brought in the transferee district. If venue would have been proper in the transferee district, the Court next considers whether transfer is in the interests of convenience and justice. To make this determination, district courts consider several factors:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Walker v. Jon Renau Collection, Inc.*, 423 F. Supp. 2d 115, 117 (S.D.N.Y. 2005).

The Parties acknowledge that the FCA provides for nationwide process. The appropriateness of venue in the Southern District of Ohio, then , is not in dispute.

a. *Plaintiff's Choice of Forum*

Plaintiff's choice of forum is usually entitled to great deference. *See D.H. Blair & Co. Inc.,* 462 F.3d at 107. However, "plaintiffs' choice of forum is accorded less weight where the plaintiffs' chosen forum is neither their home nor the place where the operative facts of the action occurred." *Dwyer v. Gen. Motors Corp.,* 853 F. Supp. 690, 694 (S.D.N.Y. 1994); *see also Rindfleisch v. Gentiva Health Sys., Inc.,* 752 F. Supp. 2d 246, 251 (E.D.N.Y. 2010). The Government has the capability to litigate in either forum. The Court gives no weight to this factor. *See United States ex rel. Bassan v. Omnicare, Inc.*, No. 15-cv-4179 (CM), 2022 WL 72300 (S.D.N.Y. Jan. 7, 2022).

b. *Locus of Operative Facts*

"The location of operative events is a primary factor in determining a § 1404(a) motion." *Eres N.V.,* 605 F. Supp. 2d at 481. "To determine where the locus of operative facts lies, courts look to the site of events from which the claims arises." *Flood v. Carlson Restaurants Inc.*, 94 F. Supp. 3d 572, 578 (S.D.N.Y. 2015).

This case involves a nationwide scheme with multiple loci. Defendant argues that employees at its Columbus, Ohio office were charged with submitting the data at issue to CMS, making Ohio the locus of operative facts. The Government argues that the operations at Ohio, although necessary to the scheme, were only administrative, and the true policymakers that motivated the fraud worked in Anthem's offices across the country. The Court finds that the locus of operative facts for the purposes of this motion should be determined by the location of the decisionmakers. The facts point to a fraud scheme in which key decision makers, namely Anthem's executives, pushed a policy of revenue maximization in lieu of legal compliance. *Cf. United States ex rel. Fla. v. ApolloMD Inc.*, No. 1:17-CV-20012-KMW, 2020 WL 10181736, at

*7 (S.D. Fla. Aug. 3, 2020) (transferring case where a nationwide fraudulent billing scheme was driven by senior executives at company's headquarters in another forum).  This factor is neutral against transfer.

    c. *Convenience of the Witnesses*

The convenience of witnesses is "typically the most important factor" on a motion to transfer.  *Eres N. V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 480 (S.D.N.Y. 2009).  Further, "[t]he convenience of non-party witnesses is accorded more weight than that of party witnesses." *Indian Harbor,* 419 F. Supp. 2d at 402.

Defendant argues that witnesses likely to be called to testify are located in Ohio.  Plaintiff contends that those witnesses, though arguably greater in number, were not decision makers in the alleged fraudulent scheme and are thus less important to proving or disproving the elements of the FCA case.  The Government notes that other potential witnesses, who are no longer Anthem employees, decision makers, are located in Connecticut and Maryland.  They also point to a number of other witnesses located in other parts of the country.

The nonparty witnesses at issue appear to reside outside of Ohio, and a number of these witnesses are located in the Northeast.  Given the location of the nonparty witnesses in this case, the convenience of the witnesses in this case weighs against transfer to the Southern District of Ohio.

    d. *Location of Relevant Documents and Relative Ease of Access to Sources of Proof*

This factor is less important "in an era of electronic documents, easy copying and overnight shipping." *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 548 (S.D.N.Y. 2008).  Defendant alleges that the relevant documents are in Ohio as the Columbus office was

responsible for running the chart review program. Plaintiff argues the opposite given that policymakers were not situated in Columbus. The Court finds that this factor is neutral.

After considering all of these factors, the Court denies the motion to transfer.

### III. Motion to Dismiss

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). Additionally, "[a]lthough the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (internal quotation marks and citations omitted).

"[T]o be actionable under the FCA, 'a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.'" *United States ex rel. Foreman v.*

*AECOM*, 19 F.4th 85, 109 (2d Cir. 2021) (quoting *Escobar*, 136 S. Ct. at 2002). A plaintiff must therefore plead sufficient facts to plausibly allege materiality. *Id.* (citing *Escobar*, 136 S. Ct. at 2004 n.6). "Materiality must also "be pleaded with particularity under Rule 9(b)." *Id.* (quotation marks and citations omitted). "The materiality standard "is demanding," inasmuch as it serves to protect the FCA from being transformed into 'a vehicle for punishing garden-variety breaches of contract or regulatory violations.'" *Id.* (quoting *Escobar*, 136 S. Ct. at 2003.)

