```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA,          : Docket #20-CV-2593

                    Plaintiff,     :

     -against-                     :

ANTHEM, INC.,                      : New York, New York
                                     April 11, 2023
                    Defendant.

--------------------------------:

                     PROCEEDINGS BEFORE
            THE HONORABLE KATHARINE H. PARKER
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      DOJ-USAO
                    BY:  ZACHARY BANNON, ESQ.
                         ADAM M. GITLIN, ESQ.
                         DANA WALSH KUMAR, ESQ.
                         REBECCA SOL TINIO, ESQ.
                    86 Chambers Street, 3rd Floor
                    New York, New York 10007

For Defendant:      O'MELVENY & MYERS, LLP
                    BY:  K. LEE BLALACK, II, ESQ.
                         DAVID DEATON, ESQ.
                         VALERYA COHEN, ESQ.
                         JIM BOWMAN, ESQ.
                    1625 Eye Street, NW
                    Washington, DC 20006

For Defendant:      NELSON MULLINS RILEY &
                    SCARBOROUGH, LLP
                    BY:  JOHN MARTIN, ESQ.
                    1320 Main Street, 17th Floor
                    Columbia, South Carolina 29201

Transcription Service: Marissa Mignano Transcription
                    Phone:  (631) 813-9335
                    E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1          THE DEPUTY CLERK:  Calling case 20-cv-2593,
2    USA v. Anthem.
3          Beginning with counsel for the plaintiff,
4    please make your appearance for the record.
5          MR. JACOB:  Good morning, Your Honor.
6    Charles Jacob for the United States.  I am here with
7    my colleagues AUSA Zach Bannon, Adam Giltin, Dana
8    Walsh Kumar, and Rebecca Tinio.
9          THE COURT:  Hi.
10          THE DEPUTY CLERK:  And the counsel for the
11    defendant, please make your appearance for the
12    record.
13          MR. BLALACK:  Good morning, Your Honor.
14    Lee Blalack, lead counsel for the defendant, here
15    with my colleagues David Deaton, Jim Bowman, Valerya
16    Cohen, and John Martin.
17          THE COURT:  Okay.  Hi, everyone.
18          So we're here for an initial case
19    management conference.  I see you already have some
20    disputes about the schedule, and I want to talk
21    about that.  I'd like to hear a little bit more
22    about the case from the Government, and it seems as
23    if there's a Massachusetts action that may be
24    related.
25          Is there information in that that's been

1    exchanged in that case that may be relevant in this

2    case?  Why don't plaintiffs start?

3              MR. JACOB:  Sure.  Thank you, Your Honor.

4              This case is principally about how Anthem

5    came to learn through a retrospective review of its

6    medical records for its beneficiaries that diagnoses

7    that it had submitted to the Government were not

8    supported.  And we actually don't think there's too

9    much in dispute about how that program operated.

10   And we would like discovery -- and we think

11   discovery should be really focused in this case.

12             There is a related litigation out in

13   California where the United States has brought a

14   case against another Medicare Advantage

15   organization, United.

16             THE COURT:  Okay.

17             MR. JACOB:  One of the reasons why we think

18   discovery can be streamlined in this case is that

19   the Government has already collected a significant

20   number of documents in that case that we can try and

21   leverage here to make efficient productions to

22   Anthem.

23             THE COURT:  Even though it was a different

24   company?

25             MR. JACOB:  It's a different company.  So

1    what Anthem is seeking discovery on is the issue of

2    materiality from the Government.  And so the

3    materiality issues are similar, and the collections

4    of the relevant custodians are similar, because the

5    Government is intending to prove at trial that these

6    submissions were material to the Government's

7    payment decisions.

8            So we do need to offer evidence on that,

9    and the Anthem is entitled to some discovery on

10   that, but we think it needs to be focused and

11   streamlined, consistent with Judge Carter's decision

12   in this case and the motion to dismiss, which

13   already defined what the legal standard should be on

14   materiality.

15           THE COURT:  Okay.  So the computer -- it's

16   a computer program that goes through the bill; is

17   that right?

18           MR. JACOB:  So the program that Anthem

19   operated was a review of medical charts.  So they

20   had vendors as employees look through medical charts

21   and find additional diagnoses codes, which led to

22   more money being paid to Anthem by --

23           THE COURT:  So there were actual people

24   doing that?  It wasn't a computer program?

25           MR. JACOB:  Yes.

1          THE COURT:  All right.  And then these --

2    so these individuals who went through what you're

3    saying might have realized, oh, this code was

4    improper, at the same time they were reviewing and

5    saying, oh, we also need to submit for this code?

6          MR. JACOB:  Yes.  It's a little slightly

7    different.  What we allege is that Anthem learned

8    through that program that codes it had previously

9    submitted to the Government were not actually

10   supported by the medical documentation.  And what

11   Anthem did was continue to attest to the Government

12   that its submissions were accurate.  And what it

13   also did was it failed to delete those unsupported

14   codes in violation of the False Claims Act.

15         THE COURT:  So was it the same vendor that

16   reviewed Anthem's submissions as reviewed United's

17   submissions?  I'm a little unclear as to why there

18   would be overlap since it's a different company.

19         MR. JACOB:  Yeah, of course.  So the

20   discovery from Anthem is going to be different than

21   the discovery took from United in that case.  What

22   we're thinking is similar is the discovery to be

23   taken from the Government.  So in other words,

24   Anthem's discovery request to the Government.

25         THE COURT:  I see.  I see.

1          What you already -- what the Government

2     produced would be the same to Anthem?

3          MR. JACOB:  Yes.  And it's true that we did

4     conduct an investigation of Anthem before bringing

5     this suit, so we do have a fair amount of documents

6     that we would like to, you know, make use of that

7     and not require the duplication of efforts.

8          THE COURT:  Right.

9          MR. JACOB:  So we want to focus on

10    discovery on the aspect that we really need, which

11    for example, is the database that Anthem has.  It's

12    pretty technical, but that should reflect the

13    diagnosis codes that it didn't delete and will allow

14    the Government to identify the full population of

15    false claims here.

16         THE COURT:  And for the database, what

17    period of time are you looking to cover?

18         MR. JACOB:  Our relevant time period is

19    2014 to 2018.

20         THE COURT:  Okay.  And have you already had

21    conversation with defense counsel about production

22    of that database?

23         MR. JACOB:  We've had initial conversations

24    during a Rule 26(F) conference.  We brought it up

25    during some more meet and confer emails yesterday.

1    You know, we're going to serve our formal document

2    request by, we expect, early next week.

3         THE COURT:  So that data really is going to

4    be the key?  That's the key evidence from the

5    Government's standpoint?

6         MR. JACOB:  Yeah, that's part of the key

7    evidence for the claims and damages.  We are going

8    to take some discovery relating to Centre as well,

9    the company's knowledge and instructions of the

10   program and how it worked and how the company came

11   to learn that these claims were unsupported.

12        THE COURT:  And I saw that you wanted or

13   both parties were thinking there would be 35

14   depositions on each side.  That's a lot.

15        Who are the witnesses?  Have you already

16   talked about custodians and -- custodians and

17   witnesses?  There'll be some overlap, but there may

18   not be complete overlap?

19        MR. JACOB:  Yeah, and to be clear, just one

20   point, we're fine with fewer depositions.  Anthem

21   requested 35.  Our proposal was 25, but as an

22   accommodation to Anthem's request, we agreed to 35.

23   And the same with respect to the interrogatories as

24   well and the proposed 35.  We were fine with 25.

25        THE COURT:  Okay.

