# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

               Plaintiff,

     v.

ANTHEM, INC.,

               Defendant.

Case No.  1:20-cv-02593-ALC-KHP

**REPLY IN SUPPORT OF DEFENDANT ANTHEM, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO ANTHEM'S REQUEST FOR PRODUCTION NO. 1**

## TABLE OF CONTENTS

**Page**

ARGUMENT ............................................................................................................................ 2

    A.    Plaintiff Does Not Meaningfully Contest Anthem's Showing That the Documents Responsive to RFP No. 1, as Narrowed, Are Relevant ......................................... 2

    B.    Anthem's Narrowed RFP No. 1 Is Proportional Because the Requested Documents Are Highly Relevant, Non-Cumulative, and Impose No Production Burden on Plaintiff................................................................................................ 5

CONCLUSION ...................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Felske v. Hirschmann*,
 2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) ..................................................................... 2

*Michael Kors, L.L.C. v. Su Yan Ye*,
 2019 WL 1517552 (S.D.N.Y. Apr. 8, 2019) .................................................................... 6

*Parmalat Securities Litigation*,
 2006 WL 3592936 (S.D.N.Y. Dec. 1, 2006) ................................................................... 8

*U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*,
 2018 WL 8459926 (C.D. Cal. Dec. 14, 2018) ............................................................ 3, 8

*U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*,
 2019 WL 2353125 (C.D. Cal. Mar. 28, 2019) ................................................................. 4

*U.S. ex rel. Schutte v. SuperValu Inc.*,
 598 U.S. 739 (2023) ......................................................................................................... 2

*United States v. de la Jara*,
 973 F.2d 746 (9th Cir. 1992) ........................................................................................... 8

*UnitedHealthcare Ins. Co. v. Becerra*,
 16 F.4th 867 (D.C. Cir. 2021) ......................................................................................... 4

**Regulations**

65 Fed. Reg. 40,170, 50,268 (June 29, 2000) ..................................................................... 2

Plaintiff's Opposition (Dkt. 182, "Opp.") to Anthem's Motion to Compel (Dkt. 180, "Motion" or "Mot.") is most notable for what it does *not* say. Plaintiff never disputes that *U.S. ex rel. Poehling v. UnitedHealth Group*, 16-cv-08697 (C.D. Cal.) involves nearly identical issues as this case, nor that documents it produced in *Poehling* from the 40 custodians at issue in the Motion are relevant here. Nor does Plaintiff challenge Anthem's authority establishing that internal documents from the Centers for Medicare & Medicaid Services ("CMS") are relevant to Anthem's defenses. Plaintiff does not even dispute that it produced the vast majority of the requested documents to UnitedHealth ("UHC") without making any effort to identify potentially privileged documents or assert privilege over those materials. But Plaintiff complains of the burden associated with re-producing the *Poehling* productions to Anthem, asserting—without any evidence—that the productions contain documents irrelevant to this case. Yet, Plaintiff omits from the Opposition that, as far back as May 2023, Anthem has been willing to consider removing from the scope of its Request for Production ("RFP") No. 1 documents that Plaintiff produced in response to certain *Poehling* RFPs. Plaintiff rejected that offer, like every other offer of compromise, claiming that it could not identify which documents were produced in response to any given RFP. That assertion is flatly contradicted by the information Plaintiff has disclosed in its Opposition.[1] Plaintiff should be compelled to produce these highly relevant documents.

---

[1] While Plaintiff now provides the Court with the search terms it used in *Poehling* and associated hit counts, the *Poehling* meet-and-confer record, and production date ranges in support of its Opposition, Plaintiff neglects to mention that it withheld all of this information from Anthem until it filed its Opposition last week, ***despite Anthem having requested this exact information for months***. (Declaration of James Bowman in Support of Anthem's Reply in Support of Anthem's Motion to Compel ("Reply Decl.") Ex. 4 (Anthem's 9.15.23 Letter to Plaintiff).)

