```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/13/2024
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                    Plaintiff,

                -against-

ANTHEM, INC.,

                                  Defendant.
-----------------------------------------------------------------X

20-CV-2593 (ALC) (KHP)

**OPINION AND ORDER ON MOTION TO COMPEL AND ORDERS CONCERNING REMAINING DOCUMENT REQUESTS**

**KATHARINE H. PARKER, United States Magistrate Judge:**

Before the Court is Anthem, Inc.'s ("Anthem") motion to compel production of "copycat" or "clone" discovery; specifically, to compel the Plaintiff (the "Government") to re-produce discovery previously produced in another litigation – *United States ex rel. Poehling v. UnitedHealth Group. Inc.* ("*Poehling*") – involving similar claims against one of Anthem's competitors, UnitedHealthcare.

For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Anthem, Inc. ("Anthem") is a Medicare Advantage Organization ("MAO"). It contracts with the Centers for Medicare and Medicaid Services ("CMS"), a part of the U.S. Department of Health and Human Services ("HHS"), to offer a variety of private health plan options for individuals eligible for Medicare Part C programs.[1] In general, MAOs are paid by the

---

[1] Health plan options can include health maintenance organizations ("HMOs"), provider sponsored associations ("PSOs") and preferred provider organizations ("PPOs"). The vast majority of plans also cover Medicare Part D prescription drug benefits.

1

government based on the reasonable costs incurred delivering Medicare-covered services to plan members.  More specifically, the government pays the MAO a set rate per person, per year, and the MAO assumes the risk of providing all care for the inclusive amount.  MAOs are required to submit diagnosis codes applicable to beneficiaries in their plans, which CMS uses to calculate "capitated" payments to each MAO.  More money is paid to the MAO for plan members with certain serious illnesses or chronic conditions, such as diabetes or heart disease.

CMS promulgates various regulations and rules applicable to MAOs. Among other things, CMS requires MAOs to implement effective compliance programs to ensure that information submitted to CMS is accurate and truthful to "prevent, detect and correct fraud, waste and abuse."  *See* 65 Fed. Reg. 40170-01 at 40263 (June 29, 2000); 42 C.F.R. § 422.503(b)(4)(vi).  And, in becoming and remaining a MAO, Anthem entered into contracts with CMS which included a requirement to delete inaccurate diagnosis codes previously submitted. MMC Manual, Chap. 7 § 40 (June 2013).  MAOs submit attestations with their submissions to CMS that their diagnosis data is "accurate, complete and truthful" according to their "best knowledge, information and belief." (SAC ¶ 5)

In this action brought pursuant to the False Claims Act ("FCA"), the Government alleges that Anthem knowingly disregarded its duty to ensure the accuracy of risk adjustment diagnosis data that it submitted to CMS.  In particular, Anthem utilized a vendor to conduct "retrospective chart reviews."  During these reviews, conducted after Anthem made a submission of diagnosis data to CMS, the vendor would obtain medical records from beneficiaries' medical providers.  It would then review the medical records to identify all diagnosis codes supported by the records to identify and report to CMS previously unreported

health conditions documented in the records. The exercise was additive only; meaning, if additional health conditions were identified in the medical records, Anthem would update CMS and add diagnosis codes with a new certification attesting to the accuracy and truthfulness of its submission. The process had the effect of increasing reimbursements to Anthem. When conducting the retrospective chart reviews and updating CMS, Anthem did not look for or remove previously submitted diagnosis codes that were not supported by the medical records or otherwise correct other types of errors discovered during the review. The Government contends this additive-only process constituted fraud and resulted in millions of dollars of overpayments by the government to Anthem. The payment years at issue are 2013 to 2016.

Anthem vigorously denies the allegations of fraud and claims that it complied with applicable law and regulations at all times. It contends that the government was well aware of Anthem and other companies' conduct of retrospective chart review and knew and approved of Anthem and other MAOs engaging in an additive-only process. It asserts that the retrospective chart reviews were consistent with all statutes and applicable regulations. Additionally, it asserts that to the extent there were errors in its submissions to CMS, they were not material or intentionally false submissions.

