

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

May 13, 2024

<u>Via ECF</u>
The Honorable Katharine H. Parker
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *United States of America v. Anthem, Inc.*, No. 20 Civ. 2593 (ALC) (KHP)

Dear Judge Parker:

   We write to explain two discovery disputes that we believe require the Court's attention. The first dispute concerns whether Anthem should be required to search the records of Court-ordered (and other agreed-upon) custodians for more than a narrow subset of the Government's RFPs. The second dispute concerns the sufficiency of data security measures that the government has proposed to implement for its provision of certain Anthem data to NERA, a leading economic consulting firm hired by the Government. The Government respectfully requests that the Court: (1) direct Anthem to search the records of the seven at-issue custodians in accordance with the Government's proposed custodian-RFP breakdown and provide hit reports to the Government based on the Government's proposals; and (2) overrule Anthem's objections to the adequacy of the Government's proposed data security protocols (or, in the alternative, require Anthem to pay for additional security measures Anthem has requested).

**I.**  **<u>Anthem's Response to the Government's Second Set of RFPs</u>**

   After the April 9, 2024, conference, the Court ordered Anthem, over its objection, to search the ESI of four custodians in response to the Government's RFPs (John Gallina, Julie Smith, Brian Sassi, and Krista Bowers). Contrary to the Court's Order, Anthem has agreed to search the records of those four custodians (and three other custodians, Robert Gray King, Anne Lieb, and Camille Welch) for only a narrow subset of the Government's RFPs. But these custodians will likely have records responsive to far more of the Government's RFPs. Each of the seven custodians at issue played important roles in Anthem's chart review and compliance with CMS rules and the Court should compel Anthem to search their records with respect to the Government's RFPs as proposed in the **Exhibit A** attached hereto. Anthem's current refusal to conduct adequate searches of their records to respond to the Government's RFPs has served only to further delay discovery in this matter. Indeed, Anthem has yet to produce *any* documents to the Government, apart from its initial disclosures and some responses to a few other narrow, non-custodial RFPs. Conversely, the Government has produced hundreds of thousands of pages of discovery to Anthem and has committed to produce millions more. To move document discovery towards a conclusion, the Government requests that the Court direct Anthem to: (1) search the records of seven custodians in accordance with the Government's proposed custodian-RFP breakdown; and (2) promptly produce hit reports for each of the Government's proposed sets of search terms and custodians, so the parties can bring the year-long debate over the scope of Anthem's custodial searches to a close. We provide further information concerning these disputed custodians below:

**John Gallina**: Anthem refuses to search Mr. Gallina's records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes; (2) errors with diagnosis codes submitted to CMS; (3) Risk Adjustment Data Validation ("RADV") audits, which are conducted by CMS to confirm the accuracy of MAOs' diagnosis codes and a way for CMS to collect overpayments; (4) changes to Anthem's chart review after learning how other MAOs structured their chart reviews; and (5) Anthem's attestations to CMS. However, based on Gallina's position and documents produced during the Government's investigation, Gallina possesses records that are responsive to these RFPs and others. Specifically, Gallina served in several senior positions overseeing finance, risk, and audit functions and, in 2016, was appointed CFO. Documents that Anthem has produced confirm that Gallina had oversight over ▮▮▮▮ that Anthem ▮▮▮▮ Medicare programs. Gallina was also: (1) the signatory of an audit entitled ▮▮▮▮ which discussed CMS-required attestations; and (2) a recipient of an audit entitled ▮▮▮▮ which noted that Anthem's compliance ▮▮▮▮ related to the ▮▮▮▮ of data that Anthem submitted to CMS. Lastly, Gallina participated in a presentation discussing chart review, including that: ▮▮▮▮

**Julie Smith**: Anthem refuses to search Ms. Smith's records for RFPs relating to, among other things: (1) actions taken in response to the accuracy of Anthem's chart review vendor's coding; (2) compliance with CMS requirements related to the accuracy of diagnosis codes; (3) revenue from additional chart reviewed codes; (4) errors with the accuracy of codes submitted to Anthem by providers; and (5) Anthem's attestations to CMS. However, based on Smith's position and documents produced during the Government's investigation, Smith possesses records that are responsive to these RFPs and others. Smith served as Vice President and General Manager Medicare East and Central, where the entire risk adjustment program, including chart review, ▮▮▮▮ According to Anthem's ▮▮▮▮ Ms. Smith was responsible for managing the risk that CMS's ▮▮▮▮ Smith was also involved in relevant internal audits, one entitled ▮▮▮▮ which noted that certain diagnosis codes identified in chart review needed to be ▮▮▮▮; and that unsupported diagnosis codes exposed Anthem to ▮▮▮▮ Ms. Smith also discussed CMS audits relating to data accuracy—including, for example, when she ▮▮▮▮ when she learned about a CMS audit's potential implications for Anthem. And lastly, Ms. Smith signed sub-attestations on Anthem's behalf to comply with CMS rules regarding data accuracy.

