**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

                            Plaintiff,

    v.

ANTHEM, INC.,

                            Defendant.

No. 20 Civ. 2593 (ALC) (KHP)

 

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S OBJECTION TO CERTAIN DISCOVERY ORDERS**
**OF THE MAGISTRATE JUDGE**

 

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2695

Of Counsel:

PIERRE ARMAND
PETER ARONOFF
RACHAEL DOUD
HARRY FIDLER
ADAM GITLIN
CHARLES JACOB
DANA WALSH KUMAR
Assistant United States Attorneys

**CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .............................................................................................................. 2

    A.    Medicare Part C and Anthem's Chart Review Program..................................... 2

    B.    Procedural History............................................................................................ 4

    C.    Anthem's Misleading Characterization of the Record ...................................... 5

    D.    Anthem's Changes to Its Chart Review Program After It Learned of the
Government's Investigation............................................................................... 9

    E.    CMS's Notice of Sanction to Anthem............................................................ 10

    F.    Prior Discovery, Anthem's Discovery Requests, and the Court's Orders....... 11

STANDARD OF REVIEW ............................................................................................. 12

ARGUMENT.................................................................................................................. 13

    I.    The Orders Should Be Upheld................................................................... 13

    A.    The Government's Intended Use of the Notice ............................................... 13

    B.    The Requests Are Not Proportional to the Needs of the Case......................... 14

    C.    Anthem's Remaining Arguments Are Without Merit ..................................... 24

CONCLUSION............................................................................................................... 25

# AUTHORITIES

Page(s)

**Cases**

*Bogan v. Nw. Mut. Life Ins. Co.*,
 144 F.R.D. 51 (S.D.N.Y. 1992) ................................................................................................ 24

*Chelsea Hotel Owner LLC v. City of New York*,
 No. 21 Civ. 3982 (ALC) (RWL), 2025 WL 880530 (S.D.N.Y. Mar. 21, 2025) ...................... 16

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
 542 U.S. 367 (2004)................................................................................................................ 18

*Diaz v. New York Paving Inc.*,
 No. 18 Civ. 04910 (ALC), 2025 WL 964933 (S.D.N.Y. Mar. 30, 2025)................................. 17

*Duncan Golf Mgmt. v. Nevada Youth Empowerment Project*, No.,
 23 Civ. 00666-ART-CSD, 2024 WL 3357655 (D. Nev. July 10, 2024) .................................. 18

*Elliott v. Cartagena*,
 84 F.4th 481 (2d Cir. 2023) .................................................................................................... 21

*Fischer v. Verizon New York, Inc.*,
 No. 18 Civ. 11628 (RA), 2021 WL 5827639 (S.D.N.Y. Dec. 8, 2021) ..................................... 5

*Freeman v. Seligson*,
 405 F.2d 1326 (D.C. Cir. 1968)............................................................................................... 18

*Fund v. Halcyon Const. Corp.*,
 No. 15 Civ. 1191 (PGG) (JCF), 2015 WL 6509022 (S.D.N.Y. Oct. 26, 2015)........................ 17

*Gropper v. David Ellis Real Est., L.P.*,
 No. 13 Civ. 2068 (ALC) (JCF), 2014 WL 518234 (S.D.N.Y. Feb. 10, 2014) ......................... 16

*Hedgeye Risk Mgmt., LLC v. Dale*,
 No. 21 Civ. 3687 (ALC) (RWL), 2023 WL 4235768 (S.D.N.Y. June 28, 2023).............. 12, 13

*Hellstrom v. U.S. Dep't of Veterans,
 Affs.*, 201 F.3d 94 (2d Cir. 2000) ............................................................................................ 20

*Henry v. Morgan's Hotel Grp., Inc.*,
 No. 15 Civ. 1789 (ER)(JLC), 2016 WL 303114 (S.D.N.Y. Jan. 25, 2016).............................. 16

*In re Kidd*,
 No. 20 Civ. 800 (KAD), 2020 WL 5594122 (D. Conn. Sept. 18, 2020) ................................. 17

*Juice Creative Grp., LLC v. Uncommon Good, Inc.*,
 No. 22 Civ. 1175 (JCH), 2026 WL 1790912 (D. Conn. May 18, 2026) ................................. 24

*Kahn v. United States*,
 No. 13 Civ. 24366, 2015 WL 4112081 (S.D. Fla. July 8, 2015) ............................................ 18

*Makhnevich v. Arrowood Indem. Co.*,
 No. 23 Civ. 1559 (JMF) (VF), 2024 WL 1020577 (S.D.N.Y. Mar. 8, 2024).......................... 13

*Miller v. Wolpoff & Abramson, L.L.P.*,
 321 F.3d 292 (2d Cir. 2003)................................................................................................... 21

*Milner v. City of Bristol*,
 No. 18 Civ. 1104 (JAM), 2020 WL 6049261 (D. Conn. Oct. 13, 2020) ................................. 17

*Molnlycke Health Care US, LLC v. Greenwood Mktg., LLC*,
 No. 22 Civ. 3719 (CS) (JCM), 2024 WL 2048644 (S.D.N.Y. May 7, 2024)........................... 13

*Nat'l Audubon Soc. v. Hoffman*,
132 F.3d 7 (2d Cir. 1997) ....................................................................................... 25
*Ravarino v. Voya Fin., Inc.*,
No. 21 Civ. 1658 (OAW), 2025 WL 969674 (D. Conn. Mar. 31, 2025)................................ 17
*Rivera v. Hudson Valley Hosp. Grp., Inc.*,
No. 17 Civ. 5636 (KMK), 2019 WL 3955539 (S.D.N.Y. Aug. 22, 2019) .............................. 25
*Rouviere v. DePuy Orthopaedics, Inc.*,
560 F. Supp. 3d 774 (S.D.N.Y. 2021)........................................................................ 13
*U.S. ex rel. Swoben v. United Healthcare Ins. Co.*,
832 F.3d 1084, *as amended on denial of rehearing en banc*, 848 F.3d 1161 (9th Cir.2016)..... 7
*U.S. Fish & Wildlife Serv. v. Sierra Club*,
592 U.S. 261 (2021)................................................................................................ 18
*United States ex rel. Foreman v. AECOM*,
19 F.4th 85 (2d Cir. 2021) ............................................................................... 13, 14
*United States v. Strock*,
982 F.3d 51 (2d Cir. 2020)................................................................................ 21, 22
*UnitedHealthcare Ins. Co. v. Becerra*,
16 F.4th 867 (D.C. Cir. 2021)................................................................................... 10
*Universal Health Services, Inc. v. United States* ex rel. *Escobar*,
579 U.S. 176 (2016)................................................................................................ 14

## Rules

Fed. R. Civ. P. 26(b)(1)............................................................................................. 15
Fed. R. Civ. P. 72(a) ................................................................................................ 13
Federal Rule of Civil Procedure 26(b)......................................................................... 15

## Regulations

42 C.F.R. § 422.504(l) ............................................................................................... 5
79 Fed. Reg. 1918 ...................................................................................................... 7

Plaintiff the United States of America (the "Government") respectfully submits this brief in opposition to the objection, ECF No. 551, of defendant Anthem, Inc. ("Anthem") to two orders of the Honorable Katharine H. Parker, the United States Magistrate Judge assigned to this False Claims Act ("FCA") case, who declined to compel the Government to further respond to certain discovery requests (the "Requests").

