**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

September 1, 2026

Via ECF
The Honorable Katharine H. Parker
United States District Court
500 Pearl Street
New York, New York 10007

Re: *United States of America v. Anthem, Inc.*, No. 20 Civ. 2593 (ALC) (KHP)

Dear Judge Parker:

This Office represents the Government in the above-referenced matter. We write in accordance with the Court's July 22, 2026, order to raise outstanding discovery disputes. ECF No. 555. This dispute arises from Anthem's refusal to provide any testimony in response to certain of the Government's Rule 30(b)(6) topics. Anthem has also baselessly limited its testimony in response to other relevant and proportional topics. For the reasons set forth below, the Court should direct Anthem to provide testimony concerning the Government's Rule 30(b)(6) topics, without Anthem's improper limitations.

## I. Background

In this fraud case, the Government claims that, from 2014 to 2018, Anthem falsely attested to the accuracy of data submitted to CMS by "knowingly disregard[ing] its duty to ensure the accuracy of the risk adjustment diagnosis data that it submitted to the Centers for Medicare and Medicaid Services ('CMS') under the Part C plans operated by Anthem." ECF No. 60, Opinion and Order, at 1. Specifically, the Government alleges that Anthem operated its retrospective chart review program in a manner designed to identify additional diagnosis codes to submit to CMS and thereby increase the payments Anthem received from CMS while turning a blind eye to diagnosis codes its chart review revealed to be unsupported. Amended Complaint, ECF No. 26 ("Compl.") ¶¶ 5-8, 120-33.

On January 21, 2026, the Government served its Notice of Deposition Under Federal Rule of Civil Procedure 30(b)(6) ("Notice") on Anthem. *See* Ex. A. The parties then engaged in several lengthy meet-and-confer sessions and exchanged multiple rounds of letters and emails concerning the Notice. In response to Anthem's concerns, the Government significantly narrowed the scope of the topics. Nonetheless, Anthem still refuses to provide testimony concerning several important and narrowly-tailored topics, either in their entirety or without interposing unreasonable limitations. Anthem should be required to provide testimony concerning these topics without any such limitations. The current versions of the topics at issue as well as the scope of the testimony, if any, Anthem has agreed to provide on each such topic are set out in the table attached hereto as Exhibit B.

Pursuant to Rule 30(b)(6), "when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject." *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 268 (2d Cir. 1999). This representative must "testify about information known or reasonably available to the organization."

Fed. R. Civ. P. 30(b)(6). The corporation "must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997). "[A] Rule 30(b)(6) deposition notice is subject to the limitations under Federal Rule 26—deposition topics should be proportional to the needs of the case, not unduly burdensome or duplicative, and described with reasonable particularity." *Blackrock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14-cv-09371 (KPF) (SN), 2017 WL 9400671, at *1 (S.D.N.Y. Apr. 27, 2017) (internal citations omitted). As explained below, the topics on which the Government seeks testimony meet these standards.

## II. Anthem Must Provide Testimony Concerning the Government's Rule 30(b)(6) Topics, Without Anthem's Improper Limitations

Anthem should be required to provide testimony about each of the topics below.

**Topic c – Anthem Trainings**

This topic concerns training provided to Anthem employees involved in the design, implementation, or operation of Anthem's chart review program. The topic is limited to training regarding Anthem's legal and regulatory obligations with respect to diagnosis codes it submitted to CMS—the core obligations at issue in this lawsuit. The training—or lack thereof—that Anthem provided to employees who operated the chart review program at issue in this case on legal obligations relating to diagnosis codes is directly relevant to whether Anthem acted in reckless disregard of its obligation to delete the diagnosis codes revealed as unsupported through the chart review program. *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 658, 663 (7th Cir. 2024), *aff'd and remanded on other grounds,* 604 U.S. 140 (2025) (holding, in False Claims Act case, that there was a reasonable inference of scienter where, among other things, "[the defendant] did not train its sales representatives on the [relevant legal] rule"). Anthem has agreed to provide testimony on this topic only for the period from June 1, 2013, to March 1, 2017, and only where the training references three specific phrases Anthem has selected. These unilateral limitations are improper and should be rejected.

