O'Melveny

O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006-4061

T: +1 202 383 5300
F: +1 202 383 5414
omm.com

File Number:

November 13, 2026

**K. Lee Blalack II**
D: +1 202 383 5374
lblalack@omm.com

**VIA ELECTRONIC DELIVERY AND COURT FILING**

The Honorable Katharine H. Parker
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 750
New York, New York 10007

**Re: *United States of America v. Anthem, Inc.*, 1:20-cv-02593-ALC-KHP**

Dear Judge Parker:

We represent Defendant Anthem, Inc. ("Anthem") in the above-referenced action. We provide herein Anthem's position on the disputes identified in the parties' letter to the Court dated November 10, 2026 (Dkt. 611).[1]

## I. Plaintiff Has Offered No Justifiable Basis to Seek Relief From This Court's Order Requiring Plaintiff to Identify Each and Every Allegedly False Diagnosis Code or Overpayment.

As the Court is aware, Plaintiff's theory of falsity has evolved during this False Claims Act ("FCA") litigation. But while Plaintiff has recently stated to Anthem and the Court that it is abandoning its initial theory of falsity as a matter of prosecutorial discretion, and has asked Anthem to agree to release it from its Court-ordered obligations to identify its full list of allegedly false diagnosis codes related to that theory, Plaintiff has refused to stipulate that it will not pursue that theory in the future. But just as Plaintiff has changed its theory before, it could easily do so again. And as long as Plaintiff reserves the right to reassert its prior theory of liability, it must meet its obligations to provide Anthem with the basic information necessary for Anthem to defend against those allegations.

Under the theory of falsity that Plaintiff originally alleged in the Amended Complaint, any diagnosis code that a healthcare provider submitted to Anthem—and that Anthem passed along to the Centers for Medicare and Medicaid Services ("CMS")—but was not later reported to Anthem by the vendor conducting Anthem's retrospective chart review of the medical record for the same encounter was necessarily false. Am. Compl. (Dkt. 26) ¶¶ 130-33, 154. Plaintiff's theory of falsity was based on the contention that a mere mismatch between a chart review coder's report and a

[1] The letter identified a dispute regarding the scope and timing of Anthem's supplemental response to Plaintiff's Second Set of Interrogatories. Following submission of that letter, the parties resolved that dispute by agreement. Anthem therefore does not address that dispute here.

provider's previously submitted diagnosis would be sufficient proof to establish that the diagnosis is false under the FCA ("the Mismatch Theory"). *Id.* That Mismatch Theory thus relied exclusively on the results of a comparison between the diagnosis codes reported by the treating providers and the diagnosis codes reported for those same encounters by coders conducting Anthem's retrospective chart reviews, not on an examination of the underlying medical records documenting the actual encounters.

Plaintiff repeatedly reaffirmed its commitment to this Mismatch Theory and insisted that it did not require proof from medical records to establish the falsity of the at-issue diagnosis codes. *See* July 23, 2024 Tr. 25:12-26:25 ("[Plaintiff's] case is that [Anthem] failed to delete codes that [it] recognized through that [chart review] program were unsupported." . . . "[I]t is our position that Anthem's own [] coder's [] determination that [a code] was unsupported . . . is sufficient evidence to show falsity."); Pl.'s Sept. 12, 2023 Ltr. (Dkt. 126) at 2 ("The universe of . . . false diagnosis codes consists of all . . . codes where Anthem's chart review program did not identify a submitted code as supported . . . ."); Jan. 9, 2024 Tr. 24:21-43:3 (Plaintiff affirming to the Court it does not need medical records to prove falsity because it is relying on the findings of Anthem's own chart review coders).

In response to Anthem's repeated requests, Plaintiff eventually agreed to identify to Anthem the list of diagnosis codes that it alleged were false based on a data analysis that it conducted using Anthem data (the "Mismatch Analysis"). *See, e.g.*, Ex. A (Pl.'s June 15, 2023 Ltr.) (stating Plaintiff "is willing to identify specifically all such Unsupported Diagnosis Codes for Anthem once" Plaintiff's data analysis was complete). Having this list of specific codes is essential for Anthem to defend itself against this Mismatch Theory because Anthem requires that information to develop rebuttal evidence in response. Plaintiff contends that Anthem has not conducted meaningful rebuttal discovery since receiving its list; that is incorrect. Anthem has developed factual and expert evidence associated with these codes. *See, e.g.*, Ex. F (Anthem's Third Supplemental Rule 26 Disclosures) at 52 ¶ 19. But this is not simply a question of rebuttal discovery; Anthem cannot guess, from a list of codes Plaintiff ***might*** contend are false at trial, which codes Plaintiff ***actually*** contends are false, and is entitled to know the specific allegations against it.