In determining materiality a court considers: "(1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was 'minor or insubstantial.'" *AECOM*, 19 F.4th at 110 (quoting *Escobar*)

As an initial matter, Defendant contends that *Escobar* requires that Plaintiff meet the threshold question of whether CMS would have refused payment if it had known of the misrepresentations. The Court disagrees with the Defendant's reading. In *Escobar*, the Supreme Court notes:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

579 U.S. 176, 194 (2016). Contrary to the Defendant's reading, the above pronouncement merely deems a showing that the Government would have the right to decline to pay as insufficient for a finding of materiality. If CMS absolutely would have refused to pay had it known of the misrepresentation, that misrepresentation would certainly be material. But that is materiality's ceiling, not its floor. Materiality "looks the effect on the likely or actual behavior

8

of the recipient of the alleged misrepresentation," *i.e.*, whether the decisionmaker would attach importance to that information when making a decision. *Escobar*, 579 U.S. at 193-94. Defendant attempts to mint a new standard of materiality by reading this necessity into the *Escobar* factors. True, there may not be a big gap between materiality's floor and ceiling, but there is a gap. The Court declines to adopt Defendant's view and now turns to consider the *Escobar* factors.

    a. *Whether the Requirement Was an Express Condition of Payment*

"[W]here a misrepresentation relates to a condition of eligibility, examining only the express conditions of ultimate payment will obscure the true materiality of a requirement." *United States v. Strock*, 982 F.3d 51, 62 (2d Cir. 2020). "Although the Supreme Court in Escobar indicated that the government's decision to expressly identify a provision as a condition of payment is relevant, it emphasized that this factor is not "automatically dispositive." *AECOM*, 19 F.4th at 111 (quoting *Escobar*, 136 S. Ct. at 2003).

Plaintiff argues that the annual attestations language regarding potential criminal prosecutions or civil actions should be read as an express condition of payment. Defendant disagrees. Anthem has the better of the argument. Plaintiff does not point to any express language in the contract that violations of CMS regulations would result in nonpayment. Given that this factor is not dispositive, the Court declines to dismiss Plaintiff's allegations based on an absence of an express condition of payment.

    b. *Response to Noncompliance*

This "factor concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision." *United States v. Strock*, 982 F.3d 51, 62 (2d Cir. 2020). "*Escobar* directs examination of the government's reaction to noncompliance both 'in the

9

mine run of cases,' as well as in the "particular" case at issue." *Id.* (quoting *Escobar*, 136 S. Ct. at 2003).

The Amended Complaint contains no allegations that the Government had actual knowledge of noncompliance with these CMS regulations before the beginning of similar *qui tam* suits. In that regard, Defendant cannot and does not claim that the Government's response to its noncompliance was mere acquiescence. CMS routinely audited MAOs for noncompliance, at times recouping losses incurred from overpayment to MAOs. AC ¶ 95. The Amended Complaint contains allegations of four separate instances in which Plaintiff sued other MAOs who have defrauded CMS through similar noncompliant policies like those at issue here. One such instance occurred before the relevant period, and Anthem's executives appeared to have knowledge of this enforcement action. *See* AC ¶¶ 99, 104-05.

        *c.   Whether the defendants' alleged noncompliance was "minor or insubstantial."*

"This factor looks at the 'contracts' purpose' and whether "the defendants' noncompliance deprived the government of [the] intended benefits" of the contract. *AECOM*, 19 F.4th at116 (2d Cir. 2021) (quoting *Strock*, 982 F.3d at 65). "Set against the backdrop of complex and voluminous regulatory and contractual requirements, "'broad appeals' to the importance of a given regulatory requirement 'cannot clear the rigorous materiality hurdle.'" *AECOM*, 19 F.4th at 116 (quoting *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020)). Courts instead consider 'whether [the Government] has demonstrated sufficiently widespread deficiencies' in the contractor's performance or identified misrepresentations that go to the heart of the bargain, such that any regulatory, statutory, or contractual violations 'would likely affect the Government's payment decision.'" *Id.* (quoting *United States ex rel. Janssen*, 949 F.3d at 542). "Absent such a showing, it cannot be said that any such violations truly go the essence of the bargain." *Id.* "The significant financial costs to

the government of the alleged . . . violations tend to weigh in favor of materiality because they suggest that the alleged violations might affect the government's payment decision." *AECOM*, 19 F.4th at 117.

Here, Anthem submitted annual attestations acknowledging that "misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution." AC ¶ 88. Anthem argues the threat of suit or prosecution does not mean CMS would have declined payment if it was aware of Anthem's failure to meet its obligations. Here, the financial costs to the government—the total overpayment to Anthem—appears to be well over $100 million. The Government alleges that Anthem's chart review program resulted in an estimated tens of millions in overpayments per year. AC ¶¶ 145-46. The financial costs to the Government here are substantial and not merely administrative costs. *Cf. AECOM* (declining to find substantiality where financial costs to government was low despite a showing that violations might have affected the government's payment decision).

## CONCLUSION

For the foregoing reasons, Defendant's motion is DENIED. The Clerk of the Court is respectfully directed to terminate ECF No. 36.

**SO ORDERED.**

**Dated:** **September 30, 2022**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**