```
 1              MR. JACOB:  But, yeah, we've exchanged
 2    Rule 26 disclosures that identify -- the parties
 3    have already done that, that identify witnesses on
 4    both sides.
 5              THE COURT:  Okay.  And so just to enlighten
 6    me a little bit more, who are these witnesses?  Are
 7    they some of the reviewers?
 8              MR. JACOB:  Yeah.
 9              THE COURT:  And then there were -- at the
10    vendor, and then people at Anthem who were the
11    decision makers about the submissions?
12              MR. JACOB:  That's fair.  We're looking for
13    the individuals at Anthem who designed and operated
14    the chart review program, who had knowledge relating
15    to the representations that Anthem made to CMS, as
16    well as the vendor that actually operated that
17    program, which will be third-party discovery.
18              THE COURT:  Right.  Okay.
19              MR. JACOB:  But we think 14 months is more
20    than enough time to accomplish this task for both
21    parties.
22              THE COURT:  And the expert discovery that
23    you're anticipating, are you anticipating there'll
24    be an expert who will look at that data?  Sort of a
25    data expert.
```

```
 1              MR. JACOB:  Exactly.
 2              THE COURT:  And any other kind of expert?
 3              MR. JACOB:  Not from the Government's
 4    perspective.  We expect that expert to provide
 5    additional analysis on top of the data, but it'll
 6    be, we expect, one expert from the Government's side
 7    currently.
 8              THE COURT:  Okay.  All right.  I'll come
 9    back to you.
10              But let me hear next from Anthem in terms
11    of, overall, what it's thinking for discovery.
12              MR. BLALACK:  Good morning, Your Honor.
13    Lee Blalack for the defendant.  So let me just put
14    the context of our defense into some perspective.
15    There'll be a lot of little factual defenses.
16              We don't agree, for example, that the
17    results of the chart reviews, which is what they're
18    called, the medical record reviews that my opposing
19    counsel identified, showed that Anthem had knowledge
20    of unsupported diagnosis codes that had been
21    submitted to CMS.  That's going to be a factual
22    question that the parties will have to work through.
23              In other words, the fact of those chart
24    reviews and what they produced will not answer the
25    question definitively as suggested here, that Anthem
```

1    had knowledge that there was a diagnosis code

2    submitted to the Government that's not supported.

3    So that's kind of a preliminary factual question

4    that will be disputed.

5            THE COURT:  What are the qualifications of

6    the people who do these reviews?

7            MR. BLALACK:  They're vendors who are

8    coders, certified coders.  So they --

9            THE COURT:  People whose title -- job title

10   is coder?

11           MR. BLALACK:  They're certified -- they're

12   trained as coders.

13           THE COURT:  And what does that mean?  What

14   is their background?  Is it in healthcare?  Is it in

15   billing?

16           MR. BLALACK:  Well, there's an entire

17   industry, Your Honor, of coders who work in

18   healthcare because they have to translate what a

19   doctor writes in a medical record into a claim that

20   gets submitted to a payer either in commercial

21   health insurance or in a Government health plan.

22           THE COURT:  So these coders are looking at

23   actual doctors' notes.

24           MR. BLALACK:  Correct.  They look at a

25   medical record, and then based on the coding

```
 1    rules -- and there are coding rules that will be --
 2    I suspect, at the end of the day, some of those,
 3    many of those may be disputed before the case is
 4    over.
 5              They will apply those rules to the medical
 6    records, and they will record their views of what
 7    diagnostic conditions can be recorded from the
 8    medical record, and then they'll report that to --
 9    in some documentation or database.  And then that's
10    then used --
11              THE COURT:  These are not people who are
12    nurses or doctors?
13              MR. BLALACK:  There might be, but that's
14    not a requirement.
15              THE COURT:  It's not a job requirement?
16              MR. BLALACK:  Correct.  There is an entire
17    industry with trade associations and everything of
18    thousands and thousands of people who work as
19    diagnostic or procedural coders.
20              THE COURT:  I'm just trying to get a little
21    bit more understanding of it because it's not my
22    industry.
23              MR. BLALACK:  Sure.  Sure.
24              THE COURT:  So these individuals are
25    looking -- as part of this chart review, they're
```

1  looking at individual patients and their doctor's

2  notes?

3           MR. BLALACK:  Correct.

4           THE COURT:  And then they're going to look

5  at codes that were submitted and that were not

6  submitted?  How does that work?

7           MR. BLALACK:  No, they simply look at the

8  medical record without any knowledge of what has or

9  has not been submitted to CMS.  And then they

10  record, based on that review, in their judgment,

11  what information the medical record supports in the

12  way of a code.

13           THE COURT:  Okay.  And so that would be,

14  say, certain tests, certain other kinds of services?

15           MR. BLALACK:  It could be based on

16  laboratory information.  It could be other --

17  there's a very arcane, detailed set of rules that

18  govern how you can record a diagnosis generally and

19  in connection with the Medicare Advantage or

20  Medicare programs.

21           So, for example, the guidance that the

22  United States issues or that CMS issues, 115

23  single-space pages of detailed guidance.  So it is

24  information that coders use, along with other trade

25  association guidance issued by the American Hospital

1   Association, the American Coders Association, who

2   take all of that, like any other profession, look at

3   the record and say, based on this record, I find

4   these conditions can be reported as diagnosed

5   conditions based on the doctor's medical record.

6          THE COURT:  Okay.  So when they -- so they

7   evaluate.  In their discretion, they come up with

8   codes based on their training and this guidance.

9          MR. BLALACK:  Correct.

10          THE COURT:  And then what do they do as

11   part of this chart review?

12          MR. BLALACK:  They just report it.

13          THE COURT:  Report it how?

14          MR. BLALACK:  They report it usually into a

15   database that then gets ultimately compiled and

16   submitted to the client.  In this case, it would be

17   Anthem.  But these are vendors that work for every

18   health insurer who participates in these programs in

19   the country.

20          THE COURT:  And so they put it into the

21   database, they send it to Anthem, and then is there

22   somebody at Anthem that then looks at it, or is

23   there a computer algorithm that looks at it?  What

24   happens?

25          MR. BLALACK:  It depends, and it changed

1    over time, Your Honor.  The evidence will show that

2    depending on the time period and the program at

3    Anthem, it evolved in varying ways that will be

4    highlighted in discovery.

5        But sometimes there was a computer

6    extraction of which codes the chart review vendor

7    found were not on file with CMS, and then those

8    could be submitted under CMS guidance.  CMS

9    specifically authorizes the submission of what's

10   called Risk Adjustment Data, diagnostic data to the

11   Government through chart review programs.

12       THE COURT:  What does that mean in plain

13   English?

14       MR. BLALACK:  It means that CMS

15   contemplates that health insurers like Anthem or

16   United, which is the target of another action by the

17   United States, or Kaiser or Humana can use a process

18   called retrospective chart review, which is the

19   process -- the corporate practice that's in dispute

20   in this case, to go out and mine medical records of

21   their members to see if there are conditions,

22   diagnostic conditions, that the doctor did not

23   report in a claim form at the time of the encounter,

24   but that should have been reported.

25       THE COURT:  Okay.  And if another -- so if

1    there's another diagnosis, somebody had diabetes
2    that wasn't reported --
3         MR. BLALACK:  The doctor didn't write it
4    down, but the record establishes that the person has
5    diagnosed diabetes.
6         THE COURT:  And so then that will justify
7    payment for additional --
8         MR. BLALACK:  Correct.
9         THE COURT:  -- tests or medications or
10   visits?
11        MR. BLALACK:  Well, Medicare Advantage --
12   Medicare Advantage doesn't pay on procedures or
13   services.  So you don't get paid for having rendered
14   care to a member.  You are paid as a Medicare
15   Advantage organization for assuming the risk of
16   future cost of care in the next year.  You submit a
17   bid.  You anticipate what the cost of that care will
18   be.  It's a very complex formula that I won't bore
19   the Court with.  A payment is established, and then
20   it can be adjusted.  It's called risk adjustment.
21        THE COURT:  So if there's more diagnoses,
22   you get paid more?
23        MR. BLALACK:  Correct.  Well, of a certain
24   type, Your Honor.  There are some diagnoses that
25   don't have any impact on risk adjustment at all.

1    There are some, like the example you used, diabetes,
2    that would.
3         So if a doctor did not record diabetes in
4    the claim information for that patient, even though
5    Anthem had accepted the risk of care for diabetes in
6    the coming year for that member because they bid for
7    all of the cost of the medical care under Medicare
8    Advantage for that member, they would not get that
9    reimbursement.  The chart review would identify that
10   misdiagnosis of diabetes, would submit it, and then
11   that risk would be properly accounted for in the
12   reimbursement.  That's how the system is designed to
13   work.
14        THE COURT:  So Anthem, once it gets the
15   information from its vendor, looks at the codes,
16   compares it against what codes were already
17   submitted, and then submits the differential, the
18   ones that weren't previously submitted?
19        MR. BLALACK:  Correct.  And that is a
20   recognized and authorized practice by CMS that every
21   health plan that participates in Medicare Advantage
22   uses.  And many of them use vendors.  Some will use
23   internal employee coders; others will use vendors,
24   as in the case of Anthem in this dispute.
25        THE COURT:  And you said that there's a

1    computer?  Once these codes are put into the
2    computer, it's a computer that compares what was
3    submitted and what previously was --
4            MR. BLALACK:  I think the evidence will
5    show it depended on time, Your Honor.  I mean, this
6    was --
7            THE COURT:  So this case is involving 2014
8    through '18.
9            So what period of time were you using
10   humans versus --
11           MR. BLALACK:  Right.  I think there will
12   be -- because it was not as centralized and as
13   organized as the United States implies, I think
14   there will be some instances where a human might
15   have done the comparison, but most of that time
16   period is going to involve a computer comparison
17   between the file provided by the vendor and the file
18   that's submitted to the Government.
19           THE COURT:  I see.
20           And so the people of the vendor were
21   looking at these charts and coming up with the codes
22   in their discretion based on the guidelines?
23           MR. BLALACK:  Correct.
24           THE COURT:  They're never knowing what was
25   previously submitted; they're only doing an