## ARGUMENT

### A.   Plaintiff Does Not Meaningfully Contest Anthem's Showing That the Documents Responsive to RFP No. 1, as Narrowed, Are Relevant

Plaintiff does not meaningfully rebut Anthem's relevance arguments in the Motion. (Opp. 12-19.)  Aside from potential UHC-specific documents, which are discussed *infra*, Plaintiff offers no factual basis to believe that the *Poehling* production includes documents irrelevant to this action; nor would that make sense, given that Plaintiff never disputes that *Poehling* is nearly identical to this case and that it presumably only produced documents there that it determined were relevant.[2]  In fact, Plaintiff explicitly concedes the relevance of the 40 *Poehling* custodians at issue (*see* Opp. 12), and that CMS documents are relevant to Anthem's defenses.  (*See* Opp. 13; Opp. 17).

In its Motion, Anthem details the case law establishing why internal agency documents are relevant to the falsity, scienter, and materiality elements of the False Claims Act ("FCA") and also Plaintiff's common law claims.  (Mot. 13-17).  Plaintiff does not even reference this authority, let alone dispute it; thus, Plaintiff effectively "concedes [Anthem's] arguments by . . . failure to respond."  *Felske v. Hirschmann*, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012).  The few cases Plaintiff cites hardly bear mention.  Arguing that internal agency documents are not relevant to scienter, Plaintiff incorrectly suggests that *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023), held that the only relevant information for scienter under the FCA is the

---

[2] Plaintiff briefly notes that *Poehling* involves a slightly different liability period (payment years 2009-2015 for *Poehling* and payment years 2013-2016 here), and that the *Poehling* productions include documents ranging from 2000-2019.  But *Plaintiff* has put that same date range at issue here.  (*See* Am. Comp. (Dkt. 26) ¶ 89 ("As CMS repeatedly notified MAOs *since June 2000*, the purpose of the annual attestation requirement is to place the responsibility on MAOs like Anthem to make 'good faith efforts to certify the accuracy' of the risk adjustment data they submitted.  *See* 65 Fed. Reg. 40,170, 50,268 (June 29, 2000)." (emphasis added)).  Moreover, Plaintiff continues to seek discovery from Anthem that is well before the liability period alleged in the Amended Complaint, including from custodians who left Anthem years before 2013.  *See* Reply Decl. Ex. 5 (2.20.23 Email from Plaintiff to Anthem).

defendants' subjective beliefs.  (Opp. 18.)  But that is just wrong.  As Anthem explained, *Schutte* did not alter existing FCA precedent holding that whether a defendant's subjective belief was widely accepted is probative of whether that belief was objectively reasonable, and thus held in good faith—a position Plaintiff itself endorsed following *Schutte*.  *See* Mot. 10-12; *see also* U.S. Department of Justice Statement of Interest, *United States ex rel. Schutte v. SuperValu Inc.*, No. 11-CV-03290 (C.D. Ill. Dec. 15, 2023), ECF No. 388 ("The existing precedent holds that recklessness under the FCA includes an objective component.").  Plaintiff addresses none of this authority.  (Opp. 18.)  In challenging the relevance of internal agency documents to materiality, Plaintiff merely cites three *non-FCA* cases that have *nothing to do* with this question.  (*Id*. 18-19.)  Courts in other FCA cases involving Medicare Advantage Organizations ("MAOs") have readily ordered CMS to produce internal agency documents showing agency officials' interpretation of Medicare Advantage standards.  *See* Order, *U.S. ex rel. Osinek v. Kaiser Permanente*, 13-cv-03891 (N.D. Cal), ECF No. 219 (ordering that "the government must produce the non-public documents that are relevant to the [Medicare Advantage] standards at issue"); *Poehling*, 2018 WL 8459926, at *11 (ordering production of internal CMS documents).[3]

In its Motion, Anthem identified several relevant categories for which it seeks documents.  (Mot. 20-21.)  Plaintiff argues that Anthem only established the relevance of documents related to chart review, not the other categories.  (Opp. 14.)  But—with one

---

[3] Plaintiff's only other arguments against the relevance of internal agency documents are that Anthem never specified the regulatory requirements for which Anthem seeks such documents, and that Anthem never "alleged" that any violation of regulatory requirements was the result of a good faith misunderstanding of its regulatory obligations.  (Opp. 17).  But Anthem is the defendant; it has no obligation to "allege" anything, let alone identify every detail of its intended defense before it is entitled to relevant discovery.  Anthem has Answered the Amended Complaint (Dkt. 65) and denied that Anthem ever submitted false claims for payment to CMS or acted with the requisite scienter to establish any FCA or common law liability.  Plaintiff cites no legal basis for requiring Anthem to do more before it can seek the discovery to which it is entitled under Federal Rule of Civil Procedure 26(b).

exception[4]—Plaintiff never argues that the document categories are *actually* irrelevant; Plaintiff

rests its argument on the idea that Anthem's relevance arguments concerned only chart review.