## DISCOVERY REQUESTED

Anthem served various Requests for Production ("RFPs") on the Government in this case. RFP 1 requested "all documents that [the government] produced in response to any discovery requests served on [the government] in the *Poehling* Litigation, regardless of time

period."[2]   RFPs 2-5 and 23 also sought information about discovery in the *Poehling* matter, including the discovery requests served by United Healthcare, identifications of all custodians from whom documents were collected, communications about the scope of the collection and production, the privilege log produced and all documents produced concerning documents withheld on grounds of privilege, and "all HHS and CMS Documents, regardless of time period, concerning the *Poehling* Litigation."  *See* ECF No. 182-4.

The remaining 29 RFPs sought information specific to Anthem and the Government's investigation of Anthem, as well as information about CMS and HSS organizational structure and employees and their duties and responsibilities, Medicare program rules and regulations and changes thereto, internal deliberations about rules and regulations under consideration, document retention policies, witness statements and interview notes, and documents concerning other litigations.   The requests are incredibly broad, many are not limited in time period, and many seek "all documents" about broad subjects.

At issue in this motion is RFP 1 – the request for clone discovery from the *Poehling* litigation.

During the *Poehling* litigation, the government collected documents from 187 custodians for the time period 2000 to 2019.  Some custodians who are relevant to the instant action are among those whose records were collected in *Poehling*.  The parties in the *Poehling* litigation agreed to apply technology assisted review ("TAR") to a subset of the documents pulled through use of agreed-upon, broad search terms.  The search terms included terms

---

[2] The *Poehling* litigation involved payment years 2009 to 2015 and thus overlaps to some extent with the payment years in this case.

specific to United Healthcare and other terms designed to pull documents about CMS and HSS organizational structure and employees and their duties and responsibilities, Medicare program rules and regulations and changes thereto, internal deliberations about rules and regulations under consideration, among other thigs.  They included terms that would collect many of the documents requested in Anthem's non-*Poehling* specific RFPs (other than those RFPs that seek Anthem-specific communications).  Ultimately, approximately 3 million documents were produced in *Poehling*, many of which are relevant in this action because they pertain, for example, to the rules, regulations and standards at issue in this case, the people responsible for auditing MAOs and the process for contracting with, auditing and paying MAOs.  Of course, the population of documents collected and produced in *Poehling* is also broader than necessary in this action because, among other reasons, those documents concern a much longer time period than at issue here (i.e., 2009 to 2019 compared to 2013 to 2018) and include audits of and communications with United Healthcare about its specific bidding process.

      Because of the overlap of information needed in this action and the information produced in *Poehling*, this Court previously directed the Government to produce certain documents from the *Poehling* litigation to allow the parties to benefit from work done in *Poehling* and tailor discovery in this action to information that was specific to Anthem and not redundant of key information that could be learned from *Poehling*.  In keeping with this direction, the Government produced 55,000 documents produced in *Poehling*, 49 deposition transcripts with their corresponding 572 exhibits.  The documents and deposition transcripts covered virtually all of the non-Anthem specific topics to which Anthem's non-*Poehling* RFPs are directed including retrospective chart reviews, risk adjustment documentation, standards,

diagnosis coding guidance, ICD diagnosis coding, MAO risk adjustment attestations and compliance obligations, CMS contracting decisions, CMS communications with MAOs about their responsibilities and CMS rules and regulations, risk adjustment data validation audits, overpayments and return of same, CMS encounter data submissions, and errors in fee-for-service Medicare.  In other words, Anthem has received a substantial set of core documents and testimony relevant to this case already.  Further, it has benefitted substantially from the work of the attorneys' in *Poehling* who had to sift through a massive data set to locate the most important documents and testimony relevant to the claims in that case, many of which will likely be the most important documents in this case on subjects relating to the government's Medicare program, interactions with MAOs generally, and regulations, policies and procedures for submission of diagnosis data, audit of such data, standards for contracting with and paying MAOs.

      Anthem, having learned from the *Poehling* documents already, has narrowed RFP 1 to seek 2.2 million additional documents produced in *Poehling* from 40 custodians out of the total 187 custodians.  During argument on the motion, Anthem clarified that if these documents are produced, then it will not seek any additional documents from these 40 custodians.  Further, it clarified that if granted this discovery, it would only seek additional documents from up to 25 other custodians in response to its RFPs 15, 16, 27, 28, 29 and 30 and non-custodial documents – specifically, lists prepared by the Government—in response to its RFPs 31-33.  Anthem argues that the *Poehling* documents it seeks are relevant and that there is no burden to the Government because it can simply reproduce the production it produced in *Poehling*.