**Brian Sassi**: Anthem refuses to search Mr. Sassi's records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes; (2) error rates with the coding of Anthem's chart review vendor or codes that Anthem submitted to CMS; and (3) the financial impact if Anthem's chart review program "looked both ways." However, based on Sassi's position and documents produced during the Government's investigation, Sassi possesses records that are responsive to these RFPs and others. Sassi served as President and CEO of Consumer Business, including overseeing the unit that ran Anthem's chart review. Sassi was instrumental in the creation of Anthem's chart review—for example, he signed the original master services contract between Anthem and Verscend. Mr. Sassi likewise had oversight over similar ▮▮▮▮ mentioned above—*i.e.*, ▮▮▮▮

**Krista Bowers:** Anthem refuses to search Ms. Bowers' records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes; (2) Anthem's obligation to delete inaccurate diagnosis codes that were coded as part of chart review; and (3) whether the structure of Anthem's chart review complied with its legal obligations. However, based on Bowers' position and documents produced during the Government's investigation, Bowers possesses records that are responsive to these RFPs and others. Bowers served as Senior Vice President and President of Anthem's Senior Business and Consumer Marketing. Bowers oversaw Anthem's compliance operations at a critical time: when Anthem hired Verscend to review medical charts for Anthem's chart review program. Bowers likely possesses relevant documents concerning compliance issues identified in connection with developing the chart review program. Bowers stated in an email that ███████████████████████████████████████████████████████ and that Anthem should reserve ███████ that it may need to repay CMS for possible errors identified during an audit. Further, Bowers received a memorandum that discussed Anthem's understanding that chart review could generate ███████████ that might necessitate the deletion of records.

**Robert Gray King:** Anthem refuses to search Mr. King's records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes; (2) error rates with the coding of Anthem's chart review vendor or codes that Anthem submitted to CMS; and (3) risks associated with the structure of Anthem's chart review program. However, based on King's position and documents produced during the Government's investigation, King possesses records that are responsive to these RFPs and others. King served as Staff Vice President, Medicare Revenue Management, a unit that oversaw chart review. While leading that unit, King discussed CMS regulations and compliance related to chart review, including what ███████ Anthem had in place, and that it was important to ███████ the ███████ of an audit that showed inaccuracies in Anthem's chart review. And King discussed financial considerations related to chart review, including the ███████—that is, revenue loss to Anthem if it informed CMS that previously-reported diagnosis codes were inaccurate. Lastly, King also signed CMS-mandated attestations related to data accuracy.

**Anne Lieb:** Anthem refuses to search Ms. Lieb's records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes, including the obligation to delete inaccurate codes; and (2) errors with diagnosis codes that providers submitted to Anthem or Anthem submitted to CMS, and actions Anthem took when it became aware of errors. However, based on Lieb's position and documents produced during the Government's investigation, Lieb possesses records that are responsive to these RFPs and others. Lieb served as a Compliance Training & Policy Consultant in Anthem's MRR department. Lieb possesses ESI that is critical to this case because she drafted a policy entitled ███████████████████████████████ which governed the process by which Anthem would return payments to CMS to which it was ███████████. Lieb also circulated emails that discussed CMS requirements and the False Claims Act. Lieb was also instrumental in training Anthem employees on topics such as: ███████████████████████████████████████████████████████████████████████████

**Camile Welch:** Anthem refuses to search Ms. Welch's records for RFPs relating to, among other things: (1) compliance with CMS requirements related to the accuracy of diagnosis codes, including the obligation to delete inaccurate diagnosis codes; (2) errors with coding that Anthem submitted to CMS; and (3) the risk of overpayment for inaccurate diagnosis codes. However, based on Welch's position and documents produced during the Government's investigation, Welch

3

possesses records that are responsive to these RFPs and others. Welch served as Staff Vice President of Advanced Analytics at Anthem. Ms. Welch discussed CMS requirements related to chart review, and also oversaw Anthem's ███████████ which re-reviewed the diagnosis codes identified by Anthem's chart review vendor. She was also another recipient of an audit which assessed the completeness and accuracy of the data that Anthem submitted to CMS and that noted that Anthem's compliance ███████████

## II. Data Security Issue

[redacted]

4

                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney

By:    */s/ Adam Gitlin*
        PETER ARONOFF
        ZACHARY BANNON
        ADAM GITLIN
        CHARLES JACOB
        DANA WALSH KUMAR
        REBECCA TINIO
        Assistant United States Attorneys
        86 Chambers Street, 3rd Floor
        New York, New York 10007

cc:    Anthem's Counsel (Via ECF)