### PRELIMINARY STATEMENT

Anthem seeks to overturn the decisions of the magistrate judge who has overseen discovery in this complex action for more than three years. But Judge Parker acted well within her discretion when she determined that a request for "all documents" about a Government administrative action, including deliberations that led to its formulation, is overbroad on its face, and that the burden of any further discovery would be "significant, while the likely benefit is slight." ECF No. 542 at 5.

In this fraud case, the Government claims that, from 2014 to 2018, Anthem falsely attested to the accuracy of data submitted to CMS by "knowingly disregard[ing] its duty to ensure the accuracy of the risk adjustment diagnosis data that it submitted to the Centers for Medicare and Medicaid Services ('CMS') under the Part C plans operated by Anthem." ECF No. 60, Opinion and Order, at 1. Anthem has already obtained extensive discovery: the Government has produced over 1.3 million documents, and has deposed seventeen CMS employees.

Anthem's objection concerns Judge Parker's resolution of a discovery dispute arising from Anthem's latest demands seeking wide-ranging discovery concerning a Notice of Intermediate Sanctions by CMS to Anthem in February 2026 (the "Notice," ECF No. 529-1). The Notice required Anthem to either delete sets of unsupported diagnosis codes it had identified or be barred from advertising or enrolling new members. Anthem complied, paying hundreds of millions of dollars to CMS, with more to be recouped. The years covered by the Notice postdate the years at

1

issue in this case, but Anthem's conduct—knowingly receiving payment based on unsupported diagnosis codes—is similar, and thus relevant to the Government's claims.

In response to discovery requests concerning the Notice, the Government produced the correspondence that led to the Notice and informed Anthem, via interrogatory, of the final CMS decisionmaker concerning the Notice. Anthem continued to press its request for "all documents," and moved to compel their production.

Based on her long experience managing discovery in this case, Judge Parker reasonably determined that the issues for which Anthem sought to obtain this additional discovery were at best marginally relevant; that Anthem already had the evidence it needed to make those arguments in any event; and that Anthem's requests were not proportional. Anthem's objection fails to identify any legal error or clear factual error in Judge Parker's decisions, or otherwise show an abuse of the magistrate judge's substantial discretion. This Court should thus uphold the decisions and permit discovery to "come to an end." ECF No. 542 at 5.

## BACKGROUND

### A. Medicare Part C and Anthem's Chart Review Program

The Government's FCA claims in this case arise from Anthem's operation of Medicare Advantage Plans, also known as Medicare Part C plans. Under Medicare Part C's risk adjustment payment system, Anthem submitted diagnosis data to CMS for the Medicare beneficiaries covered by its plans, and CMS relied on that data to determine how much to adjust the payments it made to Anthem for each beneficiary. *See* Government's Amended Complaint, ECF No. 26 ("Am. Compl.") ¶¶ 27–39.

Because the diagnosis data submitted by MAOs like Anthem directly affects the level of risk adjustment payments, CMS imposes regulatory and contractual requirements on MAOs to ensure the accuracy of their diagnosis data. *See* Opinion and Order on Defendant's Motion to

Dismiss, ECF No. 60 ("MTD Op."), at 2-3 (describing requirements). CMS requires Anthem and other MAOs to expressly attest, on an annual basis, that their risk adjustment diagnosis data submissions are "accurate, complete, and truthful" according to their "best knowledge, information and belief." ECF No. 26-9. From 2014 through 2018 (the "Liability Period"), executives overseeing Anthem's Medicare business submitted such attestations to CMS. ECF No. 26-6.

Anthem received diagnosis data from its beneficiaries' medical providers and submitted that data to CMS. Anthem knew that the diagnosis data that it had received from providers contained a significant number of inaccuracies. *See* Am. Compl. ¶¶ 74-78. For example, Anthem knew that "physicians do not always code accurately" and "improper dx [diagnosis] codes" was one of the "common errors." *Id.* ¶ 75 (citing November 2012 email exchange between Anthem compliance manager and Anthem executive).

Anthem also operated internal programs to identify additional diagnosis data—beyond that Anthem had received from providers—to inflate the risk adjustment payments it would receive from CMS. As relevant here, Anthem contracted with a medical coding firm to obtain medical records from providers and review them to identify all diagnosis codes contained in a beneficiary's medical record. Through this process, Anthem was able to identify a significant number of additional diagnosis codes that Anthem had not previously received from providers, boosting its revenues by hundreds of millions of dollars. *See id.* ¶ 8. The chart review program was, as the head of the business unit that ran the program stated in a 2017 email, "a cash cow" for Anthem. *Id.*

But Anthem's chart review program did not just identify *additional* diagnosis codes from medical records. It also made Anthem aware that diagnosis codes that Anthem previously reported to CMS were not supported by medical records. Chart review coders were instructed to locate and record every possible diagnosis code supported by the medical record. *See id.* ¶¶ 121-26. Thus,

3

when those reviewers failed to identify a particular diagnosis code that had previously been reported for the beneficiary for the same date of service, Anthem knew, at minimum, that there was a significant likelihood that the diagnosis code was not, in fact, supported. *See id.* ¶¶ 5, 120-33. Anthem also knew, however, that deleting these unsubstantiated diagnosis codes from CMS's systems—which would correspondingly often result in the return of payments associated with those diagnosis codes to CMS—would significantly reduce its revenue. *Id.* ¶ 133. Anthem turned a blind eye to such diagnosis codes, choosing instead to report only additional diagnosis codes that would increase its risk adjustment payments and thus its revenue.