First, Anthem generally attempts to unilaterally limit its Rule 30(b)(6) testimony to the period from June 1, 2013, through March 1, 2017, on the ground that that period "approximately corresponds to CMS payment years 2013 through 2016 and the approximate beginning of Anthem's Chart Review Program project year 2013 through the end of Anthem's Chart Review Program project year 2016." Ex. C, Anthem's Responses and Objections, at 9-10. But that period does not capture the full period during which the Government alleges Anthem violated the False Claims Act, much less the full period relevant to the Government's allegations. The Government asserts that Anthem submitted false attestations as late as October 2018 that subject it to False Claims Act liability in this case.[1] *See, e.g.*, Ex. D. Further, Anthem began operating the chart

[1] In the Amended Complaint, the Government alleges that, through early 2018, Anthem operated its chart review program in a manner designed to avoid its obligation to identify and delete inaccurately reported diagnosis codes. Compl. ¶¶ 5, 7. In early 2018, Anthem changed the structure of its chart review program to begin identifying diagnosis codes that were not substantiated by its chart review. However, those changes did not apply to the dates of service at issue in this case, and Anthem continued to submit false attestations for the dates of service at issue through October 2018.

review program with its vendor Verscend (which has, at various points, been known as MediConnect, Verisk, and Cotiviti) in 2009. Training provided to Anthem employees concerning Anthem's obligations from that point on is also plainly relevant to the Government's claims, including as to Anthem's scienter. The Court has rejected Anthem's previous attempts to limit its discovery responses to the narrow time period it attempts to impose here. *See, e.g.*, Tr. of Oct. 29, 2024, Conf. at 11:5-16, 13:13-16, 27:5-9 (ordering Anthem to produce documents for the Government's requested period of 2009-2018 and rejecting Anthem's attempt to limit the period to 2013-2017, noting, with respect to the earlier portion of the date range, "wouldn't it be relevant" to have information "in the period when you're formulating the chart review" and, with respect to the later portion, "the complaint does go through 2018" and "[Anthem's] requests go to 2018 as well").

Moreover, there is no basis to limit testimony on this topic to trainings that happen to "reference" the following specific phrases Anthem has cherry-picked: "data submission requirements," "eligibility criteria," or "deletions." These phrases do not capture the scope of Anthem's legal obligations at issue in this case. For example, as Judge Carter noted in denying Anthem's motion to dismiss, "CMS's Part C regulations require [Medicare Advantage Organizations ("MAOs")] to '[a]dopt and implement an effective compliance program, which must include measures that prevent, detect, and correct fraud, waste and abuse.'" Dkt. No. 60, Opinion and Order, at 2 (citing 42 C.F.R. § 422.503(b)(4)(vi)). However, Anthem's limited proposed testimony would not cover any training regarding this requirement. The regulations also require MAOs, as a condition of payment, to the attest to the "accuracy, completeness, and truthfulness" of their risk adjustment submissions based on "best knowledge, information, and belief." 42 C.F.R. §422.504(l). Anthem's limited proposed testimony likewise would not cover training regarding this central requirement.

Anthem has provided no explanation as to why its testimony should be limited in this way. Anthem should be able to provide testimony concerning its own trainings that are relevant to the legal and regulatory obligations at issue in this case, and it has made no showing, nor can it, that providing such testimony would be unduly burdensome. Accordingly, Anthem's unilateral limitations to this topic should be rejected.

**<u>Topics g and h – Anthem's Deletion of Specific Diagnosis Codes</u>**

These topics, as modified and narrowed through the parties' discussions, concern Anthem's decisions as to whether to delete particular diagnosis codes referenced in three specific email chains. Anthem has only agreed to provide testimony as to whether Anthem deleted the diagnosis codes at issue, and has refused to provide any testimony concerning its reasons for deleting or not deleting the diagnosis codes or the medical records it reviewed in reaching that determination.