With that in mind, over two years ago in July 2024, the Court first ordered Plaintiff to disclose its full list of allegedly false diagnosis codes. Dkt. 243. Based on Plaintiff's representations at the time that identifying the at-issue codes via the Mismatch Analysis would take "a few months," the Court set a December 30, 2024 deadline, emphasizing to Plaintiff that "by the end of the year, you really should know . . . what are the . . . actual instances of falsity." July 23, 2024 Tr. 8:2-4, 46:8-11.

Just weeks before that December 2024 deadline, however, Plaintiff sought its first extension request, seeking three more months to supply that list. Dkt. 279. Two more extension requests followed (Dkts. 311, 344) before Plaintiff finally produced its first iteration of the list in May 2025. Almost immediately thereafter, Plaintiff informed Anthem that it needed to serve a revised list, subsequently asking for two more extensions for *that* list (Dkts. 378, 378) before serving the second list in August 2025. But even before that second version of the list was served, Plaintiff informed Anthem that the list would not be final and that it intended to serve yet a *third* list, ultimately agreeing that it would serve a "final list of allegedly false diagnosis codes or allegedly false claims for payment or overpayments by December 5, 2025." Ex. B (Pl.'s Dec. 2, 2025 Email) at 2. The Court subsequently adopted this deadline in its December 22, 2025 Scheduling Order

O'Melveny

(Dkt. 425, the "December 22, 2025 Order"). Notwithstanding this Court-ordered deadline, Plaintiff recently served a ***fourth*** version of the list of allegedly false codes (the "Alleged False Code List") on October 29, 2026. But even before that fourth list was served, Plaintiff admitted to the Court that this new list did not represent a final list of diagnosis codes that Plaintiff actually alleges are false. Oct. 15, 2026 Tr. 46:17-47:6.

The reason Plaintiff no longer considers even this fourth list a final list of allegedly false diagnosis codes is because, in the two years it has taken to generate this list, Plaintiff has shifted its theory of falsity away from the Mismatch Theory and is instead planning to prove falsity by reviewing a sample of medical records involving approximately 400 diagnosis codes ("the Sample") and then extrapolating an alleged "error rate" across the larger list of approximately 200,000 diagnosis codes that are identified on the Alleged False Code List ("Extrapolation Analysis"). Plaintiff has further explained that it intends to prove this Extrapolation Analysis by presenting expert testimony using statistical methods to establish the falsity of ***unspecified*** diagnosis codes on the Alleged False Code List based on the alleged error rate that its coders report from a review of medical records associated with the Sample.[2] As Plaintiff represented during the October 15, 2026 case management conference, the Alleged False Code List "basically represents the mismatch analysis between, you know, what Anthem submitted to CMS for payment and the results of Anthem's chart review," (Tr. 39:17-20), but Plaintiff will not attempt to "prove [its] case" by asserting that all of the diagnosis codes reflected on the Alleged False Code List are actually false or an overpayment under the FCA. *Id*. 46:17-47:6.

Because even Plaintiff believes that its Extrapolation Analysis will prove that many of the diagnosis codes on the Alleged False Code List ***are in fact*** documented in the underlying medical records, Plaintiff concedes that the list it has provided to Anthem is overinclusive. Thus, at present, Plaintiff does not intend to prove that all of the codes on the Alleged False Code List are false under the FCA. And Plaintiff has informed Anthem that it does not intend to ever specify which of the diagnosis codes outside the Sample are in fact false so that Anthem knows which are at issue and which are not for trial.

Because Plaintiff has chosen to rely on the Extrapolation Analysis to prove falsity rather than the Mismatch Analysis, Plaintiff will never identify to Anthem the codes outside of the Sample that it contends are undocumented in the medical records. It will not do so in expert reports. It will not do so at summary judgment. And it will not do so at trial. Yet, it will seek to hold Anthem liable under the FCA for some number of those diagnosis codes outside of the Sample that it will not specify are false. By its plain terms, the Court's December 22, 2025 Order precludes Plaintiff from proceeding to trial based on diagnosis codes that have not been specifically identified as false, and Plaintiff recognizes this vulnerability. Accordingly, Plaintiff now seeks relief from the December 22, 2025 Order and asks that it be excused from ever having to identify to Anthem each and every diagnosis code that Plaintiff actually contends is false in this case.