```
 1    independent review.

 2              Is that how it works?

 3              MR. BLALACK:  That's the theory.  I mean, I

 4    can't represent for every one of them.

 5              THE COURT:  I'm not asking the theory.  I'm

 6    asking what was done at Anthem.

 7              MR. BLALACK:  Yeah.  I have no knowledge of

 8    anybody at the vendor who had knowledge of anything

 9    on file with CMS.  They were looking at medical

10    records and just doing a blind code.

11              THE COURT:  They're just -- okay.

12              So it's just a second review of records,

13    basically?

14              MR. BLALACK:  Well, it's the first review

15    of the medical record, because the way the original

16    data gets submitted, it comes in in a claim.  So the

17    doctor in his office or her office send a claim

18    form.

19              THE COURT:  I see.

20              MR. BLALACK:  And there's a diagnosis code

21    listed.  There's no medical record.  It's just in a

22    claim form representing this code exists.

23              THE COURT:  I see.

24              MR. BLALACK:  That's what gets submitted to

25    CMS through various data systems.
```

```
 1                    THE COURT:  I see.
 2                    MR. BLALACK:  But there's not a -- that
 3      could be --
 4                    THE COURT:  So that -- the first claims and
 5      codes submitted are actually by the doctor's office?
 6                    MR. BLALACK:  They come through Anthem, but
 7      the original diagnosis code originates with the
 8      physician's medical group or whoever does the
 9      billing for the physician.
10                    THE COURT:  And then somebody unattached to
11      the actual doctor's office reviews.
12                    MR. BLALACK:  The medical record.
13                    THE COURT:  Sitting somewhere, someplace at
14      the vendor, reviewing the records, and coming up
15      with more codes?
16                    MR. BLALACK:  Correct.  Identifies the
17      additional codes from the medical record.
18                    THE COURT:  And what has -- in the period
19      of time we're talking about, 2014 to 2018, how much
20      money did this differential represent to Anthem?
21                    MR. BLALACK:  I don't have that number in
22      my head, Your Honor.  I don't know.
23                    THE COURT:  Do you have an approximation?
24                    MR. BLALACK:  Hold on one second.  Probably
25      100 million per year, roughly, I would think.
```