(*Id.*)  But the Motion never limited Anthem's relevance arguments in that way; Anthem

explained that CMS documents concerning relevant program requirements generally are relevant

to its defenses, not just chart review (*see* Mot. 15, 17.)  Anthem previously detailed how these

topics are relevant to its defenses (*see* Dkt. 130-2) and the Amended Complaint puts each

category at issue.  (*See* Am. Compl. ¶¶ 3-4 (ICD coding guidelines); ¶¶ 83-90 (risk adjustment

attestations); ¶¶ 162, 167 (CMS contracting decisions); ¶ 54 (CMS communications to MAOs

about risk adjustment obligations); ¶¶ 91-97 (Medicare Advantage Risk Adjustment Data

Validation ("RADV") audits); ¶ 19 (overpayments to MAOs); ¶¶ 40-44 (data submissions);

¶¶ 27-33 (relevance of fee-for-service ("FFS") Medicare data to CMS payments to MAOs).)

Plaintiff also expresses concern that the *Poehling* productions may contain irrelevant

UHC-specific documents.  (Opp. 15-16.)  But Plaintiff cannot withhold relevant documents

simply because *some* possibly implicate UHC's interests.  The parties negotiated the protective

---

[4] The lone challenge Plaintiff *does* make concerns documents related to actuarial equivalence and CMS's acknowledgment of the need for a Fee-For-Service ("FFS") Adjuster to account for diagnosis coding errors in its own claims data from FFS Medicare (Opp. 14 n.7), but Plaintiff's challenge has no basis.  Actuarial equivalence and the need for an FFS Adjuster concerns—put very simply—whether CMS recognized that it has a statutory obligation to account for diagnosis coding errors in the agency's own claims data for FFS Medicare when trying to measure the existence and amount of an overpayment to MAOs.  In denying Plaintiff's motion for partial summary judgment, the *Poehling* court concluded that there was a genuine dispute of material fact whether MAOs were required to delete diagnosis codes not documented in the medical record before CMS first accounted for the error rates of such codes in FFS Medicare claims data.  *Poehling*, 2019 WL 2353125, at *8.  Plaintiff argues that *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 870 (D.C. Cir. 2021) precludes this topic from being relevant.  *Becerra* was not an FCA case, but it interpreted the Medicare statute's actuarial equivalence requirement not to apply to a CMS regulation specifying MAOs' obligation to return known and identified overpayments.  Anthem disputes the reasoning of this decision, which is not binding on this Court, but in any event, it was decided *after* the relevant period in this case.  The *Poehling* depositions and exhibits show that, for at least some parts of the time period prior to *Becerra*, CMS agreed with Anthem's interpretation of the actuarial equivalence requirement.  *See* Reply Decl. Ex. 2 (*Poehling* Rice Dep. Tr. 117:3-10 (stating ▬▬▬▬▬▬▬▬▬▬▬▬).  Even if this Court later determines that these CMS statements were ultimately incorrect, they are probative of Anthem's scienter during the period at issue, as they corroborate that Anthem held this understanding of program requirements in good faith, as well as whether CMS considered the existence of codes not documented in medical records material to its payment decisions.

order to address precisely this situation, and any sensitive UHC documents can be designated

AEO, in the same manner the parties handled the *Poehling* depositions and exhibits.

Plaintiff nevertheless suggests that the volume of UHC-specific documents renders

Anthem's proposal burdensome, which it bases on a search across the full *Poehling* production

using the terms "United," "UHC," and "UHG" that returned 1.2 million documents.  (Opp. 15.)

But Plaintiff is the **United** States, and so of course any search for "United" across documents

collected from a federal agency will inevitably return significant hits on this ubiquitous term.