The Government objects to the production on the ground that although there are undoubtedly relevant documents among the *Poehling* documents sought, there are many irrelevant documents. Among the irrelevant documents are those from outside the relevant time period, documents specific to United Healthcare's bidding process and documents relating to fee-for-service adjustments/actuarial equivalence. It also objects on the ground that the *Poehling* documents include (1) internal agency deliberations that were originally withheld as privileged in *Poehling* and only produced after an adverse ruling by the court in that case and (2) documents that were marked as attorneys' eyes only. It is willing to apply search terms to the *Poehling* documents and to an even broader set of custodians to look for documents specific to this case and responsive to Anthem's non-*Poehling* RFPs.

**DISCUSSION**

In considering any motion to compel, the Court first turns to Federal Rule of Civil Procedure 26(b), which specifies the scope of discovery. "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(3). When assessing proportionality, the court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. Under Rule 26(b), the Court may deny discovery of relevant information if it is not proportional to the needs of the case. And, as of the 2015 amendments to Rule 26, the standard for production hinges on the relevance of the

7

information to the claims and defenses—narrower than the prior standard which permitted discovery designed to lead to the discovery of admissible evidence.  Advisory Comm. Notes to Rule 26 (2015).

Rule 34 states that RFPs must must describe with reasonable particularity each item or category of items requested. Fed. R. Civ. P. 34(b)(1)(A).  Importantly, Rule 26(g) requires that lawyers who serve RFPs must certify that the request is "(i) consistent with [the] rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, *prior discovery in the case*, the amount in controversy, and the importance of the issues at stake in the action." Fed. R. Civ. P. 26(g)(emphasis added).

The drafters of the 2015 amendments sought to reduce costs and burdens of discovery and, with respect to Rule 34, prohibit "overly broad, non-particularized discovery requests that reflexively sought all documents," . . . "overuse of boilerplate objections that provided insufficient information about why a party was objecting to producing requested document," . . . and "responses . . . that failed to clarify whether responsive documents were being withheld on the basis of objections."  *The Sedona Conference Federal Rule of Civil Procedure 34(b)(2) Primer: Practice Pointers for Responding to Discovery Requests*, Sedona Conference Journal Vol 19,  pp. 452-53 (2018).  A best practice tip offered by the Sedona Conference, a tip this Court fully endorses, is that requesting parties should tailor their requests to minimize objections and facilitate substantive responses. Id. at p. 464.  "Any increase in scope gained by [overbroad

requests] is likely offset by wasted time spent resolving objections or narrowing the scope of the request, or by motion practice in which the request may be viewed as overbroad." Id. at 467.

As relevant here, numerous courts have found that requests for "all" documents produced in another litigation, so-called "clone" of "copycat" discovery, are inherently overbroad requests requiring the Court to considerably scale back the information that a producing party must produce from another litigation or deny it entirely on the ground that a party must do its own work. See, e.g., *Barrella v. Village of Freeport*, 116 F.E.P. 1328 (E.D.N.Y. 2012) (denying motion for production of documents produced in another action that was produced subject to a protective order; noting that a demand for production of all documents and transcripts from another litigation was overbroad); *Bartlett v. Societe Generale de Banque au Liban SAL*, 2023 WL 8828864 (E.D.N.Y. Dec. 21, 2023) (upholding decision denying plaintiff's request to seek and use discovery produced in another action); *Insignia Systems Inc. v News Corp.*, 2020 WL 12570807 (D. Minn. Mar. 24, 2020) ("[t]here could be a number of reasons why documents appropriately requested and provided in another case—even if the subject matter of those cases seem to overlap—would be irrelevant or burdensome to provide in another case. If relevant and proportional documents exist in the custody or control of the responding party, the appropriate thing to do is to request those documents.")(quoting *Goro v. Flowers Foods, Inc.*, No. 17-cv-02580-JLS-JLB, 2019 WL 6252499, at *18–19 (S.D. Cal. Nov. 22, 2019); *In re Outpatient medical Center Employee Antitrust Litigation*, 21 Civ. 305, 2023 WL 4181198 (N.D.Ill. June 26, 2023) (request for all documents produced in another action was facially overbroad; "cloned discovery" requests seeking all documents produced or received during other litigation

9

or investigations disfavored); *Forth v. Walgreen Co.*, 2019 WL 10255628, at *4 (N.D.Ill. July 20, 2019) (denying plaintiffs' motion to compel all documents defendant produced to the government in a seven-year *qui tam* action); *Moore v. Morgan Stanley & Co., Inc.*, 2008 WL 4681942, *2, *5 (N.D. Ill. May 30, 2008) (holding that "[a] party's requested discovery must be tied to the particular claims at issue in the case" and that "just because the information was produced in another lawsuit … does not mean that it should be produced in this lawsuit"); *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 2000 WL 760700, at *1 (S.D. Ind. Mar. 7, 2000) (party seeking documents produced in another matter ordinarily must "do their own work and request the information they seek directly" and "must make proper requests describing the information in which they are interested.")  Ultimately, "the appropriateness of cloned discovery depends upon the circumstances" of each case. *Forth*, 2019 WL 10255628, at *7.