### B. Procedural History

Based on the foregoing conduct, the Government alleges that, during the Liability Period, Anthem knowingly failed to delete diagnosis codes that it learned were invalid through its retrospective chart review program and, correspondingly, falsely attested to the accuracy of diagnosis data it submitted to CMS. Anthem moved to dismiss the Government's Amended Complaint, and the Court denied Anthem's motion. *See* MTD Op. The Court held, among other things, that the Government plausibly alleged that Anthem's conduct was material to the Government's payment decision. The Court explained that the Amended Complaint alleges, *inter alia*, that "CMS routinely audited MAOs for noncompliance, at times recouping losses incurred from overpayment to MAOs," and contains allegations of four separate instances in which Plaintiff sued other MAOs who have defrauded CMS through similar noncompliant policies like those at issue here. *Id.* at 10. The Court also found it significant that "Anthem submitted annual attestations acknowledging that 'misrepresentation to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution,'" and that the financial costs to the Government "appears to be well over $100 million." *Id.* at 11 (quoting Am. Compliant at ¶88).

The parties are now nearing the close of fact discovery.

4

### C. Anthem's Misleading Characterization of the Record

Anthem's Objection contains a Background section in which it purports to describe the purpose of its chart review program and CMS's knowledge of Anthem's practices. Anthem's description, which is almost entirely devoid of citations to any evidence, is replete with factual inaccuracies. Because Anthem did not put these (unsupported) factual claims before the magistrate judge, the Court should disregard them. *Fischer v. Verizon New York, Inc.*, No. 18 Civ. 11628 (RA), 2021 WL 5827639, at *2 (S.D.N.Y. Dec. 8, 2021). However, to ensure that the record is correct, the Government offers a limited response here, including by citing facts where needed.

First, Anthem suggests that it developed its chart review program to satisfy its regulatory obligation to ensure that its risk adjustment submissions were "complete." *See* Memorandum of Law in Support of Defendant Anthem, Inc.'s Objection to Magistrate Judge's Orders ("Br."), ECF No. 552, at 5 (citing 42 C.F.R. § 422.504(l)). But the regulations also require Anthem to certify that the risk adjustment data it submits is "accurate," meaning that it is supported by the medical record. *See generally* Am. Compl. ¶ 46 (citing ICD-10-CM Official Guidelines for Coding and Reporting). In any event, Anthem documents make clear that the actual purpose of the chart review program was to increase Anthem's revenue. Anthem treated the chart review program as a revenue enhancement program and carefully tracked the return on investment from the program. *See id.* ¶¶ 141-146 (citing Anthem documents).

In its Objection, Anthem observes that CMS is aware that MAOs conduct chart review and has not prohibited them from doing so. Br. 6. But the Government has never claimed that Anthem was not permitted to conduct chart review. Instead, the Government asserts that when Anthem learned through its own specifically designed chart review that diagnosis codes it had previously submitted to CMS were unsupported by the medical record, it could not ignore those results and make false attestations to obtain payment from CMS. Anthem further suggests that the

Government unreasonably demands that "Anthem should have categorically second-guessed *every* physician who was treating the MA beneficiaries and who actually saw the beneficiaries face-to-face." *Id.* at 7 (emphasis in original). However, the Government has not, as Anthem suggests, asserted that Anthem must check every diagnosis code submitted by a provider. *See id*. Anthem chose to "second guess" providers' diagnosis code submissions by conducting chart review in the first place. The Government's position is that when Anthem elects to do so, it cannot merely add additional diagnosis codes while ignoring unsupported diagnosis codes.[1]

Anthem also asserts that CMS "took a different view" of MAOs' obligations prior to 2018, based on the claim that Anthem purportedly made CMS aware that it was failing to delete unsupported diagnosis codes identified through its chart review program and took no action in response. Br. 7-8. But Anthem never in fact disclosed the relevant information about its chart review practices to CMS before 2018, much less received any assurance from CMS that Anthem need not take action when it learned of unsupported diagnosis codes. Anthem's sole support for any assertion to the contrary is a submission Anthem sent to CMS in 2010, in response to an audit unrelated to chart review. Br. 8; ECF No. 408-3. While that submission stated that Anthem operated a chart review program, the letter conspicuously omits that Anthem did not delete diagnosis codes its chart review program revealed to be unsupported. Moreover, in the same year,

███████████████████████████████████████████████

---

[1] Anthem also notes that the Government has identified for Anthem a list of approximately 200,000 diagnosis codes that had previously been reported by Anthem but were not substantiated by chart review. Br. 7. As the Government has consistently made clear, this is a list of diagnosis codes that Anthem's own chart review process showed was presumptively unsupported. The Government intends for its expert to review a sample of the medical records corresponding to those diagnosis codes to determine which are unsupported by medical records. Judge Parker ruled that the Government was entitled to records for such a sample, and Anthem has produced them to the Government.

██████████████████████████████████████████████████████████████████████████

████████████ Ex. 1 to Declaration of Peter Aronoff ("Aronoff Decl."), at 1. That statement was false—Anthem undisputedly did not ██████████████████████████████████████ as part of its chart review program. In fact, ████████████████████████████████████████ ████████████████████████████████████. Anthem cannot credibly assert that CMS was aware of its chart review practices and condoned them when Anthem misled CMS about that program.

Anthem also notes that, in 2014, CMS considered a proposed regulation that would have prohibited MAOs from conducting medical record reviews designed only to identify additional diagnoses to submit for payment purposes and not also to identify errors in risk adjustment data. Br. 8; *see* 79 Fed. Reg. 1918, 2000 (Jan. 10, 2014). While CMS decided not to finalize the proposed rule, *see id.* at 29,926, it reiterated that it has "always expected that [a Medicare Advantage] organization . . . implement, during the routine course of business, appropriate payment evaluation procedures in order to meet the requirement of certifying the data they submit to CMS for purposes of payment." *Id.* at 29,923. CMS explained that MAOs "are responsible for ensuring that payment data they submit to CMS are accurate, truthful, and complete (based on best knowledge, information, and belief), and are expected to have effective and appropriate payment evaluation procedures and effective compliance programs as a way to avoid receiving or retaining overpayments." *Id.*

In 2016, the Ninth Circuit considered this proposed and withdrawn rule in the context of False Claims Act claims arising from a chart review program like Anthem's program. *U.S. ex rel. Swoben v. United Healthcare Ins. Co.*, 832 F.3d 1084, *as amended on denial of rehearing en banc*, 848 F.3d 1161, 1166 (9th Cir. 2016). The Ninth Circuit held that when MAOs "design

7

retrospective reviews of enrollees' medical records deliberately to avoid identifying erroneously submitted diagnosis codes that might otherwise have been identified with reasonable diligence, they can no longer certify, based on best knowledge, information and belief, the accuracy, completeness and truthfulness of the data submitted to CMS." 848 F.3d at 1175. That is exactly what Anthem did. Moreover, *Swoben* did not, as Anthem suggests, announce a new requirement. *See* Br. 9 (asserting that the Ninth Circuit raised "for the first time" the specter of MAOs' obligations to delete unsupported diagnosis codes identified through chart review).[2] Instead, the Ninth Circuit rooted its decision in the fact that "as CMS made clear, Medicare Advantage organizations have *always* had 'an obligation to take steps to ensure the accuracy, completeness, and truthfulness of the encounter data' and 'an obligation to undertake due diligence to ensure the accuracy, completeness, and truthfulness of encounter data submitted to [CMS].'" *Swoben*, 848 F.3d at 1177 (quoting 65 Fed. Reg. at 40,268) (emphasis added).