The Government alleges in this case that Anthem violated the False Claims Act by, among other things, failing to delete diagnosis codes revealed by its chart review to be unsupported. Anthem has asserted various defenses, including that, when its chart reviewers reviewed a beneficiary's medical records and did not find support for a diagnosis code Anthem had previously submitted for that beneficiary for that date of service, Anthem did not know whether the diagnosis code was actually unsupported because there could, theoretically, be other medical records for that beneficiary that did provide support for the diagnosis code but that Anthem did not have in its possession. *See, e.g.*, ECF No. 552 at 14. According to this logic, Anthem could not be obligated to delete a diagnosis code based on review of a single medical record unless it had absolute

certainty that there were no other medical records for the beneficiary, which Anthem was under no obligation to confirm. The Government is entitled to probe whether this defense is actually just a *post hoc* rationalization for Anthem's conduct. In the case of the three emails referenced in these topics, it appears that Anthem may have deleted diagnosis codes based on a single reviewer's review of a single set of medical records, without seeking additional medical records. If Anthem in fact did so, this would undercut the argument Anthem makes here that Anthem did not believe, during the relevant time period, it had an obligation to delete the diagnosis codes when the chart review program underwent the same exact exercise, but on a much larger scale. Testimony about Anthem's reasons for its deletion decisions and what records it reviewed is thus essential to the utility of these topics. Anthem should be required to provide such testimony to the extent possible based on a reasonable inquiry.[2]

**<u>Topic i – Overpayments Policy</u>**

This topic seeks testimony concerning Anthem's Risk Adjustment Overpayments policy. Anthem has again agreed to provide some testimony while attempting to significantly curtail the usefulness of that testimony to the Government.

Anthem's Risk Adjustment Overpayments policy provides that Anthem [redacted] Ex. E. Anthem has agreed to provide testimony concerning (i) its reason for creating the policy; (ii) its understanding of a particular phrase in the policy; and (iii) which employees received the policy or were trained on the policy, but only through March 1, 2017. Anthem has refused to provide testimony concerning subpart (iv), the process and methodology Anthem used to apply the policy.

For the reasons discussed above, *see supra* at 2-3, Anthem's attempt to arbitrarily cut off its testimony at March 1, 2017, is improper. Anthem should also be required to provide testimony concerning subpart (iv), which is necessary to understand how Anthem actually applied the policy in practice. As reflected in Exhibit B, the Government's original topic sought testimony concerning all instances in which a "potentially discrepant diagnoses and/or HCC" was reported pursuant to the policy, communications among compliance personnel pursuant to the policy, and all overpayments returned pursuant to the policy. Anthem objected on the ground that, *inter alia*, this subtopic assumes that Anthem could link particular actions taken by employees to the policy and it would require Anthem to undertake a burdensome analysis. Ex. C at 26. In light of Anthem's objections, the Government revised this subtopic to focus on the overall application of the policy rather than specific actions taken pursuant to it. Anthem should be required to provide testimony on this subtopic, as revised.

**<u>Topic k – Anthem's Two-Way Look Process</u>**

This topic concerns Anthem's process for comparing the results of its chart review program to claims submitted to Anthem by providers to identify diagnosis codes that were unsupported by the medical records, including certain subtopics. Anthem has agreed to provide testimony for a narrowed time period—to which the Government agreed—but refused to provide testimony on

[2] Anthem's offer to provide testimony concerning one example of Anthem's choosing where a diagnosis code was deleted in circumstances unrelated to the three emails the Government identified is not a meaningful attempt to respond to either the Government's original topic or its revised topic.

three of the Government's subtopics: (iii) the total number of employees or contractors involved in operating the process, and the monetary cost or other financial impact of implementing the process; (iv) what activities or operations the process entailed; and (v) whether Anthem developed a written policy or protocol concerning the process, and when, if ever, that policy or protocol was finalized.