Anthem submits that no plausible reading of either the December 22, 2025 Order or the Federal Rules allows Plaintiff to assert FCA causes of action without ever informing Anthem of each specific diagnosis code that Plaintiff contends is false and then proving that falsity at trial. Nevertheless, Anthem recognizes that the legal and factual sufficiency of Plaintiff's Extrapolation

[2] As previously explained, Anthem will object to Plaintiff's effort to prove falsity under the FCA by way of sampling and statistical extrapolation, which is not permitted by caselaw. *See, e.g.*, *U.S. ex rel. Michaels v. Agape Senior Cmty., Inc.*, 2015 WL 3903675, at *8 (D.S.C. June 25, 2015).

Analysis and Plaintiff's burden of proof go to the fundamental merits of this case; those disputes therefore are more suitably resolved later in the litigation by Judge Carter rather than in the context of a discovery dispute.

But the fundamental problem still remains that Plaintiff's theory of falsity, having shifted already, could easily shift back again. Plaintiff has insisted that this change in tactics is a matter of "prosecutorial discretion." Sept. 15, 2026 Tr. 206:13-18. But Plaintiff cannot rely on prosecutorial discretion as a justification to avoid its discovery obligations while still retaining full optionality to reverse that discretion at a later date, reasserting its original theory of falsity without ever specifying each of the diagnosis codes that it contends are false.

In an effort to resolve this dilemma without burdening the Court, Anthem proposed a stipulation whereby Plaintiff would stipulate to the positions it ***had already taken*** in meet and confers with Anthem and in statements to the Court—namely, (1) that Plaintiff would not argue or offer evidence at summary judgment or trial that its Mismatch Analysis was sufficient evidence to establish liability under its FCA causes of action; (2) that it would not argue or offer evidence at summary judgment or trial that any particular diagnosis codes, other than the codes in its Sample, were false; and (3) Anthem would in turn stipulate that it would not argue that Plaintiff did not comply with the Court's December 22, 2025 Order by failing to identify each diagnosis code that Plaintiff alleges is false. *See* Ex. C (Proposed Stipulation).

This proposed stipulation should be money for nothing from Plaintiff's perspective; it simply prompts Plaintiff to stipulate to what Plaintiff has already said to this Court. And in return for that assurance, Anthem would agree to forgo any argument that Plaintiff failed to comply with the December 22, 2025 Order. But Plaintiff has inexplicably refused the proposed stipulation, without explanation. The only plausible rationale is that, contrary to its representations to Anthem and the Court, Plaintiff seeks to retain the option to someday re-assert its abandoned Mismatch Theory of falsity. Anthem submits that if Plaintiff wishes to retain that option, it must comply with the December 22, 2025 Order. After a decade of investigation and litigation, and three years of discovery, the time has come for Plaintiff to decide on how it wishes to prove its case. If Plaintiff is unwilling to do so, then it must fully comply with the Court's December 22, 2025 Order.

## II. Plaintiff Is Not Entitled to Endless Examination Time Under Federal Rule of Civil Procedure 30(b)(6).

Federal Rule of Civil Procedure 30(d)(1) is clear: absent court order or the parties' agreement, "a deposition is limited to one day of 7 hours." And the Committee Notes for Rule 30 are explicit that this applies even to depositions of corporate parties under Rule 30(b)(6); in that instance, "for purposes of this durational limit, the deposition of each individual designated under Rule 30(b)(6) should be treated as a separate deposition." Those same Committee Notes state that a "party seeking a court order to extend the examination . . . is expected to show good cause to justify such an order." The parties adopted that same time limit in this Court's May 30, 2025 Stipulation and Order, which provides that "[n]o direct examination of a fact witness shall exceed seven hours, unless otherwise agreed by the Parties," and that any enlargement of time requires agreement or good cause consistent with Rule 30. Dkt. 354 ¶¶ 4-5. That stipulation otherwise makes clear that it is intended to apply to the parties' Rule 30(b)(6) depositions. *See, e.g.*, ¶ 1 (expressly noting that deposition limit is inclusive of Rule 30(b)(6) depositions). Despite this plain language,

Plaintiff has insisted that ***no*** fixed time limit apply to any deposition of Anthem's Rule 30(b)(6) designees, including extending these depositions across more than one day if necessary. Plaintiff's position leaves no defined endpoint for its examinations. The Court should reject Plaintiff's efforts to extend these depositions beyond a single day and confirm that Rule 30's presumptive one-day, seven-hour limit applies here.