```
 1              THE COURT:  Per year?
 2              MR. BLALACK:  Give or take.
 3              THE COURT:  100 million per year
 4    differential?  It made a difference?
 5              MR. BLALACK:  But don't hold me to that
 6    precise number.  That's just a ballpark, Your Honor.
 7              THE COURT:  Yeah, I'm just asking.
 8              MR. BLALACK:  I mean, that is -- will be
 9    subject of substantial discovery.
10              THE COURT:  Of course.
11              Are you expecting there to be an expert on
12    that issue?
13              MR. BLALACK:  I expect there will be an
14    expert on a number of issues.  We'll have a damages
15    expert, Your Honor, once we see what the
16    Government's damages theory is and we have a view on
17    how to calculate damages and what's required.
18              We'll have experts on the program and how
19    it is intended to operate and what guidance the
20    agency gave and didn't give.  We'll have experts on
21    some of the clinical coding issues that are involved
22    in the case, industry practices, those kinds of
23    things.
24              We'll have much more than one expert
25    because our core defense, Your Honor, is going to be
```

1    really three things:  One, there's -- leaving aside

2    the dispute we have about whether the actual chart

3    review extract does or does not give Anthem

4    knowledge of an unsupported diagnosis code on file,

5    set that aside, even if it were true, our position

6    is we would not have knowledge under the False

7    Claims Act, under the *Safeco* line of cases from the

8    Supreme Court, because the guidance issued by the

9    United States does not prescribe the type of chart

10   review practices that the United States alleges were

11   required here.

12           And, in fact, the agency contemplated

13   issuing a regulation in 2014 requiring what the

14   United States alleges was required here, and the

15   agency withdrew that rule and did not issue it.  And

16   the guidance that we expect the United States to

17   rely on for the obligation to conduct the program in

18   the way they say we should have, we will establish

19   was ambiguous, did not require clearly us to perform

20   the practice in that way, and that the

21   interpretation of the relevant regulatory standards

22   that we applied was objectively reasonable and that

23   we were never warned away from the type of

24   interpretation of the standard that we applied,

25   which is what the relevant knowledge defense

1    requires under the *Safeco* decision.

2           The second defense will be materiality

3    under the *Escobar* case, which basically says every

4    violation of a contract or regulation is not a

5    violation of the False Claims Act.  You have to show

6    that the violation would have impacted the

7    Government's payment decision.  There's reason to

8    believe that it would have.  And we're going to

9    show, based on discovery from CMS, that it didn't

10   and wouldn't.

11          The agency not only knew about these

12   practices, but authorized them and never made any

13   decisions with respect to payment, either retracting

14   payment, pursuing overpayments, seeking to recover

15   payments that would suggest that their decision to

16   make a risk adjustment payment to Anthem was

17   impacted by this business practice.

18          And then our final defense will be damages.

19   And, again, it's a little unclear because we're not

20   exactly sure yet how the United States will prove

21   damage.  But in the risk adjustment context, because

22   the payment is not based on a procedure -- it's not

23   you get paid for doing this; you get paid for

24   assuming risk -- there will be actuarial issues that

25   will factor into how you calculate damages in this

```
 1   case.
 2               THE COURT:  And why do you need 35
 3   depositions?
 4               MR. BLALACK:  Well, I mean --
 5               THE COURT:  I mean, it seems that you have
 6   more of the information here than the Government.
 7               MR. BLALACK:  Yeah, that's where I think we
 8   disagree, Your Honor.  We're going to take or
 9   pursue, with the Court's permission, a lot of
10   discovery from the United States.
11               THE COURT:  So explain what that is.
12               MR. BLALACK:  Well, we're going to take
13   discovery of the individuals at CMS and HHS-OIG at
14   least, the Office of Inspector General, who were
15   involved in issuing the guidance that's in dispute
16   here and establishing through their own
17   communications contemporaneously, at the time, and
18   through deposition testimony, that our view of what
19   those standards required and didn't require is
20   correct and that our understanding of those
21   standards is correct and that they were aware of
22   those practices.
23               THE COURT:  In terms of the guidance, I
24   mean, doesn't the guidance speak for itself, or are
25   there other Government publications interpreting the
```

1    guidance or court rules interpreting the guidance?

2    I don't -- I guess what I'm trying to understand is

3    that any debate that happened prior to the issuance

4    of the guidance sort of is -- it ultimately resulted

5    in whatever was published, right, and statements

6    about it.

7           So what exactly are you seeking --

8           MR. BLALACK:  Well --

9           THE COURT:  -- from these regulators, I'll

10   call them --

11          MR. BLALACK:  Sure.

12          THE COURT:  -- of the Inspector General?

13          MR. BLALACK:  Well, under the *Safeco*

14   defense, Your Honor, the communications of the

15   regulators regarding what their guidance was and

16   what they meant and whether the guidance was

17   ambiguous, whether they warned the defendant away

18   from the improper interpretation that the defendant

19   is offering, whether they knew about the industry

20   practice in question, which is relevant to

21   materiality, whether they took any action critical

22   of the practice, took any action to recover monies

23   paid based on the --

24          All of that is about the Government's state

25   of mind and the Government's conduct.  And the

1    interesting thing here, Your Honor, is we're coming
2    along in this case with a long history of other
3    cases already on this practice.  In the case of
4    the --
5           THE COURT:  So then why can't you use that
6    testimony since there's been already been
7    depositions of some of these same people?  So you
8    could use that testimony.
9           MR. BLALACK:  And if, to my surprise, we
10   get all of the stuff from the *Poehling* case --
11   that's one of our first requests.  Give us all the
12   material you produced in the *Poehling* case and that
13   may, in fact, shorten our -- or make our work easier
14   in terms of identifying the type of evidence we
15   need.  And it may be that a lot of what we need is
16   in there, and they're going to give it to us.
17          I can tell you I'm litigating a case
18   against the United States right now in the Northern
19   District of California for the Kaiser Health Plans,
20   where there is -- it's not the exact theory, but
21   it's all about submission of false risk adjustment
22   data, the failure to correct what was alleged to be
23   incorrect risk adjustment data.  And in that case,
24   we asked for the *Poehling* records and we got an
25   objection and a refusal to produce.

```
 1              THE COURT:  And this Poehling case is
 2   pending where?
 3              MR. BLALACK:  In the Central District of
 4   California.
 5              And just to give you a sense, Your Honor,
 6   so you understand how the scale of these cases are,
 7   because they're incredibly complex and incredibly
 8   document and witness intensive, the Poehling case
 9   had five years and three months of fact discovery.
10   If it stays on the current trajectory for trial,
11   which is September of this year, it will have been
12   six years and two months from the first initial case
13   management conference to the trial date.
14              In the Kaiser case, the one I've got in the
15   Northern District, the United States and we agreed
16   on a schedule in that case.  And in that case, the
17   agreed fact discovery period was two years and two
18   months.
19              THE COURT:  But you now have quite a lot of
20   information about a lot of these processes, and so
21   you have some savings from that.
22              MR. BLALACK:  And if that bears out, Your
23   Honor, that will certainly affect my view on this.
24   That has not been our experience so far in the other
25   cases.  So if this case, the United States surprises
```

1    me, and all of a sudden we get a very open they're

2    going to share all the stuff from the *Poehling* case,

3    we're going to get that material, we can review

4    that, it might affect whether we do need that amount

5    of time.

6            But I haven't seen that, and we haven't

7    gotten their responses to our discovery requests

8    yet, and I have experienced objections to that same

9    discovery request in another case.  So if, in fact,

10   we get all the stuff from the *Poehling* case and we

11   can rely on that record, I don't think it's going to

12   solve all our problems, but it will certainly make

13   our task easier and more efficient.

14           THE COURT:  Do you know who all of the

15   deponents were in that case?

16           MR. BLALACK:  We don't.  I can tell you,

17   Your Honor, that in that case, in the *Poehling* case,

18   the United States has taken 31 deposition so far.

19   UnitedHealth, which is a Medicare Advantage

20   organization like Anthem, has taken 36, and they

21   have nine more to take.  So they're going to end up

22   at 76.

23           In our case, in the Northern District of

24   California, the parties agreed on 150 depositions.

25   Now, that was inflated because we had some relator