The *Poehling* search strings identified in Plaintiff's Exhibit B (Dkt. 182-2) that include

variations of UHC only return approximately 312,000 documents in the entire *Poehling*

production.  And, if the *Poehling* RFPs that Anthem had previously *offered to remove* in May

2023 (*See* Reply Decl. Ex. 3 (5.26.23 Letter from Anthem to Plaintiff)) were removed, the total

would drop to about 39,000 documents, all of which stem from RFPs regarding UHC's 2014

meeting with CMS about MAO chart review practices, which even Plaintiff agrees is relevant in

this case.  (*See* Opp. 17.)  Plaintiff cannot credibly argue that this handful of UHC documents

should bar production of other relevant documents.[5]

**B.**     **Anthem's Narrowed RFP No. 1 Is Proportional Because the Requested Documents Are Highly Relevant, Non-Cumulative, and Impose No Production Burden on Plaintiff**

Plaintiff alleges that the *Poehling* productions are disproportional because they are

cumulative, and because it would be unduly burdensome to conduct a review for deliberative

process privilege.  (*See* Opp. 19-25.)  Neither rationale withstands scrutiny.

---

[5] Plaintiff suggests in its Opposition that it cannot separate out documents responsive to specific RFPs, but does not explain why.  Plaintiff implies that this is the result of Plaintiff conducting a "technology-assisted review" ("TAR"). (*see* Opp. at 4 n.2.)  But that implication is flatly contradicted by Plaintiff's own admission in Exhibit C, which makes clear that Plaintiff in *Poehling* simply "produce[d] all documents responsive to the search terms" to which the parties agreed.  Opp. Ex. C (Dkt. 182-3) at 2.  And Plaintiff demonstrably is able to run search terms over the *Poehling* production and should be able to identify documents hitting solely on the UHC-related searches.

Plaintiff's proportionality objection depends on the remarkable premise that Anthem must rely on the documents that Plaintiff, or UHC's counsel, believes are sufficient for Anthem to mount its defense. In its wisdom, Plaintiff contends that its production of ~55,000 *Poehling* documents, coupled with the *Poehling* deposition exhibits, are all that Anthem needs. (Opp. 20.) Plaintiff's self-serving assessment is not credible for several reasons.

To state the obvious, Anthem is nowhere obliged to accept the opinion of its litigation opponent as to what documents are enough to mount Anthem's own defense here, where it faces potential damages and penalties in excess of $1 billion. *See Michael Kors, L.L.C. v. Su Yan Ye*, 2019 WL 1517552, at *7 (S.D.N.Y. Apr. 8, 2019) (Parker, J.) ("Potential damages are an important consideration in determining whether a request is proportional"). To be sure, *Plaintiff* would never agree with *Anthem* halting its production based on Anthem's assessment that Plaintiff had already received enough documents to prove its case.

Moreover, the 572 *Poehling* deposition exhibits, while useful to allow Anthem to target its requests to only the most critical *Poehling* custodians, are not enough on their own as isolated and often partial documents. A document on its own cannot be useful as evidence without also knowing the context in which it was created, including who saw it, revised it and/or reacted to it. No matter how probative a document may be in the abstract, it is useless to Anthem if the Company cannot place the document in an overall context of decision-making by the regulators overseeing the conduct of MAOs at issue here. The 55,000 other *Poehling* documents are *solely* documents that Plaintiff already reviewed for deliberative process privilege before producing to UHC, and thus have been scrubbed of relevant internal CMS analysis. They are no substitute for the documents most critical to Anthem's defenses.

Plaintiff intends to argue that these documents show nothing more than the viewpoints of individual agency staff, and do not reflect agency positions, or if they did, do not represent the agency's viewpoint for the entire relevant period.  (*See* Opp. 18.)  Without the connective tissue showing when program requirements were discussed, by whom, what information those CMS officials considered, what actions they took in response, and in some cases, how that impacted agency decisions regarding MAOs, Anthem will have no ability to rebut Plaintiff's allegations. As it stands now, Anthem cannot even meaningfully ascertain which agency personnel have *seen* a given document, limiting Anthem's ability to use these materials for impeachment.[6]

The most recent of these documents is five years old, and many are older; Anthem cannot obtain this information through deposition testimony because the witnesses will have no idea what documents they may have sent or to whom so long ago, a point that is already evident from the *Poehling* depositions.  *See* Reply Decl. Ex. 1 (Hornsby III Tr. 225:8-18).  Nor can the information be acquired by other document discovery; for example, Plaintiff argues that Anthem needs no documents related to CMS's contracting decisions because Plaintiff will provide a list of any terminated MAO contracts.  (Opp. 21 n.10.)  But the *relevant* question for Anthem is not whether a contract was renewed or terminated, but the information that CMS considered material to that decision.  That evidence cannot be gleaned from a list alone.