Having fully considered the parties' respective positions in their briefs and after extensive argument and discussion at the hearing on the motion, the Court takes a middle approach that it believes is consistent with Rule 1 and 26(b)(3), minimizes the burdens on both parties and capitalizes on the work already done by the parties in *Poehling*.  Accordingly, the 2.2 million *Poehling* documents sought shall be narrowed by process of elimination as follows:

- The Government shall apply date restrictions to each of the 40 custodians for the time period the custodians were employed in roles where they were involved in issues relevant to this case;

- The Government shall eliminate documents generated after 2018;

- The Government shall eliminate documents about United Healthcare's bidding process;

- The Government shall eliminate documents concerning fee-for-service adjustments/actuarial equivalence; and

- The Government may eliminate documents originally marked and withheld as being subject to the deliberative process privilege in the *Poehling* matter but shall ensure that any such documents are included on a privilege log for this case.

Although the Government has suggested that documents marked attorneys' eyes' only in the *Poehling* litigation may be subject to the deliberative process privilege, the Government waived that privilege by producing them in *Poehling* and not taking efforts, consistent with the protective order in that case, to claw them back as privileged. *See In re Parmalat Securities Litigation*, No. 04-MD-1653 (HBP), 2006 WL 3592936, at *4 (S.D.N.Y. Dec. 1, 2016) ("While voluntary or even inadvertent disclosure of documents may result [in] a waiver of privilege, involuntary or compelled disclosure does not give rise to a waiver."); *S.E.C. v. Forma,* 117 F.R.D. 516, 523 (S.D.N.Y.1987).

In light of the fact that the additional documents from *Poehling* will provide substantial additional information about non-Anthem specific policies and procedures, the Court will further limit the responses required for Anthem's remaining RFPs. Specifically, although RFPs 15, 16, 26, 27, 28, 29, and 30 are not limited to Anthem specifically, in light of discovery already exchanged and the production being ordered that will cover the topics in these RFPs, the Government will only be required to search for Anthem-specific documents in response to these seven RFPs. Further, the Government's searches in response to these RFPs shall be from non-*Poehling* custodians identified by the Government's recent 30(b)(6) witness. The Court understands that there are 25 such custodians but directs the parties to meet and confer to

reduce the number of custodians to under 20 for purposes of the remaining searches to be conducted by the Government. Finally, except for RFPs 31-33, which do not require custodial searches, the Government shall not be required to conduct any further custodial ESI searches in response to any other RFPs. Anthem shall be required to show good cause to propound any additional RFPs.

## CONCLUSION

For the foregoing reasons, Anthem's motion at ECF No. 178 is granted in part and denied in part. The Government shall produce the subset of documents from the 2.2 million *Poehling* documents sought consistent with this opinion.

Although not the subject of the instant motion, consistent with the Court's direction at the March 12, 2024 conference, the parties shall meet and confer regarding the Anthem custodians whose ESI will be subject to searches. The Court understands there is agreement on 28 custodians and ongoing discussions regarding 16 additional custodians. The Court directs the parties to reach agreement on the remaining custodians and search terms as soon as possible and no later than the next case management conference. The Court also directs the parties to produce non-custodial documents (e.g., policy and procedure documents and lists) responsive to each other's non-custodial RFPs by no later than the next case management conference.

Dated:      March 13, 2024
            New York, New York                                SO ORDERED.

*Katharine H. Parker*
_____
Katharine H. Parker
U.S. Magistrate Judge