---

[2] Anthem also misleadingly describes the proceedings in *United States ex rel. Poehling v. UnitedHealth Group, Inc.*, 2:16-cv-08697 (C.D. Cal.). On February 12, 2018, the district court dismissed certain of the Government's allegations in that case with leave to amend. ECF No. 212. The district court held that the Government failed to allege that UnitedHealth Group's attestations—as opposed to the underlying diagnosis data—were material and dismissed the counts of the Government's complaint corresponding to the falsity of the attestations with leave to amend. *Id.* at 18. The Court denied UnitedHealth Group's motion to dismiss as to the Government's "reverse false claims" and common law claims, holding that the Government had plausibly alleged that UnitedHealth Group had knowingly avoided obligations to repay CMS by failing to delete invalid diagnosis codes, and that such failure was material. *Id.* at 20-21. The court rejected the argument Anthem makes in this case that the fact that CMS continued to make risk adjustment payments despite "generalized knowledge" of Anthem's chart review practices undermines materiality, explaining that, "[a]s the Government argues, this generalized knowledge does not amount to actual knowledge of specific invalid diagnoses" and "[w]ithout such actual knowledge, CMS could not know how it should change the risk adjustment payments." *Id.* at 21. The special master report and recommendation from the *Poehling* case that Anthem also cites contradicts this analysis from the district court, and the district court has not yet acted on the report and recommendation.

**D. Anthem's Changes to Its Chart Review Program After It Learned of the Government's Investigation**

In 2018, after Anthem learned that the Government was investigating its chart review practices through receipt of a civil investigative demand, Anthem finally began comparing the results of its chart review to the diagnosis codes from providers that it previously submitted to CMS to identify diagnosis codes its chart review was unable to substantiate. Anthem attributes its decision to do so to the *Swoben* decision, though it did not actually change its practices until two years after the decision was issued. Br. 9. Even then, moreover, Anthem did not actually delete the diagnosis codes its chart review program failed to validate. Instead, Anthem elected to send the diagnosis codes it had been unable to substantiate to CMS on flash drives while arguing in letters to CMS that CMS should not delete those diagnosis codes. *See* Notice at 2. As Anthem well knew, deletions of unsupported or otherwise invalid diagnosis codes must be submitted by MAOs through designated CMS data submission systems, and not via flash drive. *Id.* And if Anthem had submitted those deletions to CMS through the appropriate systems, they would have been processed by CMS and Anthem's risk adjustment payments would have been reduced accordingly by hundreds of millions of dollars. Anthem thus intentionally submitted the diagnosis codes for which it had been unable to find support through the wrong method, apparently with the intent of manufacturing the argument—which it advances here, *see* Br. 10—that CMS's failure to process the deletions weighs against materiality.

At the point Anthem began sending these letters to CMS, the Government was already investigating Anthem's conduct. CMS responded to Anthem's letters by instructing it to comply with its obligations to ensure risk adjustment data accuracy and to submit data corrections through CMS's official systems when unsupported diagnosis codes are identified. Notice at 4. And in its October 16, 2024, letter to Anthem, CMS reiterated that if Anthem has information that certain

9

diagnoses are unsupported by a beneficiary's medical records, the corresponding overpayment must be reported and returned within 60 days of identification, in accordance with applicable requirements. *Id.* at 5. CMS emphasized: "To be clear, sending encrypted files with correspondence to CMS does not satisfy [Anthem's] obligations." *Id.* Anthem nonetheless continued to do so.[3]

### E. CMS's Notice of Sanction to Anthem

On February 27, 2026, CMS issued the Notice, which explained that CMS was taking action against Anthem because of its "substantial and persistent noncompliance with Medicare Advantage risk adjustment data submission requirements" by failing to "submit data corrections for diagnosis codes it identified as unsupported by medical record documentation through CMS's required electronic systems." Notice at 2. CMS notified Anthem that, if it did not submit the required data corrections through CMS's electronic systems by a specified deadline, Anthem would incur sanctions. *Id.* at 1, 8. Anthem submitted the data corrections and transmitted $342,209,085.30 to CMS, thereby avoiding the sanction. *See* ECF No. 529-2 at 3. CMS will recoup additional payments as it processes the data corrections.[4] Anthem is presently appealing the Notice administratively, and sought and obtained a modification of the protective order in this case to permit it to use discovery from this case in such an appeal.

Shortly after the Notice was issued, the Government amended its Rule 26 disclosures to include the Notice as a document upon which the Government might rely to support its claims for

---

[3] Anthem's primary argument for why it supposedly was not required to delete the diagnosis codes it had failed to substantiate was that CMS could not recoup overpayments related to diagnosis code corrections without accounting for the Social Security Act's actuarial equivalence mandate. *See* Br. 10. The D.C. Circuit rejected that argument in *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867 (D.C. Cir. 2021).

[4] In SEC filings, Anthem estimated that it would cost $935 million to avoid the sanction. *See* https://www.sec.gov/Archives/edgar/data/1156039/000115603926000039/a1q2026elvearningsrelease.htm.

relief. As the Government explained to Anthem, the Government would potentially rely on the Notice to respond to Anthem's argument that CMS has failed to take action in response to MAOs' failure to delete unsupported diagnosis codes revealed through chart review programs, and as evidence of materiality.

### F.  Prior Discovery, Anthem's Discovery Requests, and the Court's Orders

In April 2023, Judge Parker entered a case management plan in this case. *See* ECF No. 86. Since then, the Government has produced more than 1,360,000 documents, and Anthem has deposed 17 CMS employees, an HHS-OIG employee, and one CMS Rule 30(b)(6) witness. The Government has also provided to Anthem dozens of additional deposition transcripts of Government witnesses from other False Claims Act litigation.