As the Government has previously explained, starting in 2017 Anthem developed a process for doing precisely what the Government alleges it should have done sooner: comparing the results of its chart review program to the diagnosis codes previously submitted by providers to Anthem and by Anthem to CMS for the same beneficiaries and dates of service to identify those chart review did not substantiate. Anthem's process for performing this comparison is highly relevant to Anthem's purported defense that it was logistically infeasible to perform this very comparison at earlier points as well as to Anthem's scienter. The Court has recognized that this process is relevant to Anthem's feasibility argument. *See* ECF No. 516 at 5. The process is also relevant to Anthem's scienter, including because the relevant period alleged in the complaint extends into 2018 and Anthem submitted false attestations pertaining to the diagnosis codes at issue in this case in October 2018, *see supra* at 2—long after Anthem began implementing the new process.

The first subtopic on which Anthem refuses to provide testimony is directly relevant to Anthem's feasibility argument, as it seeks to probe how many personnel and what costs were actually involved in operating this supposedly burdensome process. Anthem's refusal to provide testimony on the next subtopic—what activities or operations the process entailed—is puzzling. It is unclear how Anthem could offer meaningful testimony about the process without describing the activities or operations it entailed. Finally, Anthem refuses to provide testimony about whether it ever developed a written policy or protocol concerning the process despite the fact that, at the July 2026 conference, the Court specifically indicated that the Government could obtain information about this issue at its 30(b)(6) deposition. July 7, 2026, Tr. 85:10-86:2. If Anthem never finalized a written policy or protocol laying out the steps of its process, the testimony on this subtopic would so reflect.

<u>**Topic l – Financial Analyses of the Impact of Deleting Unsupported Diagnosis Codes**</u>

This topic concerns analysis of the potential financial impact of submitting deletions based on diagnosis codes that had been submitted to CMS but were not identified by the chart review program and any adjustments to Anthem's revenue forecast based on such potential financial impact. Such testimony is highly relevant because, as one Anthem executive put it, [redacted]. Ex. F. Financial analyses of the impact of deleting diagnosis codes that were not substantiated by chart review show (i) that Anthem was capable of comparing the results of its chart review program to provider-generated diagnosis codes Anthem previously submitted to CMS, revealing the scope of potential overpayments by CMS; and (ii) how Anthem projected deleting such diagnosis codes would impact its revenue.

Anthem has, inexplicably, only agreed to provide testimony concerning analyses performed in 2017, as opposed to the period actually sought by the Government (2009-2018). Anthem seeks to further limit this topic by specifying that it will only provide testimony about such analysis performed in 2017 if it pertains to 2012-2015 dates of service. Anthem has no basis for attempting to limit its testimony in this way. During the parties' meet-and-confer discussions,

Anthem did not explain its attempt to limit this topic to a single year other than by pointing to the fact that there are documents reflecting such analysis from 2017. As the Government explained, however, there are also documents reflecting that such analysis was performed in 2018. *See, e.g.*, Ex. G [redacted]. As discussed above, the relevant period extends to 2018. Further, Anthem's analysis for dates of service other than those for which the Government seeks damages in this case is still relevant to Anthem's knowledge and intent and its feasibility arguments. It also appears, based on documents described in Anthem's privilege log, that such analysis was performed prior to 2017. In any event, if it were true that no responsive analysis was performed in any year other than 2017 there would be no reason for Anthem to preemptively limit its testimony to that one year. The purpose of this topic is for the Government to understand the full set of analyses that Anthem conducted on this highly relevant topic. Anthem should not be permitted to arbitrarily limit the topic to avoid providing relevant testimony.