During the parties' meet and confer, Plaintiff complained that it had no control over the number of topics that particular individual designees would cover. But Anthem simply separated topics into operational, compliance, and finance groupings for efficiency and to ensure that the witness had the appropriate background to be able to prepare for and testify about those topics. And Plaintiff implemented a similar split. For example, on November 18, 2026, Plaintiff will designate a single witness to testify responsive to seven different topics in Anthem's Rule 30(b)(6) notice—the exact same number of topics for which Anthem will provide testimony in any single day in response to Plaintiff's Rule 30(b)(6) notice. *Compare* Ex. E (Anthem Email to Pl.) at 1, 5 (listing topics by day) *with* Ex. D (Pl. Email to Anthem) at 1, 8 (same). The difference is that the seven topics Plaintiff assigned to a single witness represent ***70%*** of the total number of Anthem's Rule 30(b)(6) topics, whereas Anthem has not assigned more than approximately 40% of Plaintiff's topics to any witness. In any event, the parties agreed to their Rule 30(b)(6) deposition schedules weeks ago, and Plaintiff has been aware since then that certain topics would be covered on specific days. Plaintiff thus knew for the past month the volume and categories of topics that would fall on each specific day. But until last week, Plaintiff never raised any concern with those groupings or that it may not be able to complete any witness examination in a single, seven-hour day. It has identified no witness, topic, or circumstance demonstrating that seven hours of on-the-record examination time would be insufficient; it certainly has not shown the good cause that Rule 30 requires to justify extending the presumptive limits.

Despite Plaintiff having no legal basis or identified justification for ignoring Rule 30's time limit, Anthem—in an effort to be accommodating—sought to address Plaintiff's concern by proposing that the parties have 7.5 hours of on-the-record time for each day of Rule 30(b)(6) testimony. Plaintiff refused this accommodation and for the first time today—after Anthem has already completed multiple depositions of Plaintiff's Rule 30(b)(6) designees—proposed that the parties each have 21 hours of on-the-record examination time for all Rule 30(b)(6) testimony but that they have the freedom to allocate that time to require a single designee to return for a second day of questioning. This position has no basis in Rule 30 and would impose an undue burden on the witnesses who would have to alter their schedules to accommodate a second day of testimony. Plaintiff itself recognizes this; Plaintiff has steadfastly ***refused*** to allow one of Plaintiff's own designated witnesses to sit for even a full seven-hour day of deposition on the grounds that it is disruptive to the witness's schedule. *See* Ex. D at 1. These depositions are slated to be completed next week and the witnesses have already arranged their professional and personal schedules to accommodate the deposition dates that the parties negotiated. It is unreasonable to alter those expectations at this late date, particularly when Plaintiff has identified no specific topic or witness who would be expected to return for a second day of testimony. The Court should therefore confirm that Rule 30's presumptive seven-hour limit governs each day of the parties' examinations under Rule 30(b)(6).

Anthem thanks the Court for its consideration of these requests.

Dated: November 13, 2026

Respectfully submitted,

By: */s/ K. Lee Blalack, II*

K. LEE BLALACK, II, *Pro Hac Vice*
ANWAR GRAVES, *Pro Hac Vice*
WILLIAM BUFFALOE, *Pro Hac Vice*
BRIAN D. BOYLE
BENJAMIN D. SINGER
RAHUL KOHLI, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
lblalack@omm.com
agraves@omm.com
wbuffaloe@omm.com
bboyle@omm.com
bsinger@omm.com
rkohli@omm.com

JAMES A. BOWMAN, *Pro Hac Vice*
ADAM LEVINE, *Pro Hac Vice*
HANNAH E. DUNHAM, *Pro Hac Vice*
SHELBY A. CUMMINGS, *Pro Hac Vice*
ELIZABETH ARIAS GRAY, *Pro Hac Vice*
JARED GINSBURG, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
jbowman@omm.com
alevine@omm.com
hdunham@omm.com
scummings@omm.com
earias@omm.com
jginsburg@omm.com

DAVID DEATON, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

ddeaton@omm.com

CHRISTOPHER P. BURKE, *Pro Hac Vice*
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
cburke@omm.com

JOHN MARTIN, *Pro Hac Vice*
HEYWARD BONYATA, *Pro Hac Vice*
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
1320 Main Street, 17th Floor
Columbia, South Carolina 29201
Telephone: (803) 255-9655
john.martin@nelsonmullins.com
heyward.bonyata@nelsonmullins.com

*Attorneys for Defendant Anthem, Inc.*

cc: Assistant United States Attorney Peter Max Aronoff, Esq.
Assistant United States Attorney Charles Salim Jacob, Esq.
Assistant United States Attorney Adam M. Gitlin, Esq.
Assistant United States Attorney Dana Walsh Kumar, Esq.
Assistant United States Attorney Rachael Doud, Esq.
Assistant United States Attorney Pierre Armand, Esq.
Assistant United States Attorney Harry Fidler, Esq.
Trial Attorney Martha Glover, Esq.