```
 1    qui tams along with the individual case by the
 2    Government.  So it's not a perfect analogue, but it
 3    gives you a sense of the scale of the discovery in
 4    these cases.
 5            And, in fact, in the Poehling case, the
 6    United States produced 3.6 million documents, and
 7    United produced 2 million.  So, again, if --
 8            THE COURT:  Okay.  But I've got other cases
 9    involving that volume of documents that don't take
10    six years.
11            MR. BLALACK:  Well, and we certainly are --
12            THE COURT:  Plenty of cases that involve
13    that many that don't take six years.
14            MR. BLALACK:  And we certainly aren't --
15            THE COURT:  Or five years.
16            MR. BLALACK:  Right.  And we're not
17    proposing six, Your Honor.  What I'm trying to avoid
18    is a schedule where we know we're not going to hit
19    that.  I can know just from prior experience, we're
20    not going to hit those targets.  And each side is
21    then generating records about why we need an
22    extension and who's responsible, and that process
23    that creates work that's not useful for the parties.
24            THE COURT:  Well, we're going to have
25    monthly conferences in this case.
```

 1          MR. BLALACK:  Well, that will help --
 2    certainly help.
 3          THE COURT:  So it's not going to -- I'm
 4    going to move the case along.  We're going to have
 5    monthly discovery conferences, and we're going to
 6    try to avoid discovery motion practice.  Under my
 7    rules, if there's a discovery issue, you need to
 8    write a letter.  Actually, in this case, we'll have
 9    agenda letters a week in advance.
10          They're not going to be arguments.  They're
11    not going to be briefs.  Sometimes parties get a
12    little over excited about these agenda letters.  I
13    want them to just be agenda letters, not huge
14    arguments.  If there needs to be briefing, we can
15    discuss that, and then there can be briefing.  But I
16    just want the basic positions in these agenda
17    letters on issues.  But we're going to have monthly
18    conferences.  I'm going to keep this moving.
19          MR. BLALACK:  Great.  We welcome that, Your
20    Honor.
21          THE COURT:  Okay.  So --
22          MR. JACOB:  Your Honor, if I may just
23    respond to a couple of points.
24          THE COURT:  Yeah.  I want to just talk
25    about some of these early issues that you flagged in

1    the proposal, but I'll hear next from the

2    Government.

3         MR. JACOB:  So just a couple of points on

4    the *United* case and why it took so long.  That case

5    was in fact discovery when the global pandemic hit,

6    and my understanding was it was delayed

7    significantly as a result of that.

8         THE COURT:  Okay.

9         MR. JACOB:  And a key difference here is

10   that we have the guidance from Judge Carter on what

11   materiality is, and we agree with your suggestion

12   earlier that the guidance, for example, speaks for

13   itself and that these internal probings of, you

14   know, every piece of paper at CMS with low-level

15   employees don't bear on the issue of materiality.

16        You know, Judge Carter explained the three

17   factors.  Only one of them requires discovery, in

18   our view, which is the Government's response to

19   noncompliance with the relevant contractual,

20   statutory, and regulatory provision.  And we're

21   going to provide them with significant discovery.

22   We're going to use that *Poehling* production and

23   provide significant discovery that will overlap

24   significantly with the *Poehling* case.

25        But there are -- we can't just hand over

1    the *Poehling* productions for a couple of reasons:

2    One, embedded in those productions is sensitive and

3    proprietary data and communications related to

4    United, Anthem's competitor.

5            THE COURT:  Okay.

6            MR. JACOB:  Also, the Government asserted

7    privileges that were overruled in that case.  We

8    intend to still assert those executive privileges

9    here that we think both the parties should not even

10   need to get into because those issues are not

11   relevant.  But, for example, the Government has a

12   deliberative process, privilege related, as you're

13   well aware.

14           THE COURT:  Yes.

15           MR. JACOB:  I'm sure.

16           THE COURT:  So you are anticipating some

17   privilege motions involving deliberative process?

18           MR. JACOB:  Yeah.  And our view is it's not

19   even relevant, right, the lead up to the formulation

20   of a rule.

21           THE COURT:  Right.

22           MR. JACOB:  The 2014 rule that they cite,

23   the Government explains why they didn't adopt it.

24   So, sure, they have their legal defenses.  They can

25   make that on summary judgment.

```
 1              THE COURT:  Right.
 2              MR. JACOB:  We just don't think we need
 3    discovery on that.
 4              THE COURT:  Right.
 5              So one question I have for you, though:
 6    Can't you at least provide a list of who was deposed
 7    from the Government?  I mean, you could see if
 8    there's overlap there.
 9              MR. JACOB:  Yeah.  We're happy to provide
10    that list.
11              THE COURT:  Because there may be deposition
12    transcripts where you could redact.  If there's
13    proprietary information of United, you might be able
14    to redact that and then just produce the deposition
15    transcripts.
16              MR. JACOB:  I agree with that, Your Honor.
17              THE COURT:  So that would be something that
18    would, I'm sure, accelerate the discovery process,
19    and that would also save Anthem costs.  So I think
20    Anthem is not going to have an issue with redacting
21    its competitor's proprietary information.
22              Is that fair to say?  I mean, maybe you'd
23    like it.
24              MR. BLALACK:  Well, let me say this:  I
25    think it depends on what the information is.  Part
```

 1    of what we're going to be looking for are
 2    communications between our competitors and the
 3    Government about the very issue here.
 4            THE COURT:  Why?
 5            MR. BLALACK:  Because it's going to show
 6    that the Government thought this practice was just
 7    fine and had no objections and certainly didn't seek
 8    to recover payment based on this practice.  This was
 9    not a secret.  This was an open industry practice,
10    widely known, discussed --
11            THE COURT:  Why don't you just subpoena
12    somebody from your competitor?
13            MR. BLALACK:  Well, I suppose we can do
14    that, Your Honor, but the Government has the records
15    showing the communications with the United States,
16    and the United States is the key because we want to
17    be able to -- you're talking about witnesses.  I
18    could get a list of 40 witnesses of people that were
19    deposed from the Government in that case.  Some of
20    them will be people I know that we want to depose
21    because I just know enough about their role.  Some
22    of them might not.
23            So it's going to depend on what the
24    documentary record says to help us refine who those
25    witnesses are within the United States that we want

1    to depose.  Some of them I know I can look at and

2    tell you right now we're going to want to depose.

3    Some of them, I might not.

4          So I do think there will be information

5    that competitors produce to the Government where

6    we'd be able to, after we met and confer, say we

7    don't need to see that; we can redact it or withhold

8    it, depending on what it is.  But it's not going to

9    be the case that everything that involves a

10   competitor is irrelevant in the case.

11         THE COURT:  Well, we'll have to, you know,

12   deal with that when it comes up because maybe there

13   needs to be attorneys' eyes only.  Maybe there needs

14   to be permission from the competitor, you know, for

15   release of some depo transcripts.

16         MR. BLALACK:  And we're fine with that,

17   Your Honor.

18         THE COURT:  Something of that sort.

19         I do want to just caution both sides that

20   I'm going to enforce Rule 34 as amended with

21   proportionality.  So I am urging the parties, urging

22   them to tailor the document requests.  I don't want

23   to see all kinds of any and all with a long list of

24   things.  It sounds like both sides are quite

25   familiar with the issues here, and you should be