Plaintiff argues that, in addition to being cumulative, re-producing the *Poehling* production set is disproportional because it would be overly burdensome to re-review these

---

[6] The June 2013 CMS memorandum excerpt that Anthem attached to its February 7, 2024, position statement exemplifies the problem.  Dkt. 174-2.  Plaintiff suggests that Anthem has a full copy of this memorandum.  (Opp. 22.)  But there is only one candidate for that proposition, *Poehling* Ex. 1460, and the author testified that ███████████ because ████████████████████████████████  (Reply Decl. Ex. 1 Hornsby III Dep. Tr. 219:10-16).  The testimony makes clear that ████████████ but Anthem cannot determine who did so, why, or what impact such discussions had without more contextual information.  Anthem cannot even discern this point from the testimony because the author claimed █████████.  (*Id.* 225:8-18 (stating ████████████████████████████).

documents for deliberative process privilege.  (Opp. 22-23.)  But Plaintiff produced the vast majority of these documents in *Poehling* without conducting *any* privilege review or asserting any privilege; having chosen to do so, Plaintiff has waived any right to assert privilege here.

Plaintiff argues that it has not waived deliberative process privilege over these documents because the *Poehling* court ordered Plaintiff to produce the documents "withheld solely on the ground of deliberative process privilege," and because the *Poehling* protective order stated that the production "does not constitute a waiver of any privilege or protection in [*Poehling*] or any other federal or state proceeding."  (Opp. 24.)  Neither of these arguments, however, rescues Plaintiff from its prior waiver of privilege over these materials.

Plaintiff's argument that it was ordered to produce documents it had "withheld" on privilege grounds fails because the vast majority of the documents at issue here were never "withheld" in *Poehling* "on the basis of deliberative process privilege".[7]  Plaintiff never **asserted** privilege over the millions of documents it produced after the *Poehling* court's order, which constitute the bulk of discovery in *Poehling*, and nothing in the *Poehling* order even discouraged Plaintiff from asserting privilege in the future over this later-produced discovery.[8]  Plaintiff made

---

[7] The only exception is the 20,000 or so documents that Plaintiff identified on its privilege log, which the *Poehling* court ordered Plaintiff to produce on the grounds that Plaintiff had not demonstrated that the documents were subject to the privilege and that, even if they had, UHC's need for those documents outweighed Plaintiff's interests in confidentiality.  *Poehling*, 2018 WL 8459926, at *11.

[8] And Plaintiff's cited cases (Opp. 24-25) favor *Anthem* here.  *United States v. de la Jara* concerned attorney-client documents collected during a search warrant, and the court *still* ordered the privilege waived because the defendant made no effort for months to claw the documents back.  973 F.2d 746, 749 (9th Cir. 1992).  In *Parmalat Securities Litigation*, Italian police seized attorney-client documents from Bank of America; the court held that "[e]ven when the initial disclosure of privileged documents is involuntary, waiver may, nevertheless, result if the party asserting the privilege ***fails to take steps reasonably designed to protect and preserve the privilege***.  . . . [T]he courts will grant no greater protection to those who assert the privilege than their own precautions warrant.  Thus, it is necessary to determine whether BOA pursued all reasonable means of preserving the confidentiality of the privileged matter after the seizure by the Italian authorities."  2006 WL 3592936 at *4 (S.D.N.Y. Dec. 1, 2006) (internal citations and quotations omitted).  In both cases, police physically seized the documents—perhaps the most involuntary means of production possible—and *still* the primary question for the courts was whether the defendant subsequently took "all reasonable steps" to preserve its privilege.  Here, Plaintiff—which was not even ordered to produce the vast majority of the *Poehling* documents—did nothing of the sort.

the decision not to review those documents for privilege.  Plaintiff's own submissions show that it remained aware of its obligation to protect potentially privileged documents in *Poehling* even after that court's order but chose not to do so.  (*See* Dkt. 182-3, Opp. Ex. C ("we reserve the right to review individual documents for responsiveness and privilege" and "are still in the process of determining the most reasonable steps for withholding potentially privileged documents" but also indicating it "would produce all documents responsive to the search terms" upon which the parties agreed).)  It cannot now block the production of relevant discovery based on its choice in the *Poehling* litigation to ignore whether those productions contained privileged materials or not.