On April 3, 2026, Anthem issued two document requests and an interrogatory related to the Notice. One document request sought "All Documents Concerning the Notice of Intermediate Sanctions against Elevance Health."[5] ECF No. 529 at 2. In its Interrogatory, Anthem asked the Government to "Identify all Persons who participated in the decision to issue the Notice of Intermediate Sanctions." *Id.* Though these requests were plainly overbroad, the Government produced the Notice, correspondence between CMS and Anthem that led to the issuance of the Notice, and memoranda cited in the Notice. *See id*. In a sworn interrogatory response, CMS also identified the Administrator of CMS as the individual who made the final decision to issue the Notice. *See id*. But Anthem objected to the Government's production of information and documents relating to the Notice, and it continued to seek "all documents" concerning the Notice or its Interrogatory. *Id*.

The parties submitted position statements to Magistrate Judge Parker concerning these

---

[5] Anthem changed its name to Elevance Health in 2022. *See* https://www.sec.gov/Archives/edgar/data/1156039/000115603923000109/R30.htm.

requests. *See* ECF Nos. 520, 523, 529, 535. On July 2, 2026, Judge Parker issued the Opinion and Order denying Anthem's request for additional discovery on this topic. ECF No. 542 ("Notice Op."). At the time the Court issued the Opinion and Order, Anthem had not yet sought particular depositions concerning the Notice. On Friday, July 3, 2026—a federal holiday—Anthem informed the Government by email that it "intended to proceed with depositions of John Scott, Shruti Rajan, and Kevin Stansbury." Anthem had never noticed the depositions of Shruti Rajan or Kevin Stansbury, who are CMS employees. As explained above, Anthem had previously deposed John Scott (another CMS employee) prior to the issuance of the Notice. In its July 3 email, Anthem asked the Government to "confirm as soon as possible whether Plaintiff will agree to produce those witnesses for deposition." On Monday, July 6, the Government informed Anthem that it did not expect to be able to provide its final position concerning the depositions by the time of the conference before Judge Parker that was scheduled for the following day, July 7.

At the July 7 conference, Anthem nonetheless asked Judge Parker to rule on this issue, forgoing briefing and asking the Court to confirm whether its July 2, 2026, Order precludes the depositions. Conf. Tr. 92:3-9.[6] Judge Parker confirmed that her July 2, 2026, Order would encompass the depositions Anthem was seeking. *Id.* 105:14-16. Judge Parker subsequently confirmed that ruling in her post-conference order. ECF No. 546.

## STANDARD OF REVIEW

"It is well-settled that a magistrate judge's resolution of a nondispositive matter should be afforded substantial deference and may be overturned only if found to have been an abuse of discretion." *Hedgeye Risk Mgmt., LLC v. Dale*, No. 21 Civ. 3687 (ALC) (RWL), 2023 WL

---

[6] Anthem erroneously claims in its Objection that the Government refused to make any of the three witnesses whose depositions Anthem sought available for depositions. Br. 13. In fact, Anthem raised the issue with Judge Parker before the Government could provide its position.

12

4235768, at *1 (S.D.N.Y. June 28, 2023) (Carter, J.) (internal citations and quotations omitted).

"This standard of review is highly deferential," *Rouviere v. DePuy Orthopaedics, Inc.*, 560 F.

Supp. 3d 774, 783 (S.D.N.Y. 2021), and "imposes a heavy burden on the objecting party."

*Molnlycke Health Care US, LLC v. Greenwood Mktg., LLC*, No. 22 Civ. 3719 (CS) (JCM), 2024

WL 2048644, at *1 (S.D.N.Y. May 7, 2024) (internal citations and quotations omitted).

The district court shall "set aside any part of the order that is clearly erroneous or contrary

to law." *Id.* (internal citations and quotations omitted); *see* Fed. R. Civ. P. 72(a). A factual

determination is "clearly erroneous" when "the reviewing court on the entire evidence is left with

the definite and firm conviction that a mistake has been committed." *Hedgeye Risk Mgmt.*, 2023

WL 4235768, at *1. A decision is "contrary to law" if the magistrate judge "failed to apply or

misapplied relevant statutes, case law or rules of procedure." *Id.* A magistrate judge's ruling may

be upheld on any ground supported in the record. *Makhnevich v. Arrowood Indem. Co.*, No. 23

Civ. 1559 (JMF) (VF), 2024 WL 1020577, at *1 (S.D.N.Y. Mar. 8, 2024).

## ARGUMENT

### I.    The Orders Should Be Upheld

#### A.  The Government's Intended Use of the Notice

In order to frame the legal issues, the Government first briefly explains its intended use of

the Notice in this action, which is relevant the FCA element of materiality.

As this Court held in rejecting Anthem's motion to dismiss, "'a misrepresentation about

compliance with a statutory, regulatory, or contractual requirement must be material to the

Government's payment decision in order to be actionable under the False Claims Act.'" MTD Op.

at 7-8 (quoting *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 109 (2d Cir. 2021)).

Materiality "looks [to] the effect on the likely or actual behavior of the recipient of the alleged

misrepresentation," *i.e.*, whether the decisionmaker would attach importance to that information.

13

*Id.* at 9 (quoting *Universal Health Services, Inc. v. United States* ex rel. *Escobar*, 579 U.S. 176, 193-94 (2016)). As the Court held, "in determining materiality a court considers: '(1) whether the government expressly designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment; (2) the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision; and (3) whether the defendants' alleged noncompliance was 'minor or insubstantial.'" *Id.* at 8 (quoting *AECOM*, 19 F.4th at 110). The Notice is relevant to the second prong of this standard.

First, as the magistrate judge recognized, Notice Op. at 5-6, it shows the result of Anthem's letter-writing campaign. As noted above, *see supra* Background § D, Anthem's campaign was a clear effort to manufacture a scenario that Anthem could later claim undercuts materiality. The Government must be able to respond to this effort by showing the steps that CMS ultimately took.

The Notice is also relevant to the second prong of the materiality standard because it is a concrete, objective indication of CMS's response once it learned of specific diagnosis codes that had been identified as unsupported by chart review, and which an MAO refused to delete from CMS's systems. In addition, CMS's explanation for its action, as reflected in the Notice, sheds light on "the likely . . . behavior" of the agency in scenarios that present similar circumstances. *Escobar*, 579 U.S. at 193. Before Anthem sent its letters, *see supra* Background § D, CMS did not know of specific diagnosis codes that Anthem identified as unsupported through chart review and refused to delete. The action reflected in the Notice, including CMS's stated legal bases, provides some evidence of what CMS would have done had it known earlier of specific diagnosis codes that Anthem had identified as unsupported through chart review.