**Topic o – Comment Grid**

This topic concerns the identity of the person who authored a particular comment in a spreadsheet collecting comments on certain regulations proposed by CMS and any actions taken by Anthem in response. Anthem has agreed to provide testimony only concerning the identity of the person who authored the quoted language but not concerning any actions taken in response to the comment. The Government believes that Anthem's response to one of the Government's interrogatories will likely obviate the need for testimony on the latter subtopic. However, while Anthem served responses and objections to the interrogatories on the Government on August 21, 2026, as the parties had agreed, Anthem's answers to the interrogatories were not signed under oath by Anthem corporate representatives, as required by Federal Rule of Civil Procedure 33. If Anthem provides a signed and sworn answer to the relevant interrogatory, and the substance of the answer is not changed, the Government will withdraw the portion of the topic concerning which Anthem has refused to provide testimony and there will be no dispute on this topic.

**Topic p – Two-Way Chart Review Programs Conducted by Anthem Plans or Subsidiaries**

This topic concerns chart review programs conducted by Anthem plans or subsidiaries where—unlike the corporate chart review program at issue in this case—the chart review resulted in both additions and deletions of diagnosis codes. Anthem documents reflect that [redacted] *See* Ex. H. Anthem's awareness of such programs operated by its own subsidiaries is clearly relevant to both Anthem's knowledge of its obligations in the context of chart review and the feasibility of deleting diagnosis codes based on chart review. Indeed, such programs undercut Anthem's claim that it was not feasible to conduct chart review in this manner, and that Anthem had no reason to believe it was obligated to do so. Anthem has nonetheless refused to provide any testimony on this topic. Anthem has claimed that chart review programs by Anthem subsidiaries are not relevant because the "size and scale" of Anthem's corporate retrospective chart review program is larger than programs conducted by its subsidiaries. But that is irrelevant to whether the existence of the subsidiary's compliant chart review program put Anthem on notice of its own obligation to delete codes in connection with its chart review program. Further, that chart review programs conducted by Anthem subsidiaries may not have been identical in scale to Anthem's corporate chart review program does not render those other programs irrelevant. This is particularly so because Anthem was not required to conduct any corporate chart review program and itself decided how many

charts to review as part of that program. Anthem has provided no valid basis for refusing to provide testimony on this highly relevant topic and should be required to do so.

**Topic q – Medicare Risk Adjustment Policy Committee**

As noticed, this topic sought testimony concerning the membership of Anthem's Medicare Risk Adjustment Policy Committee ("MRAPC"), the function of that committee, and any decisions or guidance from the committee relating to the deletion of diagnosis codes. In the course of the parties' meet and confer discussions, the Government withdrew the first two subtopics and revised the third to focus on the processes, policies, or protocols the MRAPC approved or discussed concerning the deletion of diagnosis codes, and instances in which the committee discussed the deletion of particular sets of diagnosis codes. Anthem refuses to provide testimony even on that narrowed topic.

The MRAPC is Anthem's own policy-setting body. Its decisions concerning deletions bear directly on Anthem's knowledge and intent. The Government alleges that Anthem knew it was obligated to delete diagnosis codes its chart review did not substantiate and chose not to. Compl. ¶¶ 5, 7. Whether the MRAPC approved any process for deleting unsupported codes, and what it decided when it discussed deleting particular sets of codes, is central to that allegation.

None of Anthem's stated objections justifies its refusal to testify about the committee's processes, policies, or protocols concerning deletions. The revised topic describes the testimony sought with reasonable particularity. It is confined to a single committee and a narrow subject, and the Government identified three documents from Anthem's production illustrating the discussions at issue. Anthem suggested that the Government must go further and identify particular policies and deletion decisions and Anthem might then be willing to provide testimony only about those particular policies or decisions. The Government then identified specific relevant documents as examples, but Anthem has still refused to provide any testimony on this topic. At any rate, Anthem's testimony should not be limited to specific documents the Government is able to identify from Anthem's productions. Anthem has never explained what burden it would face in preparing a witness to testify about the work of its own committee on a discrete subject. And Anthem has stated that the MRAPC did not exist before 2015, so the universe of committee deliberations at issue is relatively small by Anthem's own account. Anthem should be required to provide testimony on this topic.