```
 1    very able to be precise in your document requests.
 2              And I don't want a lot of overlap of the
 3    document requests.  So if you've already served a
 4    hundred document requests, I don't think that you
 5    need to serve anymore for quite some time.  So be
 6    judicious in how you are requesting documents and
 7    tailoring.
 8              And I also want to advise the parties that
 9    in responding to document requests, I don't want to
10    hear just an objection, or it's too narrow.  Suggest
11    something that you will produce, what you can
12    produce, what is reasonable and proportional and
13    why.  I expect that kind of dialogue.
14              Both parties are, you know, quite able,
15    capable litigators.  That's what I want to see.  I
16    don't want to see fights where you haven't fully
17    developed whether there's something that is -- that
18    you could work out between these.  And I don't want
19    you to be starting with things that are grossly over
20    broad.  If I see those in this case, I'm just going
21    to strike them down.  Okay?
22              Particularly with the caliber of lawyers in
23    this case, that should now -- I shouldn't be seeing
24    disputes over that kind of document request.  So I
25    am expecting meet and confers and focus on
```

1   proportionality.

2              Okay.  So you've already talked about a

3   protective order and ESI protocol, but you're not

4   done with that yet?

5              MR. JACOB:  We're not done.  We've

6   exchanged drafts, and we're in the process of

7   negotiating.

8              THE COURT:  Okay.  I have a sample

9   confidentiality order.  You may need to have some

10  tweaks to that, but --

11             MR. JACOB:  That's precisely what the

12  Government has worked off of, Your Honor.

13             THE COURT:  Okay.  Good.  Because that

14  works in most cases with some tweaks.

15             MR. JACOB:  We agree.

16             THE COURT:  And if you want to be more

17  specific about clawbacks, for example, or the timing

18  of clawbacks, you can think about that and put that

19  in.  I have sort of a standard 502(D) provision, but

20  if you want to -- I think it's sufficient.  But what

21  might not be sufficient is clawback -- I don't want

22  to have a dispute coming up about clawbacks a week

23  before a deposition when the parties have planned

24  things.

25             That, you know, can create a lot of issues

1    in these kinds of cases when you have a lot of

2    deposition like that.  So if you want to add

3    something like that, you should maybe think about

4    that.

5            And for the ESI protocol, I suggest that

6    you think about that more iteratively because you

7    may not anticipate everything.  You might want to

8    have a more general ESI kind of protocol, and then,

9    as you see the data, you can then have a

10   conversation about further refining it.  Sometimes

11   overly detailed -- I don't want you to spend an

12   undue amount of time on the ESI protocol before you

13   actually see some data.  It sometimes can work

14   against the parties that way.

15           Okay.  I'd like you to try to get the

16   protective order and the ESI protocol in place for

17   submission by the end of this month.  I think that

18   should be doable.

19           Now, there are a couple of disputes here

20   that you wrote were anticipated:  Anthem's request

21   for an additional early Rule 30(b)(6) deposition and

22   its request to propound five contingent

23   interrogatories.  I guess I want to understand from

24   Anthem first what it is seeking, and then I'll hear

25   from the Government.

```
 1              MR. BLALACK:  Thank you, Your Honor.

 2              So the first issue is we would simply like

 3     to take an early exploratory deposition of the

 4     United States focused on the key division's

 5     personnel who were involved in the decisions that

 6     we're going to be pursuing discovery related to for

 7     materiality and knowledge.

 8              And so the goal here is there is some

 9     question in the case law whether we need leave to do

10     that.  We have told the Government we will only do

11     it by leave, and under the case law, it states that

12     leave should be granted if it's otherwise permitted

13     in Rule 26(B).  We have told the Government we will

14     share with them a draft of the notice without

15     serving it so that they can look at it and react to

16     it and give us their feedback.  And then our hope is

17     that we can work out an agreement in advance,

18     consent, and just do it without a contested motion.

19              THE COURT:  But aren't there organizational

20     charts?  I mean, don't you know who the key people

21     are?

22              MR. BLALACK:  We don't, Your Honor.  And we

23     certainly don't have a sense of the functional

24     responsibilities and reporting roles of the key

25     people.  This is an issue we just litigated in our
```

1    case in the Northern District of California.

2              THE COURT:  But how do you not know this if

3    you have been involved in other litigations

4    involving similar -- aren't the Government officials

5    who are involved known?

6              MR. BLALACK:  Well, the standards -- we

7    haven't been involved in the *Poehling* case, Your

8    Honor.  That's the *United* case.  We've just observed

9    that from afar, watching the record.  We've been

10   involved in the case involving risk adjustment

11   submissions against Kaiser.  And, in fact, the

12   magistrate judge in that case just authorized us,

13   over the Government's objection, to take an early

14   30(b)(6) on organizational and reporting issues for

15   the simple reason that it will help make future

16   discovery requests more tailored and focused, which

17   the Court noted on the record numerous times.

18             THE COURT:  Well, how much overlap is there

19   for the 30(b)(6) that you're going to be taking in

20   this case?  Why can't --

21             MR. BLALACK:  I think there might be some,

22   but it won't be perfect, Your Honor, because the

23   standards that are in dispute in the *Kaiser* case are

24   not the exact same standards as in dispute in this

25   case.

```
 1              THE COURT:  Yeah, but you're just talking
 2       about -- this is just organizational reporting and
 3       foundational issues.
 4              MR. BLALACK:  Related to the standards that
 5       are going to be the dispute in the case.  So we're
 6       not just going to take a general "Tell us how CMS
 7       works" type of deposition.  It's the people who are
 8       involved in the actual standards and administering
 9       the discrete standards governing the practice at
10       issue in this case, which is not --
11              THE COURT:  Well, when is that one going to
12       be taken?
13              MR. BLALACK:  Well, we are supposed to have
14       an agreement back to the magistrate by Friday, so
15       hopefully we'll get that deposition in the next
16       month.
17              THE COURT:  Okay.  So why shouldn't you
18       just wait until you take that deposition, see what
19       you can use, and then see about what remains?
20              MR. BLALACK:  That might very well help
21       narrow the dispute.  We're not adverse to that, Your
22       Honor, at all.
23              THE COURT:  I think that probably makes
24       sense.
25              MR. BLALACK:  That's fine with us.  But
```