Plaintiff also misreads the *Poehling* protective order when arguing that it immunized Plaintiff's *Poehling* productions from privilege waivers.  Paragraph 9 of the order (*Poehling*, 16-cv-08697, ECF No. 412) requires that a party "*exercise good faith* to prevent the disclosure" of privileged material, and states that a party may not "assert privilege over Protected Material the Producing Party previously identified as not privileged."  Paragraph 15 requires a party to serve notice demanding that privileged material be returned or destroyed.  *Id.*  Plaintiff did neither. Whether Plaintiff stuck its head in the sand and produced the *Poehling* documents without making *any* good faith effort to protect that privilege; or it produced the documents believing them privileged and never clawed them back, neither scenario complied with the *Poehling* protective order and Plaintiff cannot now invoke its protection against waiver.  And Plaintiff's use of the *Poehling* protective order here contradicts its prior positions in this case; in September, it told the Court that its protective order—which contains a provision identical to the language of the *Poehling* protective order—was *not* sufficient to preserve privilege in future litigation if it voluntarily produced the *Poehling* deposition exhibits, which is exactly why it asked the Court to

order their production rather than agreeing to voluntarily producing them.  (9.19.23 Tr. at 60:23-62:12) (seeking "stipulation and order by the Court" for *Poehling* materials).

Even if Plaintiff is entitled to conduct a privilege review before production in this case, this is a burden of Plaintiff's own making.  Plaintiff chose not to review the *Poehling* documents for potential privilege and has advised that it does not have the ability to determine which documents were produced in response to any given *Poehling* RFP.  (*See, e.g.*, Opp. 4 n.2.)  Thus, Plaintiff's actions, not those of Anthem, have created the very burden of which it now complains.

And Plaintiff has made clear it intends to conduct this review over *any* production of CMS documents—whether it be Anthem's selected custodians or any new production that derives from the entire *Poehling* collection of 40 million documents.  Plaintiff's proposed approach differs only in that the parties will also have to first negotiate and likely dispute the search terms, time frame, and subject matter.  Plaintiff's proposal thus offers no efficiencies to discovery; it merely delays the burden of asserting a waived privilege.

Plaintiff protests that the parties may still have disputes over other topics, such as Anthem's remaining RFPs.  (Opp. 25.)  Plaintiff has refused to negotiate those RFPs before this Motion is resolved, (*see* Reply Decl. Ex. 6 (2.29.23 Letter from Plaintiff to Anthem)), so there is no way for Anthem to determine if a concrete dispute exists concerning those RFPs.  But even if there are disputes, there is no basis to conclude those disputes are less likely to occur if the parties used Plaintiff's proposed "targeted searches" across the 40 million documents in the *Poehling* collection.  Plaintiff's alternative only offers the certainty of prolonged meet-and-confer discussions and further disputes before the Court, yielding no meaningful efficiencies.

## **CONCLUSION**

For the foregoing reasons, Anthem's Motion to Compel should be granted.

Dated:  March 4, 2024                    Respectfully submitted,

By: /s/ K. Lee Blalack, II

K. LEE BLALACK, II, *Pro Hac Vice*
ANWAR GRAVES, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
lblalack@omm.com
agraves@omm.com

JAMES A. BOWMAN, *Pro Hac Vice*
ADAM LEVINE, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
jbowman@omm.com
alevine@omm.com

DAVID DEATON, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
610 Newport Center Drive, 17th Floor
Newport, California 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994
ddeaton@omm.com

JOHN MARTIN, *Pro Hac Vice*
HEYWARD BONYATA, *Pro Hac Vice*
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
Telephone: (803) 255-9655
john.martin@nelsonmullins.com
heyward.bonyata@nelsonmullins.com

*Attorneys for Defendant Anthem, Inc.*

11