### B. The Requests Are Not Proportional to the Needs of the Case

The Requests represent Anthem's attempt to create a sideshow based on unfounded conjecture about CMS's reasons for issuing the Notice. Judge Parker acted well within the

discretion afforded to her when she determined that Anthem's overbroad requests for further discovery exceeded what is permitted by Rule 26. Anthem's arguments rely on legal errors, are unsupported by evidence, and ignore Rule 26's proportionality standard. Judge Parker's decision should thus be upheld.

**1. Judge Parker Correctly Concluded That the Requests Are Facially Overbroad and Disproportionate to the Needs of the Case**

Judge Parker appropriately determined that Anthem's discovery requests concerning the Notice did not comply with Federal Rule of Civil Procedure 26(b) because they were facially overbroad and disproportionate. As Judge Parker noted, Rule 26 requires that discovery requests be "proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Notice Op. at 3 (quoting Fed. R. Civ. P. 26(b)(1)). Here, Anthem sought "all documents" concerning the Notice, three depositions of CMS employees, and an interrogatory response identifying "all persons" that "participated" in the Notice. In response, the Government produced relevant documents (the correspondence between Anthem and CMS leading to the Notice) and identified Dr. Mehmet Oz as the final decisionmaker. Judge Parker correctly determined that "Anthem has failed to demonstrate how additional discovery on this issue, beyond what the Government has already provided, is proportional to the needs of this case." [ ] at 4. As Judge Parker explained in further detail:

> Anthem's discovery requests are facially overbroad. A request for "all documents" concerning the Notice is not tailored to any discrete issue in this case. It would require the Government and CMS to conduct a broad search and undertake a substantial privilege review involving attorney-client communications, deliberative process materials, and communications between CMS and the Department of Justice. The likely burden of that exercise is significant, while the likely benefit is slight given that Anthem already has the Notice, the underlying correspondence, and the identity of the final

15

decisionmaker.

*Id.* at 5.

This analysis is well supported by law. To start, courts routinely reject requests for "any and all" documents on a topic (let alone requests for "any and all" documents on a topic *plus* three depositions of government officials focusing on irrelevant issues relating to the topic, along with a burdensome interrogatory). Such blanket requests are "objectionable on their face," because a request for "'any and all' documents" on a subject is "inherently overbroad." *Gropper v. David Ellis Real Est., L.P.*, No. 13 Civ. 2068 (ALC) (JCF), 2014 WL 518234, at *4 (S.D.N.Y. Feb. 10, 2014); *see also Henry v. Morgan's Hotel Grp., Inc.*, No. 15 Civ. 1789 (ER)(JLC), 2016 WL 303114, at *2 (S.D.N.Y. Jan. 25, 2016) (holding that "blanket requests" for any and all documents are plainly overbroad and impermissible, and collecting additional authorities). But Judge Parker's analysis does not stop there; it reflects a careful consideration of Rule 26's factors: it pinpoints the specific defect in Anthem's requests, notes how the requests would be burdensome on the Government, and weighs the benefit of the proposed discovery by cataloguing what Anthem already has in its possession.[7] These are the very types of determinations that are left to the "broad discretion provided to courts handling complex discovery matters." *Chelsea Hotel Owner LLC v. City of New York*, No. 21 Civ. 3982 (ALC) (RWL), 2025 WL 880530, at *3 (S.D.N.Y. Mar. 21, 2025), *reconsideration denied*, 2025 WL 1603918 (S.D.N.Y. June 6, 2025). Judge Parker

---

[7] Anthem seeks the CMS employee depositions to probe the same topics relating to irrelevant internal deliberations that Judge Parker found to be disproportionate to the needs of the case. Indeed, the privilege concerns identified by Judge Parker are even more acute in a deposition setting, where privileged content cannot be pre-screened and logged but must be policed in real time. Policing such deliberative process testimony would require extensive and burdensome involvement of CMS officials who would be taken away from their responsibilities of running the Medicare program. Judge Parker thus correctly determined that the burden concerns animating her decision regarding the document requests applied with equal force in the context of depositions.

16

"properly considered the law, including the proper standards to be used, and the facts of this case." *Diaz v. New York Paving Inc.*, No. 18 Civ. 04910 (ALC), 2025 WL 964933, at \*1 (S.D.N.Y. Mar. 30, 2025) (upholding magistrate judge's determination).

Judge Parker was also well within her discretion to deny Anthem's requests (beyond what the Government had already provided) in full, given that the scope of discovery sought by Anthem was facially overbroad. A court may properly "decline to rewrite . . . document requests in order to conform them to the discovery rules." *Trs. of New York City Dist. Council of Carpenters pension Fund v. Halcyon Const. Corp.*, No. 15 Civ. 1191 (PGG) (JCF), 2015 WL 6509022, at \*1 (S.D.N.Y. Oct. 26, 2015); *Milner v. City of Bristol*, No. 18 Civ. 1104 (JAM), 2020 WL 6049261, at \*6 (D. Conn. Oct. 13, 2020). Anthem has not explained why its plainly overbroad requests are proportional. Judge Parker was not required—particularly where Anthem is represented by sophisticated counsel—to refashion Anthem's discovery requests to comply with Rule 26.

Anthem also faults the Government for failing to provide evidence about the burden of complying with the Requests. Br. 22-23. But such evidence was unnecessary, given that the Requests were facially overbroad and burdensome. A discovery request that is facially overbroad may be denied without the need for declarations about burden. *See, e.g.*, *In re Kidd*, No. 20 Civ. 800 (KAD), 2020 WL 5594122, at \*11-12 (D. Conn. Sept. 18, 2020) (overturning magistrate judge's determination that a declaration was required to demonstrate burden where requests that sought "all documents" on certain topics were overbroad on their face); *see also Ravarino v. Voya Fin., Inc.*, No. 21 Civ. 1658 (OAW), 2025 WL 969674, at \*6 (D. Conn. Mar. 31, 2025) (no need for declaration where requests were facially disproportionate). That is particularly true when the Court's determination was made against the backdrop of yearslong litigation in which similar disputes have been repeatedly aired and resolved; Judge Parker was entitled to, and did, draw on

17

her experience and familiarity with the issues.