**Topic r – Claims Validation**

This topic concerns instances in which Anthem performed claims validation or an Anthem employee recommended performing claims validation. Anthem does not dispute that it performed claims validation, which involves verifying that medical diagnoses are supported by the patient's medical record, in various contexts other than its chart review program (where it instead turned a blind eye to diagnoses that its review of charts did not substantiate). Anthem's decision to confirm the accuracy of diagnosis codes in other contexts, and to delete or otherwise take action when such diagnosis codes were not supported, is relevant to Anthem's knowledge and intent with respect to the chart review program, as well as to the feasibility of performing such review.

The parties have reached an agreement on the scope of the testimony Anthem will provide on this topic except with respect to the timeframe covered. The Government seeks testimony for the period from June 1, 2009, through December 31, 2018, while Anthem attempts to unilaterally limit its testimony to June 1, 2013, through March 1, 2017. As explained above, Anthem's time

period does not even cover the full period for which the Government seeks damages and penalties for false claims and statements. *See supra* at 2-3. Anthem has never explained why it should be entitled to refuse to provide testimony (or other discovery) past February 2017 when the Government alleges that it failed to delete unsupported diagnosis codes and submitted attestations the Government asserts are false through 2018. Further, while Anthem has stated that it began chart review for 2012 dates of service (the beginning of the range for which the Government alleges False Claims Act liability in its complaint) in June 2013, claims validation Anthem conducted or discussed conducting before then is still relevant to feasibility and Anthem's knowledge and intent. The Court has previously rejected Anthem's attempts to unilaterally limit its discovery responses in this way. *See, e.g.*, Tr. of Oct. 29, 2024, Conf. at 11:5-16, 13:13-16, 27:5-9.

**Topics s and t – Financial Targets and Performance Evaluations**

Topic s concerns productivity goals, quotas, or performance metrics applicable to Anthem employees involved in the development or implementation of the chart review program. Topic t concerns financial goals, quotas, or performance metrics applicable to the program itself. Anthem refuses to provide any testimony in response to either topic. Testimony on these topics is important because Anthem's documents alone do not show how these financial goals, performance metrics and compensation programs operated in practice. For example, the compensation plans state their terms in general form. They do not show which categories of employees involved with the chart review program were subject to them or how Anthem applied them—for example, how performance against revenue targets was evaluated, and what that evaluation meant for an employee's compensation. Only an Anthem witness can answer those questions. Nor has Anthem explained what burden it would face in preparing a witness, and it is difficult to see one: these topics relate to a single program, the employees who worked on that program, and compensation plans Anthem has already produced. Anthem should be required to provide testimony on these topics.

Further, this testimony is relevant to Anthem's scienter. As discussed above, [redacted]. *See* Ex. F. Anthem's revenue targets for the program and how Anthem tracked its performance against those targets and compensated employees based on whether Anthem met them bear directly on why Anthem operated a program that added diagnosis codes but never deleted them. That is especially so for the employees responsible for ensuring that the program complied with CMS requirements. If the employees charged with compliance were themselves paid based on the revenue the program generated (and not based on ensuring the accuracy of diagnosis data), they had a financial incentive to avoid recommending processes that would result in the deletion of diagnosis codes.

Anthem has never explained in detail what it finds objectionable about these topics. Anthem told the Government that if the Government identified specific performance reviews or compensation policies that have been produced, Anthem would consider providing testimony about those materials. As reflected in Exhibit B, the Government then did exactly that, replacing both topics with narrowed ones anchored to four named Anthem compensation plans and to documents from Anthem's own production reflecting the financial targets at issue. Anthem refused to agree to the narrowed topics, without identifying anything that remained deficient and without proposing an alternative.

We thank the Court for its consideration of this submission.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: *<u>/s/ Rachael Doud</u>*
PIERRE ARMAND
PETER ARONOFF
RACHAEL DOUD
HARRY FIDLER
ADAM GITLIN
CHARLES JACOB
DANA WALSH KUMAR
Assistant United States Attorneys
86 Chambers Street, 3rd Floor

cc: Counsel of record (via ECF)