```
 1    we -- I wouldn't expect us to have worked out the
 2    meet and confer process with the United States on
 3    the 30(b)(6) anyway to either get to an impasse or
 4    get to an agreement for a few weeks.  We're going to
 5    send them the draft notice probably early next week.
 6    They'll look at it.  We'll talk.  So hopefully we'll
 7    either get to --
 8           THE COURT:  Well, how much is it going to
 9    be identical to the notice in the other case?
10           MR. BLALACK:  The basic types of questions
11    or topics will be the same, but the standards will
12    be different.  Many of them will be different.  So
13    the people implicated may be different.  That's why.
14           THE COURT:  Maybe.
15           MR. BLALACK:  Divisions and people.
16           We'll see.  I can't speak until I get the
17    testimony.  And if there's testimony in that case
18    that covers this case, and the United States, in
19    this case, is comfortable allowing us to use it in
20    this case to focus --
21           THE COURT:  I mean, why couldn't you
22    cooperate?  If it's the same witnesses, if the
23    Government can see the deposition notice in that
24    other case that was permitted, and it's the same
25    people being designated that would be designated in
```

1     yours, maybe you could accelerate that, and you

2     could agree just to use that deposition for both

3     cases.

4          Doesn't that save a lot of time?

5          MR. BLALACK:  Well, if the United States

6     will tell us that the people who are involved with

7     the standards dispute in this case are the same

8     people involved there, and we can -- are permitted

9     by agreement of all the lawyers on both cases to

10     cover these issues in that deposition, we're not

11     averse to that, as long as we have adequate time.

12          So it's not like we're trying to be overly

13     formalistic.  It's just I have no indication from

14     the United States that they're open to us using --

15     on either case, using that deposition in this case,

16     or any assurance that the people who would be

17     testifying in that 30(b)(6) would have the knowledge

18     about the standards -- who was involved with the

19     standards at issue in this case.  I just don't know

20     the answer to that, Your Honor, which is why we hope

21     the meet and confer process can help resolve that.

22          THE COURT:  And what about these contention

23     interrogatories?  Because those interrogatories are

24     really not that useful, honestly.

25          MR. BLALACK:  Yeah.  Well, these aren't

1    just ordinary "Tell us why you were damaged" type

2    interrogatories.  These are the core issue in the

3    case.  So the interrogatories we're talking about --

4            THE COURT:  Isn't it obvious?

5            MR. BLALACK:  No, it's not.

6            THE COURT:  The Government is saying that

7    it paid more money than it should have.

8            MR. BLALACK:  We don't know what the false

9    claims are.  We don't -- I can't tell you -- I

10   couldn't go pick up what is the claim for payment

11   that the United States contends we submitted to CMS

12   that was false, I couldn't tell you why they think

13   it was false, and I couldn't tell you how much

14   overpayment they claim the United States suffered as

15   a result of the submission of that false claim.

16           So our goal is to get some very basic

17   understanding of what their theory of liability is

18   around the actual false claims they've identified.

19   Now, we've, again, talked with the United States

20   about this already, told them we'd share a draft of

21   the rogs in advance before serving them so they

22   could react, because we'd like their consent to

23   this.  We think this will be to their benefit and

24   ours and the Court's to make the process going

25   forward more efficient.

```
 1              And, in fact, these interrogatories I'm
 2     talking about, Your Honor, to give you a sense, we
 3     did serve in the Northern District of California
 4     case.
 5              THE COURT:  And did you get answers?
 6              MR. BLALACK:  Yes, but they wouldn't answer
 7     this case because this is specific to Anthem.  So
 8     the claims for payment that Anthem supposedly
 9     submitted and they're supposedly false and why
10     they're false and what the financial injury is,
11     nothing in those cases speak to that.
12              Now, those cases -- in both of those cases,
13     the United States did answer those interrogatories
14     and they are useful in telling the parties and the
15     Court here's what the Government thinks is the
16     relevant theory of liability for a claim for payment
17     under the False Claims Act, and they point to the
18     complaint.  The complaint doesn't answer this
19     question for us.
20              And we've told them we'll meet and confer
21     after we send them the draft, and we're not seeking,
22     like, a definitive list of every potential false
23     claim they might allege by the time discovery is
24     over.  We understand they contend that there are
25     false claims that they have yet to identify.
```

1    They'll be absolutely entitled -- and we told them

2    this.  They'll be absolutely entitled to amend their

3    list at some later date.

4         But whatever false claims they have

5    identified as part of their Rule 11 process for

6    filing this complaint as part of their multi-year

7    investigation that they know of today, we ought to

8    know what those are and what their allegations are.

9         THE COURT:  You're not going to get that in

10   documents that are produced?

11        MR. BLALACK:  No, we will not.  We will not

12   be able to tell from a document request what the

13   claim for payment is and what they contend was false

14   about it or what the amount of damage is from that.

15        THE COURT:  Okay.  Let me hear from the

16   Government on that issue.

17        MR. JACOB:  Thank you, Your Honor.

18        First, on the 30(b)(6), our view is just

19   give us a chance to give them the information they

20   need or they would like.  We produced last week,

21   after they raised this issue, about 2,500 pages of

22   work charts and other similar function statements of

23   various CMS components.  We've suggested to them

24   that we rely on this upcoming 30(b)(6) to see what

25   information was testified there.

```
 1                 THE COURT:  In the other case?

 2                 MR. JACOB:  In the other case.

 3                 And supply them, whether formally or

 4      informally, with the transcript.  Whatever it is.

 5      Just get them the information from that deposition,

 6      answer whatever interrogatories they have now in

 7      writing, and then see where we are.  We have

 8      concerns.  You know, we just want to do it the most

 9      efficient way.

10                 A 30(b)(6), you know, we just don't think,

11      based on our initial consultations with CMS, there's

12      even going to be one employee that knows the

13      document storage practices of each component of CMS.

14                 THE COURT:  Right.

15                 MR. JACOB:  So then we're just, you know,

16      educating them on each specific issue.  So why not

17      just answer it in writing and give them the

18      information, the documents they need.  So that's our

19      view on that, that it's premature.  Let's see where

20      we are after we've gone through early discovery.

21                 On the contention interrogatory part, we're

22      happy to identify the false claims of -- the theory

23      of the false claims.  That's what they're concerned

24      about.  There are two sets of false claims here.