Judge Parker also appropriately considered the burdens associated with privilege review. The threshold problem with the Requests, as Judge Parker correctly determined, Notice Op. at 5, is not that some requested material is privileged, but that reviewing such material for potential privilege and creating a log itself creates an unreasonable burden, in violation of Rule 26(b)(1). *See, e.g.*, *Duncan Golf Mgmt. v. Nevada Youth Empowerment Project*, No. 23 Civ. 00666-ART-CSD, 2024 WL 3357655, at \*5 (D. Nev. July 10, 2024). Indeed, where the number of documents at issue is large, courts have held that issues regarding relevance, overbreadth and proportionality should be litigated before the Government is required to engage in the "laborious" work of asserting executive privilege. *Freeman v. Seligson*, 405 F.2d 1326, 1338–39 (D.C. Cir. 1968); *see also, e.g.*, *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 388-89 (2004); *Kahn v. United States*, No. 13 Civ. 24366, 2015 WL 4112081, at \*2 (S.D. Fla. July 8, 2015). This point applies to both deliberative process and attorney-client privileges.

By their nature, "all documents" and deposition testimony on internal pre-decisional governmental decision-making will almost certainly include materials that fall within the scope of the deliberative process privilege. Indeed, Anthem's stated reason for its requests is to seek "internal communications and documents" about the process that led to the formulation of the Notice. Br. 20. But the deliberative process privilege "shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *U.S. Fish & Wildlife Serv. v. Sierra Club*, 592 U.S. 261, 267 (2021) (quotation marks omitted). The privilege is "encourage[s] candor, which improves agency decisionmaking." *Id*. Yet recommendations and predecisional deliberations are exactly what Anthem seeks.

18

Anthem also expressly seeks information likely protected by the attorney-client privilege: according to Anthem, it seeks discovery to bolster its speculative charge that the Notice was "issued to bolster" the Government's case and was "influenced by" Government counsel. ECF No. 535 at 1. During the parties' meet and confer discussions, Anthem noted that it intended to seek communications that include Government attorneys, whether at the Department of Justice, CMS, or elsewhere. Anthem has never explained why it would be improper for CMS to consult with attorneys, including from the Department of Justice, before acting, and Anthem itself presumably consulted with its own counsel in connection with its letter-writing campaign to CMS leading up to the Notice. In any event, Judge Parker properly noted that review for attorney-client privilege also imposed a "significant" likely burden in exchange for "slight" benefit. Notice Op. at 5.

Against these obvious burdens, Anthem seeks information of at most limited relevance. Anthem seeks to cast doubt on the reasons that CMS issued the Notice, which are set forth in detail in the Notice itself. Br. 20. However, for materiality purposes, the salient fact is that CMS acted. As this Court has held, "the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision" is relevant for materiality purposes. MTD Op. at 8. Documents and testimony reflecting internal deliberations, by their nature, do not bear on an agency's *actual* "response to noncompliance." Anthem's Requests are also of limited relevance because they seek to learn the thought process of individual officials—but CMS speaks through its official actions.

Thus, Anthem is correct that the documents and information produced to date do not show the "state of mind of CMS's decision-makers" or the "agency's motive for issuing the Notice," in the sense of the subjective motives of individual agency personnel. Br. 20. But as explained above, the FCA and Rule 26 do not entitle defendants to extensive discovery on the state of mind or

19

subjective motivations behind every decision by the Government that weighs in the materiality analysis. This principle is particularly applicable here, where Anthem has had the opportunity to extensively probe the decisionmaking process of CMS more generally by obtaining over 1.3 million Government documents and taking 17 depositions of CMS employees, with a Rule 30(b)(6) deposition also to be taken in the coming months.

As Judge Parker observed, Anthem already has the information it needs to argue both that "the Notice is not relevant to the issues in this case and that that the Government issued the Notice only to bolster its case in this action." Notice Op. at 4. Relevance is a legal question, and Anthem has never claimed that anything besides the Notice itself is needed to make the argument. As for its purported questions about the reasons for the Notice, Anthem can, as Judge Parker noted, point to the same facts about timing that Anthem includes in its brief. Br. 11-13.

Finally, Anthem mistakenly argues that denying further discovery on the Notice would run afoul of a principle that "targeted responsive discovery" must be allowed. Br. 21-22. But Anthem has already obtained targeted responsive discovery on this topic. As Judge Parker noted, the Government has produced the Notice (which includes CMS's rationale for issuing it), along with "the correspondence between CMS and Anthem that led to its issuance," and has "identified the CMS Administrator, Dr. Mehmet Oz, as the final decisionmaker." Notice Op. at 5. Thus, the question is not whether any discovery is appropriate; it is whether any further discovery is appropriate. Judge Parker correctly determined that Anthem's request for "all documents" regarding the Notice is facially overbroad, not targeted. Notice Op. at 5. Anthem's argument in this regard also ignores Judge Parker's determination that the requested discovery was "at best tangential to the core issues" of the case. *Id*. at 6. Thus, while it might be error to deny discovery of "'information that is essential'" to a claim or defense, Br. 21 (quoting *Hellstrom v. U.S. Dep't*

*of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000)), the requested information is not that.

Anthem's other citations are decisions where a party claimed that it required discovery in order to be able to defend a summary judgment motion. Br. 21-22 (citing *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303-07 (2d Cir. 2003) and *Elliott v. Cartagena*, 84 F.4th 481, 493-94 (2d Cir. 2023). But this case is not at the summary judgment stage, and as Judge Parker noted, Anthem already has information that it can use to advance the arguments it seeks to make. Notice Op. at 4.

### 2.  The Order Does Not Overlook Controlling Law

Anthem's argument (Br. 16-19) that the magistrate judge overlooked controlling law is mistaken. As set forth above, Judge Parker properly applied Rule 26, which is the controlling law for this discovery dispute, in the context of the Government's False Claims Act claims. Anthem's citations do not address discovery disputes, which is fatal to Anthem's objection that Judge Parker overlooked controlling law.

Instead, Anthem attempts to muddy the FCA's materiality standard by drawing from the Second Circuit's decision in *United States v. Strock*, 982 F.3d 51 (2d Cir. 2020), a purported rule that FCA defendants may seek wide-ranging discovery on whether evidence of a government action is "manufactured" or "pretextual." Br. 18. But *Strock* did not endorse this proposition.

*Strock* was decided at the motion to dismiss stage, before discovery. 982 F.3d at 64. The Second Circuit's had to decide—when assessing whether a complaint plausibly pled FCA claims—how much weight to give allegations that it found self-serving. The Court concluded that allegations about what the Government would have done provided "only weak support" to meet the pleading standard. *Id.* at 64. The Court also held that allegations that the Government had prosecuted parties for fraudulently violating contractual conditions—"post hoc enforcement actions"—should be given less weight than mid-contract refusals to pay. *Id.* at 63. The Court

21

nonetheless went on to hold that, taking account of all the allegations, including steps the Government took to verify compliance before entering into contracts and the importance of the contractual requirement at issue, the Government had adequately pled materiality. *Id*. at 65.