25      There are annual attestations that Anthem submitted
```

```
 1    to CMS about the accuracy of the data.  We can
 2    identify those and produce those to Anthem in short
 3    order.  We're already collecting those contracts
 4    now.  We're in the process.
 5              THE COURT:  And when you produce them, you
 6    can say this is the group of attestations that
 7    comprise the basis for your action?
 8              MR. JACOB:  Yes, for this bucket of false
 9    claims, yeah.  And the second bucket are the
10    diagnosis codes that they failed to delete, the ones
11    that, in our view, they learned through the chart
12    review program were not supported.  We need that
13    data for that.  But we're happy to articulate the
14    basis and the process by which we are intending to
15    go about identifying those false claims through the
16    data, the methodology.  And, you know, we can do
17    that in short order too.  So we think this -- you
18    know, we're happy to --
19              THE COURT:  And how would you do that?
20              MR. JACOB:  How would we do that?
21              THE COURT:  How would you articulate that?
22    In response to an interrogatory?  In just a letter?
23    How are you proposing to do that?
24              MR. JACOB:  We can do it in a letter.  I
25    mean, if it moves this issue, it might be easier.
```

1    But, for example, our view of the case is that the

2    chart reviewers who did this blind did not identify

3    diagnoses that Anthem had previously submitted to

4    CMS.

5          And so, in our view, based on all of the

6    other evidence that we've been collecting in the

7    investigation and intend to obtain through

8    discovery, Anthem knew that those codes it had

9    previously submitted, not identified through the

10   chart review program, were unsupported.  And those

11   codes led to additional and significant payments to

12   Anthem, and Anthem didn't do anything about it.

13         They didn't delete those codes.  They

14   continued to sign their annual attestations.  So

15   we're going to go through a process in discovery of

16   comparing what the chart review identified as

17   compared to what Anthem had originally submitted to

18   identify those gaps.

19              THE COURT:  Right.

20              And that's through the database?

21              MR. JACOB:  That's through the database.

22              THE COURT:  Which you need right away?

23   That has to be accelerated for production?

24              MR. JACOB:  That's project one for us, yes.

25              THE COURT:  Okay.  All right.  I believe

1    that that's the most important piece of discovery

2    that needs to be in exchange, in terms of documents.

3    The database is going to be really core.  And so

4    that process should be front loaded because it

5    takes -- my experience with databases, it takes a

6    while to get that produced, and then get -- for your

7    independent people to get their arms around that

8    data and to work out any, you know, idiosyncrasies

9    in the database.  They take a long time.

10          So I want the parties to front load

11   production of that database.  That's got to be ASAP.

12   Before emails or whatever, you need to be getting

13   that database figured out, what you're doing,

14   because there will be a lot of questions about data

15   mapping, data dictionaries, what have you.  There

16   may be codes that are inconsistent, all kinds of

17   things.

18          So that, in my view, is going to take a lot

19   of time.  And that's where, really, the core

20   information is going to be in this case.  So I want

21   you to focus on getting that database produced

22   upfront.

23          In terms of the 30(b)(6) deposition, at the

24   moment, I don't think it's warranted.  I think first

25   you need to take the 30(b)(6) deposition in the

1    other case.  I have no objection to Anthem providing

2    the form of notice that it provided in the other

3    case so that the Government sees the questions.  And

4    if there are variations in what you would want in

5    this case, go ahead and provide that so the

6    Government can see that.

7         But the Government may be able to say these

8    documents answer these questions.  See what you get

9    in the other case and what can be used before you

10   bring it -- before you bring it to me for another

11   deposition.  One is not going to be scheduled right

12   now until, you know, that information comes through

13   because it can be a real waste of time to have a

14   30(b)(6), especially where there's multiple

15   witnesses, and you may just be able to get an

16   adequate explanation through the documents and

17   through the meet and confer process for some of

18   these issues.

19        In terms of the early interrogatories, I

20   don't think interrogatories -- contingent

21   interrogatories have that much utility, honestly.

22   I'm not inclined to grant early contingent

23   interrogatories.  Instead, I think that the

24   Government should provide the information that it is

25   suggesting, and that way, plaintiffs will have that

1    information, and you may be able to more carefully

2    tailor a request once you're informed.

3         The Government is not trying to hide the

4    ball.  It will provide you that information, and

5    then you can think about a contention interrogatory.

6    But I don't think one should be propounded at this

7    moment.  First, have some back and forth.  It can be

8    through a letter, it can be through identification

9    of specific documents, and then you can be more

10    specific and more tailored in what you actually

11    need.  Okay?

12         But I expect a lot of cooperation,

13    including, if there's efficiencies that could be

14    gained in these other cases, I want you to seek to

15    gain those efficiencies in this case.

16         Okay.  So in terms of the schedule, the

17    Government is proposing one year, essentially, a

18    little more than a year, 15 months, discovery

19    schedule.  And Anthem is proposing almost twice

20    that.  I don't have a good sense yet from what I've

21    heard today on how much efficiencies can be gained

22    through these other cases.  It sounds like maybe a

23    lot.

24         So at the moment, I'm going to set the --

25    I'll set the end of June of 2024.  The Government

1    says June 11, but I'll do June 30.  Whatever's the
2    weekday at the end of 2024 as the end of fact
3    discovery.  And like I say, we're going to have
4    monthly conferences.  So if there's a need to extend
5    that schedule, if it makes sense, we can talk about
6    that.

7            In terms of the expert discovery Anthem
8    set, you're anticipating maybe four expert
9    witnesses?

10            MR. BLALACK:  We're still in that process,
11    but in that ballpark, Your Honor.

12            THE COURT:  And the same for the
13    Government?

14            MR. JACOB:  We may need rebuttal witnesses,
15    therefore, but as far as principal witnesses, only
16    one.

17            THE COURT:  Right.  Okay.  So I'm going to
18    set the end of February 2025 for close of expert
19    discovery.  And, again, since I'll be seeing you, if
20    that needs to be extended, we can do that.  I want
21    you to endeavor, like I said, to have conversations
22    with each other, keep an open dialogue, and work
23    cooperatively to gain efficiencies in the case.

24            What I'm going to do is I'll work with my
25    deputy to get monthly conference dates, and I want

1    you to propose an agenda in a letter, a joint

2    letter, three days before the -- three business days

3    before the conference.  And like I say, don't turn

4    them into briefs.  Just state your position simply.

5    And if we need additional briefing, we can set it at

6    the conference.

7          I hope to avoid that, if possible.  I want

8    the parties to be practical in how they're

9    approaching discovery.  So I'll work with my deputy,

10   and we'll get some dates on the calendar.

11          Now, in terms of settlement, has the

12   Government made a settlement proposal?  Does it

13   involve changes?  Would any settlement involve -- I

14   assume money.

15          But, also, would it involve changes to this

16   process?

17          MR. JACOB:  Principally money.  Our

18   understanding is that the chart review program as

19   designed is no longer in existence.

20          THE COURT:  I see.

21          MR. JACOB:  So, principally, it would be

22   money.  We're prepared to make a demand based on the

23   information we have.  Anthem has requested that we

24   supply, for example, the basis of every false claim,

25   which we're just not in a position to do without

1    discovery.  But if Anthem -- if you would think it
2    would facilitate the process to prepare a demand, we
3    can easily do so.
4            THE COURT:  Well, I think you should
5    prepare a demand at the outset because Anthem ought
6    to know what it is.
7            MR. JACOB:  Okay.  We're happy to do so.
8            THE COURT:  So go ahead, prepare that
9    demand.
10           MR. JACOB:  Yeah.
11           THE COURT:  And that also will, frankly,
12   give Anthem some information it was seeking through
13   an interrogatory.  You'll have some idea.  So
14   prepare a demand, and then, you know, you can
15   exchange some information, and we'll revisit when to
16   schedule a settlement conference.  But Anthem is
17   going to have to digest whatever demand you put
18   together.
19           So for now, I'm expecting a proposed
20   protective order, ESI protocol, by the end of this
21   month, and we'll set some dates going forward.  I
22   don't want any motions filed.  Like I say, just
23   letters or just in the agenda letters, and then
24   we'll deal with any motions.  But don't file any
25   motions without first reviewing it in a conference.

1    Okay?

2         Anything further from the Government?

3         MR. JACOB:  Nothing from the Government.

4    Thank you, Your Honor.

5         THE COURT:  All right.  Anything further

6    from Anthem?

7         MR. BLALACK:  No, Your Honor.  Thank you.

8         THE COURT:  Okay.  Thanks, everyone.  We're

9    adjourned.

10        MR. BLALACK:  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, Marissa Mignano, certify that the foregoing

4    transcript of proceedings in the case of

5    UNITED STATES OF AMERICA v. ANTHEM, INC., Docket

6    #1:20-cv-02593, was prepared using digital

7    transcription software and is

8    a true and accurate record of the proceedings.

9

10

11   Signature ___*Marissa Mignano*_____

12                  Marissa Mignano

13

14   Date:      April 12, 2023

15

16

17

18

19

20

21

22

23

24

25