The instant dispute presents a completely different context. Here, the Court has already rejected a motion to dismiss on materiality grounds, and the Notice is a real-world action that CMS has taken. Moreover, the question before the Court is neither whether the Government has met the pleading standard, nor how much weight to give the Notice; it is whether Anthem is entitled to vast discovery in pursuit of an unfounded claim about the Notice.

Nor, contrary to Anthem's argument, Br. 18, is the Notice a "post hoc enforcement action" of the type described in *Strock*. *Strock* used "post hoc enforcement" to refer to litigation after a contracted transaction is complete, which "risks only the costs of litigation." *Id.* at 63. The court contrasted such after-the-fact enforcement through litigation with "mid-contract refusals to pay," which "risk delay of a project," and thus carry a higher cost. *Id.*

The Notice is plainly not a post hoc enforcement action. It is not litigation after contractual performance is complete; it is an action that CMS is entitled to take under its contract with Anthem. The Notice carried significant risks for CMS. If Anthem did not avoid the sanction by returning the overpayments to CMS, the sanction would have prevented Anthem from enrolling new members, creating disruptions for Medicare beneficiaries who are either newly eligible or who wish to change plans. Nor does the mere fact that the Notice postdates the Liability Period render it relevantly "post hoc." The Notice concerns separate, later years, but represents administrative action, not enforcement by litigation.

### 3. Anthem's Arguments for Additional Discovery Rest on Sheer Speculation

Anthem's filings make clear that its main purpose for the Requests is to buttress its unfounded speculation that the reasons given in the Notice are not CMS's true reasons for action.

22

But none of the facts that Anthem has marshaled even suggests pretext.

Anthem claims that CMS's decision to issue the Notice can be traced to purportedly damaging deposition testimony given by former CMS official Cheri Rice in August 2025. Br. 11. Ms. Rice's testimony—in substance, that CMS had not taken certain actions to that point—was no revelation, and not even in dispute. Ms. Rice, CMS, and Anthem obviously already knew whether CMS had (for example) terminated an Anthem contract. Thus, Ms. Rice's testimony does nothing to support Anthem's claims that the Government belatedly realized that its case had a "fatal failure of proof on materiality." Br. 19.

Anthem makes a similarly implausible argument about the deposition testimony of another CMS official, John Scott. Mr. Scott testified at his February 10, 2026, deposition that he had recently received a referral to sanction an MAO for failing to submit accurate data, and Anthem observes that the Notice was issued "just seventeen days after the deposition." Br. 12. Anthem does not explain how this timing is purportedly meaningful, particularly given that Mr. Scott testified that he had received the referral in 2025. Scott Tr. 119:3-120:2. Anthem also insinuates some unspecified impropriety when Government counsel instructed Mr. Scott not to answer certain questions that plainly sought privileged information. Br. 12. Casting this undisputed deposition testimony in conspiratorial language does not create a conspiracy.

At bottom, Anthem's speculation that the Notice was a sham makes no sense. The sanction is a significant administrative enforcement action in its own right: Anthem has already paid approximately $342 million to CMS as a result of the Notice, and Anthem's own securities filings show that it reserved $935 million for issues related to the Notice. *See* supra n.4.

Finally, the fact that the Government has not responded factually to Anthem's speculation in no way suggests it is correct. *See* Br. 19. Anthem apparently takes the position that a party

23

resisting discovery must disclose the very information at issue or risk having its argument rejected, a position at odds with basic logic.

### C.  Anthem's Remaining Arguments Are Without Merit

Anthem's remaining arguments do not alter the outcome. First, Anthem argues (Br. 24) that it could not have reasonably requested or obtained additional information about the Notice until recently. But Judge Parker did not deny the Requests on the basis that Anthem had delayed. Rather, Judge Parker's point in noting that "fact discovery needs to come to an end" was that "additional broad discovery sought about the Notice, which Anthem contends is irrelevant to this case, is simply not proportional to the needs of the case." Notice Op. at 5. Judge Parker reasonably determined that it was inappropriate to prolong fact discovery to facilitate Requests that are disproportionate to the needs of the case, when considering all the evidence gathered and the relative value of the requested material. The magistrate judge who has been overseeing discovery for more than three years is best positioned to make such discretionary judgments about case management, and such judgments are accordingly reviewed for abuse of discretion. *See, e.g.*, *Bogan v. Nw. Mut. Life Ins. Co.*, 144 F.R.D. 51, 53 (S.D.N.Y. 1992) (upholding decision of the magistrate judge who, "having conducted lengthy conferences with the parties in an effort to resolve discovery disputes, was in the best position to have the proper feel for the appropriate resolution of the problem"); *Juice Creative Grp., LLC v. Uncommon Good, Inc.*, No. 22 Civ. 1175 (JCH), 2026 WL 1790912, at *2-3 (D. Conn. May 18, 2026) (a magistrate judge's discretionary order based on close familiarity with the proceedings should not be lightly disturbed).

Anthem also argues (Br. 24-25) that the Notice Order includes a mistaken premise—that "Anthem may obtain additional information through the ongoing administrative process pursuant to which it is contesting the Notice that potentially could be used for cross-examination." Notice Op. at 6 n.2. The Government does not contend that Anthem has alternative means to obtain

24

evidence through the administrative process. To the contrary, the Government is concerned that the Requests are an improper attempt to obtain discovery that Anthem might seek to use either in the administrative process or subsequent litigation, even though discovery is generally not permitted in challenges to administrative action. *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997). But the entire Order does not rest on the reasoning of its single-sentence final footnote. Thus, any error in this regard was harmless and is not a basis to set aside the Order. *See, e.g.*, *Rivera v. Hudson Valley Hosp. Grp., Inc.*, No. 17 Civ. 5636 (KMK), 2019 WL 3955539, at *4 (S.D.N.Y. Aug. 22, 2019).

## CONCLUSION

For the reasons set forth above, Defendant's objections should be overruled.


Dated: August 6, 2026
       New York, New York


                                    Respectfully submitted,

                                    JAMES M. MCDONALD
                                    United States Attorney
                                    Southern District of New York

                              By:   */s/ Peter Aronoff*
                                    PIERRE ARMAND
                                    PETER ARONOFF
                                    RACHAEL DOUD
                                    HARRY FIDLER
                                    ADAM GITLIN
                                    CHARLES JACOB
                                    DANA WALSH KUMAR
                                    Assistant United States Attorneys
                                    86 Chambers Street, Third Floor
                                    New York, New York 10007
                                    Tel.: (212) 637-2697